UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILE COPY

-------------------------------------------------------------------------X

DARRYL T. COGGINS,

                Plaintiff,

DOCKET NO.: 07-CV-3624
(JFB)(AKT)

- against -

COUNTY OF NASSAU, NASSAU COUNTY POLICE
DEPARTMENT, POLICE OFFICER JAMES VARA , in
his individual and official capacity, and POLICE OFFICER
CRAIG BUONORA , in his individual and official capacity,
and JOHN DOES "1-10", in their individual and official capacity,

                Defendants.

-------------------------------------------------------------------------X

## DECLARATION OF VALERIE M. CARTRIGHT
## IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS

**I, VALERIE M. CARTRIGHT** declare under the pains and penalties of perjury, pursuant to 28 U.S.C. Section 1746, that the following statements are true an correct, to the best of my knowledge:

1.     I am one of the attorneys representing Plaintiff DARRYL T. COGGINS. I submit this Declaration in support of Plaintiff's Memorandum of Law and Supporting Papers in Opposition to Defendants' Motion for Summary Judgment and Motion to Dismiss the Claims of Plaintiff.

2.     Attached as Exhibit A is a true and accurate copy of *Nassau County Police Department Latent Fingerprint Section Report*, dated October 18, 2004

3.     Attached as Exhibit B is a true and accurate copy of transcript of Grand Jury Testimony conducted on March 17, 2005.

4.     Attached as Exhibit C is a true and accurate copy of Coggins' *Demand the District Attorney Present Witnesses and Submit Charges Against Police Officer Vara*, dated March 17, 2005

5.   Attached as Exhibit D is a true and accurate copy of *Indictment No. 0663N-05*

6.   Attached as Exhibit E is a true and accurate copy of *Floral Park Police Department Narrative of assistance to Nassau County Police Department foot pursuit, on October 9, 2004*

7.   Attached as Exhibit F is a true and accurate copy of *Certificate of Disposition Dismissal of Indictment No.: 0663N-05.*

8.   Attached as Exhibit G is a true and accurate copy of *Nassau County District Court Felony Complaint,* dated October 10, 2004.

9.   Attached as Exhibit H is a true and accurate copy of *Plaintiff's Third Party Complaint dated November 7, 2012..*

10.   Attached as Exhibit I is a true and accurate copy of *the Court's June 20, 2008 decision on Defendant Buonora's Motion for Summary Judgment/Motion to Dismiss.*

Dated: Hempstead, New York
       July 26, 2013

                                        Respectfully submitted,

                                        LAW OFFICES OF
                                        FREDERICK K. BREWINGTON

By:

                                        VALERIE M. CARTRIGHT (VC7327)
                                        *Attorneys for Plaintiff*
                                        556 Peninsula Boulevard
                                        Hempstead, New York 11550
                                        (516) 489-6959

EXHIBIT A

MAR. 3.2005  12:34PM             NO.220    P.1/2

# SUPPLEMENTARY
## POLICE DEPARTMENT, COUNTY OF NASSAU, NEW YORK

### LATENT FINGERPRINT SECTION REPORT

PDCN 35c

DATE 10/18/2004

REFERENCE Case Report Number 204 CR 82564 (Possession of Weapon)
· Detective Barnych - Third Squad

SUBJECT OF EXAMINATION One Magazine
               Five .380 Auto Cartridges from Magazine



GRAND JURY
EXHIBIT
9 ew
3/17/05 PS

\*RESULTS The above evidence was processed and evaluated and had no identifiable latent impressions present.

The evidence was placed in the Main Office Evidence Locker Number 52 at 1915 Hours, this date directed to the Forensic Evidence Bureau Firearms Section.

☐ \*Evidence will be returned.

☐ \*Forward completed PDCN Form 106 - Property Bureau Invoice to the Latent Fingerprint Section in order that the evidence may be invoiced to the Property Bureau.

I hereby certify that I am a public servant of the County of Nassau, New York, and I am employed as a Latent Fingerprint Technician. This report was made by me in the normal course of my duties and I performed the fingerprint examination stated in the report. I understand that any false statements made herein are punishable as a Class A Misdemeanor pursuant to Section 210.45 of the Penal Law of the State of New York.

| DATE | SIGNATURE OFFICER PERFORMING EXAMINATION | SERIAL NO. | SECTION SUPERVISORS INITIALS | COMMANDING OFFICER INITIALS |
|------|------------------------------------------|------------|------------------------------|------------------------------|
| 10/18/2004 | Det. E. Baehr | 5539 | DGL ○○ | |

# EXHIBIT B

5

1                    March 17, 2005

2       you a fuller -- the full definition of the law

3       at the close of all the evidence.

4               And I'll call my first witness,

5       Police Officer Vara.

6               (The witness entered the Grand Jury

7       chamber.)

8               MS. PLOTKIN:  If you would step into

9       the witness box, remain standing, raise your

10      right hand, face the Grand Jury foreperson and

11      be sworn in.

12              THE FOREPERSON:  Do you swear that

13      the evidence you shall give to the Grand

14      Inquest upon this Complaint against Darryl

15      Coggins shall be the truth, the whole truth and

16      nothing but the truth, so help you God?

17              THE WITNESS:  I do.

18              MS. PLOTKIN:  Please be seated.

19              THE WITNESS:  (Complying.)

20      EXAMINATION BY

21      MS. PLOTKIN:

22          Q    Officer Vara, if you would state your

23      name, spell your full name and give your rank,

24      shield and command for the record.

25          A    Officer James Vara, J-A-M-E-S, V-A-R-A.

6

1      March 17, 2005

2           Shield number 2526, Third Precinct.

3      Q      Officer Vara, how long have you been a

4    member of the Nassau County Police Department?

5      A      Seven-and-a-half years.

6      Q      What is your present assignment?

7      A      I'm assigned to the highway patrol

8    bureau.

9      Q      On October 9th, 2004, what was your

10   assignment?

11     A      I was assigned to the Third Precinct,

12   post 318.

13     Q      What was your specific assignment?

14     A      Routine patrol.

15     Q      I'll direct your attention again to

16   October 9th, 2004, at approximately 4:30 in the

17   morning.

18          Were you working on that date and time?

19     A      Yes, I was.

20     Q      What was your tour of duty?

21     A      1900 to 0700.

22     Q      Can you tell the Grand Jurors whether you

23   were in a marked or unmarked police car?

24     A      Marked.

25     Q      Were you in uniform or plain clothes?

7

1                **March 17, 2005**

2        A       Uniform.

3        Q       Were you working alone or with a partner?

4        A       Alone.

5        Q       Still keeping your attention on October

6    9th, 2004, at approximately 4:30, tell the Grand

7    Jurors what, if anything, attracted your attention.

8        A       I observed a black Mazda operating at a

9    high rate of speed, approximately fifty-five miles

10   an hour in a thirty-five mile an hour zone,

11   westbound on Jericho Turnpike in New Hyde Park.

12       Q       That's a public roadway that you observed

13   the vehicle operating?

14       A       Yes, it is.

15       Q       Just so the record is clear, this is in

16   the County of Nassau, State of New York?

17       A       Yes.

18       Q       It's your testimony that you observed a

19   black Mazda traveling at a high rate of speed?

20       A       Yes.

21       Q       Did that vehicle bear the registration,

22   New York registration of CRJ7395?

23       A       Yes, it did.

24       Q       Did you make an estimate as to the speed

25   of that vehicle?

8

March 17, 2005

1

2     A      Yes, I did, an independent speed

3  estimate, as well as a calibrated speed estimate

4  with my speedometer while I was pacing the vehicle.

5     Q      With respect to your independent speed

6  estimate, what estimate did you arrive at?

7     A      He was operating about fifty-five miles

8  an hour.

9     Q      What was the speed zone in that area?

10    A      Thirty-five.

11    Q      Did you see the black Mazda pass a posted

12 speed sign?

13    A      Yes.

14    Q      That speed sign was what?

15    A      Thirty-five miles an hour.

16    Q      That was a visual estimate that you just

17 described?

18    A      Yes.

19    Q      How long did it take you to arrive at

20 that visual or make that estimate with respect to

21 the estimate?

22    A      Approximately a half a mile.

23    Q      You observed the vehicle for

24 approximately half a mile?

25    A      Yes.

VERITEXT/NEW YORK REPORTING COMPANY, LLC
212-267-6868                                    516-608-2400

9

**March 17, 2005**

1

2    Q    And you said you also made a calibrated

3 speed estimate?

4    A    Yes.

5    Q    Can you explain to the members of the

6 Grand Jury what that is?

7    A    The police cars, the speedometers are

8 calibrated in police cars.

9         The records are maintained by the police

10 department so you know in the vehicles, the vehicles

11 are calibrated, so at that speed, that's the speed

12 that you're actually going.

13    Q    Can you explain to the Grand Jurors how

14 you arrived at a calibrated speed estimate?

15         What do you do to arrive at that number?

16    A    You drive behind the vehicle that you're

17 pacing for an estimated time, and that's how you

18 determine how fast that car is actually traveling.

19    Q    You're observing your speedometer in the

20 process?

21    A    Yes.

22    Q    Is it called pacing?

23    A    Yes.

24    Q    Do you pace the vehicle?

25    A    Yes.

10

1                    **March 17, 2005**

2        Q      How long did you pace the vehicle?

3        A      Approximately half a mile.

4        Q      Do you have any training in speed

5    estimation, Officer?

6        A      Yes.

7        Q      Are you certified?

8        A      Yes.

9        Q      Do you know your rate of accuracy?

10       A      Plus or minus two miles an hour.

11       Q      Did there come a time, Officer, that you

12   stopped the vehicle?

13       A      Yes.

14       Q      How is it that you stopped the vehicle?

15       A      I turned on my emergency lights and

16   siren, and he pulled over to the right-hand side of

17   the road.

18       Q      He complied immediately --

19       A      Yes.

20       Q      -- with the vehicle?

21       A      Yes, right away.

22       Q      Once the vehicle stopped, did you

23   approach the vehicle?

24       A      Yes, I did.

25       Q      How many occupants did you observe?

11

1        **March 17, 2005**

2        A       Three.

3        Q       Where were the occupants positioned?

4        A       There was a driver, a passenger in the

5    front seat, and a passenger behind the driver.

6        Q       Did you approach the driver of the

7    vehicle?

8        A       Yes, I did.

9        Q       What, if anything, did you notice with

10   respect to the driver?

11       A       I observed he had a strong odor of

12   alcoholic beverage on his breath, glassy, bloodshot

13   eyes and slurred speech.

14       Q       Where were you in relation to the driver

15   when you made these observations?

16       A       I was right at his driver's window.

17       Q       Was the window up or down?

18       A       Down.

19       Q       How would you describe the weather that

20   night?

21       A       It was clear, nice night.

22       Q       Was it windy at all?

23       A       No.

24       Q       Did you ask the defendant for his

25   license?

12

1                        March 17, 2005

2          A     Yes.

3          Q     Did he provide anything?

4          A     Yes, he did.

5          Q     He provided a license?

6          A     He provided a New York State driver's

7     license.

8          Q     Did that license contain a photograph?

9          A     Yes.

10         Q     Did you compare the characteristics on

11    the photograph with the person seated in the

12    driver's seat?

13         A     Yes.

14         Q     Were you confident that they were the

15    same individual?

16         A     Yes, I was.

17         Q     What was the name of the individual on

18    the license?

19         A     Darryl Coggins.

20         Q     Did he have a date of birth of January

21    25th, 1981?

22         A     Yes.

23         Q     Did you ask the defendant if he had been

24    drinking?

25         A     Yes, I did.

13

1                        March 17, 2005

2        Q        What, if anything, did he tell you?

3        A        He said he had two Coronas.

4                        JUROR:  Can you just push the mike

5        over a little bit.

6                        THE WITNESS:  Is this better?

7                        JUROR:  Yes.  You speak a little

8        low.

9        Q        You had asked him if he had been

10       drinking?

11       A        Yes.

12       Q        He had responded?

13       A        He stated two Coronas.

14       Q        Did you ask him where he was coming from?

15       A        He stated he was picking up the passenger

16       in the rear seat from Garden City Park.

17       Q        What, if anything, happened next?

18       A        I had asked him to exit the vehicle.

19       Q        Did he exit the vehicle?

20       A        Yes.

21       Q        What, if anything, did you notice about

22       the defendant when he exited the vehicle?

23       A        He was staggering as he walked.

24       Q        Where were you now in relation to the

25       defendant?

14

March 17, 2005

1

2      A      I backed up with him and we went up onto

3  the sidewalk.

4      Q      Within a few feet of the defendant at

5  this point?

6      A      About two feet.

7      Q      How is the lighting in the area?

8      A      Dark.  Lighted roadway.

9      Q      What happened then?

10     A      I had administered standardized field

11  sobriety tests.

12     Q      Can you tell the members of the Grand

13  Jury what standardized field sobriety tests are?

14     A      Tests to determine -- it's a divided

15  attention test.  It's to determine the person's

16  intoxication through alcohol or drug.

17     Q      Have you had any training in the

18  recognition of intoxicated persons?

19     A      Yes.

20     Q      What is that training?

21     A      It's done through the police academy.

22     Q      How many DWI arrests or assists have you

23  made during your career?

24     A      Well over a hundred.

25     Q      Turning your attention again to the

15

1                    March 17, 2005

2    standardized field sobriety tests, did you ask the

3    defendant to perform any of these tests?

4         A    Yes, I did.

5         Q    Did you perform these tests?

6         A    Yes.

7         Q    Which test did you give?

8         A    I did the one-legged stand and nine-step

9    walk-and-turn.

10        Q    With respect to the one-legged stand,

11   what instructions did you give the defendant?

12        A    They're advised to stand on one leg, the

13   other leg approximately six inches off the ground,

14   looking at the foot that's off the ground, and

15   they're counting to thirty, using 1,000.  They're

16   not supposed to use their arms to balance or put

17   their foot down.  And if they put their foot down,

18   to determine if they can listen to the examples that

19   I gave them, and to put their foot down is to

20   determine if they are intoxicated.

21        Q    A demonstration of the test was given to

22   the defendant?

23        A    Yes, as instructions were given.

24        Q    To the best of your recollection, how did

25   the defendant perform?

16

1              March 17, 2005

2       A       He performed with positive results,

3  meaning that there was alcohol present.

4       Q       That was your opinion, based upon his

5  performance?

6       A       Yes.

7       Q       You said you had also given the nine-step

8  walk-and-turn?

9       A       Yes.

10      Q       What instructions were given with respect

11 to that test?

12      A       It's to walk on a straight line nine

13 steps, looking at your feet, touch heel to toe,

14 touching feet heel to toe.

15              When you reach nine steps, to turn around

16 and I instruct how to turn around, and he's to walk

17 back the same way.

18      Q       Was any demonstration provided for the

19 defendant?

20      A       Yes, it was.

21      Q       How did the defendant perform here?

22      A       He performed positive results again.

23      Q       Meaning?

24      A       That alcohol was present.

25      Q       Based upon your opinion?

17

March 17, 2005

1

2        A      Yes.

3        Q      Do you remember anything specifically

4    with respect to his performance?

5        A      No.   I can't recall.

6        Q      Officer, have you attended social

7    functions where alcohol is served?

8        A      Yes.

9        Q      Have you observed people consuming

10   alcohol at these functions?

11       A      Yes.

12       Q      Officer, based on your training and

13   experience, as well as your personal experience and

14   the defendant's performance on the standardized

15   field sobriety tests, what, if any, opinion did you

16   form as to the defendant's sobriety or intoxication

17   on October 9th, 2004, at approximately 4:30?

18       A      It was my opinion that he was

19   intoxicated.

20       Q      During the course of administering the

21   standardized field sobriety tests, did anyone else

22   arrive at the scene?

23       A      My assistance officer, Officer Buonora.

24       Q      Just so the record is clear, with respect

25   to the defendant, your opinion as to the defendant's

18

1                    March 17, 2005

2     intoxication, what did you base that opinion on,

3     what factors?

4          A     On the odor of alcoholic beverage on his

5     breath, glassy, bloodshot eyes, as he was swaying

6     and staggering as he was out of his vehicle, and the

7     tests that I performed.

8          Q     You had said during the course of the

9     standard field sobriety tests Officer Buonora had

10    arrived at the scene?

11         A     He responded after, when I was -- when I

12    had just completed the test.

13         Q     At the conclusion of the test, Officer

14    Buonora arrived?

15         A     Yes.

16         Q     How did he arrive at the scene?

17         A     Via RMP.

18         Q     What, if anything, happened when Officer

19    Buonora arrived at the scene?

20         A     At that point, I had advised the

21    defendant that I was placing him under arrest.  And

22    at that point, he became agitated, and he had

23    started to run eastbound on Jericho Turnpike.

24         Q     When you say "agitated," can you tell the

25    members of the Grand Jury what you mean by that?

19

1                          March 17, 2005

2        A     He started asking, what's going on, you

3    know, what are you guys doing here?  This isn't

4    fair.

5              And that's when he started to run.

6    That's when he ran.

7        Q     Did you follow the defendant?  Did you

8    chase after him?

9        A     Yes.

10       Q     What was your proximity to the defendant

11   while you were chasing him?

12       A     Started out in close proximity, but he

13   was a lot faster than me, so he ended up getting to

14   the next block, and he ran northbound on Holland

15   Avenue in Floral Park, and he ran northbound on

16   Holland Avenue to the second driveway and he ran

17   into the backyard.

18       Q     What, if anything, did you notice with

19   respect to the defendant's hands while this chase

20   was in progress?

21       A     As he was running, he was holding both of

22   his hands to his left side.

23       Q     If you could actually stand up and step

24   down so the Grand Jurors can see.

25       A     He was running like this.

20

1                      March 17, 2005

2                 (Indicating.)

3           He was holding both hands to his left

4    side.

5                 MS. PLOTKIN:   If the record can

6        reflect that Officer Vara has both hands placed

7        on the left side of his body near his

8        waistband.

9        A      Yes.

10       Q      And you said you chased him; a chase

11   ensued?

12       A      Yes.

13       Q      At some point, you were a couple of feet

14   from the defendant?

15       A      Yes.

16       Q      At all times, were you at least a couple

17   of feet from the defendant?

18       A      Like I said, it started out close,

19   because he was a lot faster than me.  He ended

20   up, I'd say he was no further than ten feet away

21   from me at any given point.

22       Q      What, if anything, attracted your

23   attention during the chase?

24       A      He came to a fence at the driveway.  He

25   jumped over the fence, and as he jumped over the

21

1               March 17, 2005

2    fence, I heard a metal noise hitting concrete, and I

3    looked down, and I saw an object laying on the

4    driveway.

5               My focus was still towards him, towards

6    the defendant.

7               My assisting officer stayed there at the

8    scene, and I had run around, because I thought he

9    was going to go back to the car.  So I had run

10   around to see, and when I saw he wasn't back at the

11   car, I advised the two other occupants in the

12   vehicle to stay there, and I ran to the next block,

13   thinking that I could catch him running through the

14   yards of the next block, but I was unable to.

15       Q     Back to your testimony about a metal

16   object hitting the concrete, where were you in

17   relation to the defendant when you heard this sound

18   and you heard this noise?

19       A     I was at the fence.

20       Q     And you were at the fence, and what was

21   your proximity to the defendant in terms of footage?

22       A     He was on the other side of the fence.

23       Q     And you were directly on the opposite

24   side?

25       A     Yes.

22

1                          March 17, 2005

2        Q      Did you have the opportunity to look down

3    at all?

4        A      I looked down and I saw an object, but my

5    attention was still at him, because he was my threat

6    at that point.

7        Q      Actually, where was this metal object in

8    relation to the fence?

9        A      It was on the opposite side of the fence

10   from where I was standing.

11       Q      Did there come a time that you returned

12   to this fenced area and you actually observed the

13   object?

14       A      Yes.

15       Q      What, if anything, did you observe?

16       A      It was a nine-millimeter handgun.

17              MS. PLOTKIN:   Can I have these

18          marked for identification Grand Jury 1, 2, 3,

19          4, 5 and 6.

20              (Handing.)

21              (The above-referred to photographs

22          were marked as Grand Jury Exhibits Number 1

23          through 6 for identification; 3/17/05.)

24       Q      While the defendant was running, did you

25   issue any commands?

23

1                    March 17, 2005

2        A      I told him to stop.

3        Q      Did you have your weapon drawn at this

4    point?

5        A      No.

6        Q      Did the defendant comply with your

7    command?

8        A      No, he didn't.

9        Q      What language did you use to command the

10   defendant to stop?

11       A      English.

12       Q      In English?

13       A      Yes.

14       Q      And what words did you use?

15       A      "Stop.  Stop running."

16       Q      Officer, I'm showing you what has been

17   marked as Grand Jury number 1 for identification.

18       A      Yes.

19       Q      Do you recognize it?

20       A      Yes.

21       Q      What do you recognize it to be?

22       A      This is where the stop took place on

23   Jericho Turnpike.

24       Q      Is this a fair and accurate photograph of

25   where the stop took place?

24

1                    March 17, 2005

2       A    Yes.

3                MS. PLOTKIN:  Grand Jury 1 for

4       identification is now in evidence.

5                (Handing.)

6                (Grand Jury Exhibit Number 1,

7       previously marked for identification, was

8       received and marked as Grand Jury Exhibit 1 in

9       evidence.)

10      Q    If you can display it for the members of

11      the Grand Jury as best you can, you can hold it up.

12      A    I don't know if they'll be able to see

13      it.

14      Q    If you can indicate where the defendant

15      approximately was stopped.

16      A    Okay.

17           You could still see his vehicle.  It's

18      the black vehicle.  There's a police car.  His

19      vehicle is right behind that police car, all the way

20      to the left of the picture.

21      Q    And, Officer, I'm showing you what is now

22      Grand Jury number 2 for identification.

23      A    Yes.

24      Q    Do you recognize that?

25      A    Yes.

25

1                        March 17, 2005

2       Q      What do you recognize that to be?

3       A      This is Holland Avenue.  He ran

4    northbound and he ran the second house on the block,

5    he ran in-between the first house and the second

6    house.

7       Q      Is that a fair and accurate photograph of

8    where the defendant ran and the house that he

9    entered onto the property of?

10      A      Yes.

11              MS. PLOTKIN:  Grand Jury number 2

12          for identification is now in evidence.

13              (Handing.)

14              (Grand Jury Exhibit Number 2,

15          previously marked for identification, was

16          received and marked as Grand Jury Exhibit 2 in

17          evidence.)

18      Q      If you can display it for the members of

19   the Grand Jury as best you can.

20      A      (Complying.)

21      Q      And indicate with your finger where the

22   defendant was seen running.

23      A      He ran up the sidewalk and in-between the

24   two houses, down the driveway.

25      Q      Officer, I'm now showing you Grand Jury

**March 17, 2005**

1

2      A      You can barely make it out, but there's a

3   fence, a chain-link fence.

4      Q      Can you describe how he scaled that

5   fence?

6      A      He put his arms on the fence, on the top,

7   and his body went over it.

8      Q      I'll now show you Grand Jury 4 for

9   identification.

10            Do you recognize that?

11     A      Yes.

12     Q      What do you recognize that to be?

13     A      This is still the driveway that he ran

14   down and the fence that he jumped over.

15     Q      Is that a fair and accurate photograph of

16   the driveway and the fence that the defendant was

17   seen at?

18     A      Yes.

19            MS. PLOTKIN:   That's now in evidence

20      as Grand Jury 4 in evidence.

21            (Handing.)

22            (Grand Jury Exhibit Number 4,

23      previously marked for identification, was

24      received and marked as Grand Jury Exhibit 4 in

25      evidence.)

28

1                    March 17, 2005

2       Q      And if you could display that for the

3   members of the Grand Jury.

4       A      This is the driver's side that he ran

5   down.

6              This is the chain-link fence that he ran

7   over, and you can actually see the gun, like, on the

8   opposite side of the fence.

9       Q      Officer, you're being shown Grand Jury

10  number 5 for identification.

11      A      Yes.

12      Q      Do you recognize that?

13      A      Yes.

14      Q      What do you recognize that to be?

15      A      This is the fence and the driveway and

16  the gun laying on the opposite side of the fence.

17      Q      Is that a fair and accurate photograph of

18  the driveway and the fence and the gun that -- I'll

19  ask you a follow-up question.

20             Did you have an opportunity to later

21  return to the scene and observe the weapon on the

22  driveway?

23      A      Yes.

24      Q      That's a fair and accurate photograph of

25  that?

29

1                    March 17, 2005

2        A      Yes, it is.

3        Q      If that can be displayed for the members

4   of the Grand Jury.

5        A      (Complying.)

6        Q      And lastly, I'm showing you Grand Jury

7   number 6 for identification.

8        A      Yes.

9        Q      Do you recognize that?

10       A      This is the gun that fell on the ground

11  when he jumped over the fence.

12       Q      Is that a fair and accurate photograph of

13  the gun that you observed?

14       A      Yes.

15       Q      After the chase was suspended, you said

16  you returned to the driveway and actually observed

17  now the gun on the driveway floor?

18       A      Yes.

19       Q      And was Officer Buonora there at that

20  time?

21       A      Yes, he was.

22       Q      Mr. Vara, when was the next time you had

23  the opportunity to see the defendant?

24       A      I saw him at the Third Precinct station

25  house.

1                        March 17, 2005

2        Q      What time was that, approximately?

3        A      About 8:30 that night.

4        Q      At that time, Officer, was he formally

5    under arrest, the defendant?

6        A      Yes, he was.

7               MS. PLOTKIN:  I have no further

8        questions for Officer Vara.

9               Any questions from the members of

10       the Grand Jury?

11               Sir.

12   EXAMINATION BY

13   A JUROR:

14       Q      How far behind him were you following

15   him?  How far were you behind him when you were

16   following him, you know, when you were checking his

17   speed?

18       A      When I was checking his speed?

19       Q      Yes.

20       A      About five car lengths.

21       Q      About five car lengths?

22       A      Yes.

23       Q      And how long of a chase did you have with

24   him?

25               How long was the chase?

31

March 17, 2005

1

2          MS. PLOTKIN:  You're referring to

3      the foot chase after the field tests were

4      concluded?

5          JUROR:  Yes.

6      A      In feet, you want feet?

7      Q      In time.

8      A      Time-wise?

9      Q      Yes.

10     A      Ten seconds, fifteen seconds at the most.

11     Q      You gave up after --

12     A      Well, like I said, he had jumped over the

13     fence, and I thought he may return back to the

14     vehicle and flee in the vehicle.  And I ran -- I had

15     gone back to the vehicle and secure the two

16     occupants, told them to stay there, and when I saw

17     that he wasn't there, I thought he may have come out

18     on the other side of the fence -- I mean, the other

19     street, seeing that that was the direction that he

20     was running.

21          MS. PLOTKIN:  Any other questions?

22          Sir.

23     EXAMINATION BY

24     A JUROR:

25     Q      Where was the other officer while you

32

1                       March 17, 2005

2     were chasing?

3          A      He was with me.  He was behind me.

4          Q      So you both chased him on foot?

5          A      Yes.

6                 MS. PLOTKIN:  Sir.

7     EXAMINATION BY

8     A JUROR:

9          Q      Where was the defendant finally captured?

10                MS. PLOTKIN:  Officer, I direct you

11         not to answer that question.

12    EXAMINATION BY

13    A JUROR:

14         Q      Were the two other people in the car on

15    their own -- on their own honor staying there, no

16    one was guarding them?

17         A      They were directed by me to stay there.

18         Q      And they obeyed?

19         A      They complied.

20         Q      Okay.

21                MS. PLOTKIN:  Sir.

22    EXAMINATION BY

23    A JUROR:

24         Q      What was the time at which you first

25    observed him?  What time was it?

33

1                    March 17, 2005

2       A     Approximately 4:30 in the morning.

3       Q     4:30 in the morning?

4       A     Yes.

5       Q     What time then were the pictures taken?

6               MS. PLOTKIN:  Officer, I direct you

7       not to answer that.

8       A     I don't know.

9               MS. PLOTKIN:  Any other questions?

10              Sir.

11   EXAMINATION BY

12   A JUROR:

13      Q     Was the defendant ever given any other

14   alcohol tests or blood analyzer test or anything

15   once he was arrested?

16      A     No, because of the time frame, because

17   the stop was at 4:30 in the morning and he turned

18   himself in 8 o'clock that night.

19              MS. PLOTKIN:  I would ask you to

20        disregard those remarks.

21              THE WITNESS:  Okay.

22      Q     8 o'clock that night?  I thought you said

23   eight in the morning.

24      A     No, 8 p.m., that night, is when I

25   observed him at the Third Precinct.

34

1                        March 17, 2005

2        Q       Okay.

3                        MS. PLOTKIN:  Yes.

4    EXAMINATION BY

5    A JUROR:

6        Q       With relationship to the speed that he

7    was traveling and the posted speed limit at that

8    time, was that posted speed limit consistent or did

9    it change?

10       A       From when I observed him in the village

11   of New Hyde Park, which is thirty-five miles an

12   hour, at one point, he entered the village of Floral

13   Park, which is also thirty-five, so from the time I

14   observed him and the time that I stopped him, the

15   speed limit was always thirty-five miles an hour on

16   Jericho Turnpike.

17                       MS. PLOTKIN:  Yes.

18   EXAMINATION BY

19   A JUROR:

20       Q       When you took him out of the car to give

21   him the field sobriety tests, at any point, did you

22   pat him down or any reason to inspect him?

23               Did you observe a bulge in his pocket?

24       A       He had a football jersey, a very baggy

25   football jersey on, so my eyes were on him at all

35

March 17, 2005

1    **March 17, 2005**

2    times.  I saw -- my eyes were on his hands.  I knew

3    where his hands were.

4            So at that point, no, I didn't pat him

5    down.  But if, at any point, I would have put

6    handcuffs on him, I would have patted him down,

7    because that's just the routine.

8            I didn't see a bulging in his waistband

9    at that point, because his jersey was too big to see

10   a bulge from.

11                   MS. PLOTKIN:  Sir.

12   EXAMINATION BY

13   A JUROR:

14      Q    Was he told he was under arrest?

15      A    Yes.

16      Q    Okay.

17                   MS. PLOTKIN:  Seeing no show of

18           hands, then Officer Vara is excused with the

19           thanks of the Grand Jury.

20                   THE WITNESS:  Thank you very much.

21                   (The witness left the Grand Jury

22           chamber.)

23                   MS. PLOTKIN:  I'll call my next

24           witness in just a moment.

25                   My next witness, ladies and

36

March 17, 2005

2          gentlemen, is Officer Buonora of the Third

3          Precinct.

4                      (The witness entered the Grand Jury

5          chamber.)

6                      MS. PLOTKIN:  If you would step into

7          the witness box, remain standing, raise your

8          right hand, face the Grand Jury foreperson and

9          be sworn in.

10                     THE FOREPERSON:  Do you swear that

11         the evidence you shall give to the Grand

12         Inquest upon this Complaint against Darryl

13         Coggins shall be the truth, the whole truth and

14         nothing but the truth, so help you God?

15                     THE WITNESS:  I do.

16                     MS. PLOTKIN:  Please be seated.

17                     THE WITNESS:  (Complying.)

18     EXAMINATION BY

19     MS. PLOTKIN:

20         Q    Mr. Buonora, if you would state your full

21     name for the record, spell your full name, and then

22     give your rank, shield and command.

23         A    Craig Thomas Buonora, B-U-O-N-O-R-A.

24         Q    What is your rank, shield and command and

25     first name?

37

1                    **March 17, 2005**

2        A     C-R-A-I-G.

3              It's Police Officer, Third Precinct.

4    Shield 406.

5        Q     How long have you been a member of the

6    Nassau County Police Department, Officer?

7        A     Approximately eight years.

8        Q     What is your present assignment?

9        A     Presently, I'm assigned days in 316, New

10   Cassel.

11       Q     Is that a patrol assignment?

12       A     Yes, it's patrol.

13       Q     Officer, I'll direct your attention to

14   October 9th of 2004, at approximately 4:40 in the

15   morning.

16             Were you working on that date and time?

17       A     Yes.

18       Q     What was your tour of duty?

19       A     1900 to 0700, 7 o'clock at night to

20   7 o'clock in the morning.

21       Q     Were you working alone or with a partner

22   that night?

23       A     I was working alone.

24       Q     Were you in uniform or plain clothes?

25       A     Uniform.

1                    **March 17, 2005**

2          Q      Did there come a time that you received a

3    radio transmission?

4          A      Yes, I did.

5          Q      Without telling the members of the Grand

6    Jury the contents of that transmission, what, if

7    anything, did you do in response?

8          A      I went to assist a fellow officer to a

9    traffic stop.

10         Q      Where exactly did you go to assist him?

11         A      Jericho Turnpike and Holland in Floral

12   Park, I believe that is.

13         Q      Just so the record is clear, that's in

14   Nassau County, State of New York?

15         A      Yes.

16         Q      You arrived in your patrol car?

17         A      Yes.

18         Q      That was a marked vehicle, we

19   established?

20         A      Yes.

21         Q      What, if anything, did you observe when

22   you arrived there?

23         A      As I pulled my patrol car up behind the

24   other officer's patrol car, I observed him with the

25   person on the sidewalk.

1                    March 17, 2005

2          Q      Could you describe the person that the

3    officer was with?

4          A      A gentleman, was a male black, roughly, I

5    guess, in his twenties.

6          Q      Did you learn his name to be Darryl

7    Coggins?

8          A      After the fact, yes.

9          Q      How did you learn that?

10         A      Through the other officer's

11   investigations, and he told me.

12         Q      What, if anything, did you observe the

13   defendant do?

14         A      As I pulled up, I observed the defendant

15   look at me, and then start pulling away from the

16   officer that was there, and then he took off running

17   up Holland.

18         Q      Approximately what time did you arrive at

19   the scene?

20         A      I'm not exactly sure of the time.  I'm

21   sorry.

22         Q      Is there anything that would refresh your

23   recollection?

24         A      Yes, if you have the paperwork for it.

25                MS. PLOTKIN:  I'll have you mark

1                          March 17, 2005

2          this for identification, Grand Jury 7, crime

3          report.  It's two pages.

4                    (Handing.)

5                    (The above-referred to document,

6          crime report, was marked as Grand Jury Exhibit

7          Number 7 for identification; 3/17/05.)

8          Q      I'm showing you what's been marked as

9    Grand Jury 7 for identification.

10                 I ask you to look at that document and

11   see if it refreshes your recollection.

12         A      I'll guess roughly about a quarter to

13   five in the morning.

14         Q      It was around 4:45 --

15         A      Yes.

16         Q      -- to the best of your recollection --

17         A      Yes.

18         Q      -- you arrived at the scene?

19         A      Yes.

20         Q      Again, what did you observe the defendant

21   doing at that time?

22         A      He was on the sidewalk with Officer Vara,

23   and as I pulled up, he looked over at me pulling up

24   with my cruiser and started pulling away from the

25   officer and then he started running away and ran up

41

1                    **March 17, 2005**

2    Holland.

3         Q    When you say he looked over, what exactly

4    did he do?

5         A    He started pulling away.

6              The officer, I guess, said something to

7    him and went to grab his arm, and the person started

8    pulling away from the officer, got free of him and

9    then took off running.

10        Q    Were you in your vehicle when you

11   observed this?

12        A    Yes.

13        Q    Did there come a time you got out of your

14   vehicle?

15        A    Yes.  As he took off running.

16        Q    Did you participate in the chase?

17        A    As best I could.

18        Q    Where were you in relation to Officer

19   Vara when the chase was in progress?

20        A    I was coming out of my car on Jericho

21   Turnpike, actually should have looked when I got

22   out, but I got out of the car and started running up

23   towards Holland to catch up.

24             I caught up to Officer Vara, but

25   unfortunately not the subject.

42

1                        March 17, 2005

2          Q      How far away were you from the defendant

3    during the course of the chase?

4          A      Again, about six or seven feet.

5          Q      At any given time?

6          A      Yes.

7          Q      What, if anything, attracted your

8    attention during the course of the chase?

9          A      As we got up the side street on Holland,

10   the subject went in an alleyway and went to jump a

11   fence.

12               I heard a noise as he went to jump the

13   fence, which sounded like metal hitting the ground.

14               Officer Vara was in front of me, because

15   he's a little lighter than me, I guess.  And he kept

16   after the subject.  And I looked down to see what it

17   was and found the gun there.

18         Q      Were you able to observe it as a gun

19   immediately?

20         A      Once I looked at it, yes.

21         Q      I'm showing you what is Grand Jury number

22   3 in evidence, Officer.

23         A      Yes.

24         Q      Do you recognize that?

25         A      Yes, ma'am.

43

1                    **March 17, 2005**

2          Q      Is that the alleyway you observed the

3    defendant running up?

4          A      Yes, it is.

5          Q      If you can just display it for the Grand

6    Jury.

7          A      (Complying.)

8          Q      And Officer Buonora, I'm showing you

9    Grand Jury number 4 already in evidence.

10         A      Yes.

11         Q      Is that another view of the alleyway that

12   the defendant was seen running through?

13         A      Yes.  That's the gate he jumped over.

14         Q      That's the fence that he jumped over?

15         A      Yes.

16         Q      And where were you in relation to the

17   defendant when he jumped over that fence,

18   approximately?

19         A      Approximately, I was over towards the

20   back of the van here.

21                (Indicating.)

22         Q      Again, Officer Buonora, Grand Jury number

23   5 in evidence --

24         A      Yes.

25         Q      -- do you recognize that?

44

1                    March 17, 2005

2        A     Yes.  That's the gun.

3        Q     That you observed?

4        A     Yes, that I observed.

5        Q     You said you detected a metal sound

6    hitting concrete?

7        A     Yes.

8        Q     Did you immediately look down?

9        A     Once I got up there, I immediately looked

10   to see what it was.

11       Q     Is that what you observed?

12       A     Yes, that is.

13       Q     Officer Buonora, did there come a time

14   that the gun that you observed on the concrete in

15   the alleyway was submitted to the Forensic Evidence

16   Bureau under FEB number 38704 and CR number

17   04-CR-082564 for testing?

18       A     That's correct.

19             MS. PLOTKIN:  People are having that

20       Forensic Evidence Bureau report, again, under

21       FEB number F-38704 and CR number 04-CR-082564

22       admitted into evidence as Grand Jury number 8

23       in evidence, and that is pursuant to Criminal

24       Procedure Law Section 190.30 subsection two.

25       It's a certified copy of a scientific report of

45

1                    March 17, 2005

2       a public servant.

3                    (Handing.)

4                    (Forensic Evidence Bureau report was

5       received and marked as Grand Jury Exhibit 8 in

6       evidence; 3/17/05.)

7                    MS. PLOTKIN:  I'm now going to read,

8       in pertinent part.  Again, this is a Forensic

9       Evidence Bureau report.  It is dated October

10      9th, 2004.  The defendant is named Darryl

11      Coggins.  And the quantity and description of

12      the materials submitted is as follows:  A gun,

13      a nine-millimeter Luger High Point

14      semiautomatic pistol, Model C, serial number

15      defaced.  Ammunition in the magazine, an

16      eight-round capacity nine-millimeter Luger High

17      Point magazine containing the following, one

18      nine-millimeter Luger cartridge, another

19      nine-millimeter cartridge and a third

20      nine-millimeter cartridge.

21                   And the analysis of that weapon is

22      as follows, the gun was tested with submitted

23      ammunition and is operable.

24                   A chemical etching solution was

25      applied to the defaced serial number.  The

1                      March 17, 2005

2          following number -- actually, I'll leave it at

3          that, chemical etching solution was applied to

4          a defaced serial number.

5               It is signed by Detective Frank

6          Miller, and it is dated October 29th, 2004.

7          **Q      Officer Buonora, are you also aware that**

8     **the gun that you observed and was recovered and**

9     **submitted to the Forensic Evidence Bureau was also**

10    **analyzed for latent fingerprints?**

11         **A      Yes.**

12         **Q      It was submitted under CR number**

13    **204-CR-82564?**

14         **A      Yes, ma'am.**

15               MS. PLOTKIN:  Again, this is coming

16          into evidence as Grand Jury number -- the last

17          one should be number 8.  Change it to number 8.

18          The Forensic Evidence Bureau report was 8.

19          Change that in the record.

20               And now mark this as 9.

21               (Handing.)

22               (Latent Fingerprint Section report

23          was received and marked as Grand Jury Exhibit 9

24          in evidence; 3/17/05.)

25               MS. PLOTKIN:  Grand Jury 9 is latent

47

1                    March 17, 2005

2       fingerprint section report, also in evidence

3       pursuant to Section 190.30 subsection two of

4       the Criminal Procedure Law.  It's also a

5       scientific report of a public official.

6                    I'm now going to read, in pertinent

7       part, from the latent fingerprint report.

8       Bears case number 204-CR-82564.  Subject of

9       examination, one magazine.  The above evidence

10      was processed and evaluated and had no

11      identifiable latent impressions present.

12                   This is signed by Detective E. Baehr

13      of the Forensic Evidence Bureau and it is dated

14      October 18th, 2004.

15                   I have no further questions of

16      Officer Buonora.

17                   Any questions from the Grand Jury

18      members?

19                   Sir.

20   EXAMINATION BY

21   A JUROR:

22      Q      When you arrived on the scene, did you

23   observe the defendant taking a field sobriety test?

24      A      That part I didn't observe.  I pulled up,

25   I believe, right after that.

1                    March 17, 2005

2                    MS. PLOTKIN:  Just what you

3          observed, Officer

4                    THE WITNESS:  Yes.

5                    MS. PLOTKIN:  Sir.

6                    JUROR:  I wasn't able to hear very

7          well.

8                    They weren't able to pick up the

9          latent fingerprints?

10                   MS. PLOTKIN:  I'll read again, in

11         pertinent part.  This is what the report

12         indicates:  The above evidence was processed

13         and evaluated and had no identifiable latent

14         impressions present.

15                   JUROR:  Okay.

16                   Thank you.

17                   MS. PLOTKIN:  Sir.

18    EXAMINATION BY

19    A JUROR:

20        Q     Did you say anything in this chase to

21    anybody?

22        A     "Please stop."

23        Q     That's it?

24        A     That's about it.

25              I mean, running -- I was running, trying

49

1                      March 17, 2005

2      to keep up with him.  He's much faster than me,

3      unfortunately.

4                      MS. PLOTKIN:  Did the defendant

5          comply at all?

6                      THE WITNESS:  Not at all.

7                      MS. PLOTKIN:  Yes.

8      EXAMINATION BY

9      A JUROR:

10         Q     When the other officer returned back to

11     the vehicle, where did you go?

12         A     I stayed with the gun until, I believe, a

13     Floral Park police officer relieved me so I could

14     assist that officer.

15     EXAMINATION BY

16     MS. PLOTKIN:

17         Q     And at any time, did you move the gun

18     while you were, I guess, safeguarding the weapon?

19         A     You would just safeguard it.  You didn't

20     touch it.  You wait for crime scene.

21                     MS. PLOTKIN:  Seeing no show of

22         hands, then Officer Buonora is excused with the

23         thanks of the Grand Jury.

24                     THE WITNESS:  Thank you.

25                     MS. PLOTKIN:  Thank you, Officer.

50

1                          March 17, 2005

2                     THE WITNESS:  You're welcome.

3                     (The witness left the Grand Jury

4          chamber.)

5                     MS. PLOTKIN:  I'll check on the next

6          witness.

7                     (A short recess was taken.)

8                     MS. PLOTKIN:  It's my understanding

9          the defendant wishes to testify.  If you need a

10         short bathroom break, please do so.

11                    (A break was taken at this time.)

12                    MS. PLOTKIN:  Ladies and gentlemen,

13         this is the continued case of Darryl Coggins.

14                    It's my understanding that the

15         defendant now wishes to testify, and he'll now

16         be called as a witness on his own behalf.

17                    (The witness and his attorney

18         entered the Grand Jury chamber.)

19                    MS. PLOTKIN:  Mr. Coggins, if you'd

20         step into the witness box, and have a seat.

21                    MR. COGGINS:  (Complying.)

22                    MS. PLOTKIN:  Ms. Miller, if you'd

23         please state your name and address for the

24         record.

25                    MS. MILLER:  My name is Jennifer

51

1                    March 17, 2005

2        Miller, with the law offices of Frederick K.

3        Brewington (phonetic), 50 Clinton Street,

4        Hempstead, New York 11550.

5                    Good morning.

6                    MS. PLOTKIN:  Ms. Miller, are you

7        the attorney representing Darryl Coggins?

8                    MS. MILLER:  Yes, I am.

9                    MS. PLOTKIN:  Mr. Coggins, if you'd

10       please state your full name, spell your full

11       name, and give your address for the record.

12                   MR. COGGINS:  Darryl T. Coggins,

13       D-A-R-R-Y-L, T, C-O-G-G-I-N-S.

14                   And I reside at 56 Woods Avenue,

15       Roosevelt, New York 11575.

16                   MS. PLOTKIN:  Mr. Coggins, do you

17       understand that this is a Grand Jury

18       investigation of an incident which occurred on

19       October 9th, 2004, at approximately 4:30 in the

20       morning, on Jericho Turnpike and Holland Avenue

21       in Floral Park?

22                   MR. COGGINS:  Yes.

23                   MS. PLOTKIN:  Mr. Coggins, do you

24       also understand that you're the possible target

25       of the investigation, that the crimes for which

1               March 17, 2005

2       you are being investigated include, but are not

3       limited to, two counts of criminal possession

4       of a weapon in the third degree, resisting

5       arrest, and driving while intoxicated?

6               MR. COGGINS:  Yes.

7               MS. PLOTKIN:  Do you also understand

8       that under the Constitutions of the United

9       States of America and New York State, you

10      cannot be forced to give testimony against

11      yourself before the Grand Jury, that you have

12      the right to remain silent and that your

13      silence cannot be held against you?

14              MR. COGGINS:  Yes.

15              MS. PLOTKIN:  Do you understand that

16      you have the right to talk to a lawyer before

17      giving any evidence or before signing a Waiver

18      of Immunity?

19              MR. COGGINS:  Yes.

20              MS. PLOTKIN:  Have you talked to

21      your lawyer about testifying before the Grand

22      Jury today?

23              MR. COGGINS:  Yes.

24              MS. PLOTKIN:  If you'd please state

25      the name of your attorney and give the location

53

1                    March 17, 2005

2      of her office.

3                    MR. COGGINS:  Fred K. Brewington.

4                    MS. PLOTKIN:  Where is

5      Mr. Brewington's office located?

6                    MR. COGGINS:  50 Clinton Avenue.

7                    MS. PLOTKIN:  And that is in?

8                    MR. COGGINS:  Hempstead.

9                    MS. PLOTKIN:  Is a representative of

10     Mr. Brewington's office now present with you in

11     the Grand Jury?

12                    MR. COGGINS:  Yes.

13                    MS. PLOTKIN:  It's your

14     understanding that she's of counsel to

15     Mr. Brewington's firm?

16                    MR. COGGINS:  Yes.

17                    MS. PLOTKIN:  After speaking with

18     your lawyer, is it your request to freely and

19     voluntarily testify and give evidence to the

20     Grand Jury concerning this investigation?

21                    MR. COGGINS:  Yes.

22                    MS. PLOTKIN:  Has anyone forced you

23     to come here today?

24                    MR. COGGINS:  No.

25                    MS. PLOTKIN:  Do you understand that

54

1                         March 17, 2005

2          before testifying before the Grand Jury, you're

3          required to sign a piece of paper called a

4          Waiver of Immunity?

5                    MR. COGGINS:  Yes.

6                    MS. PLOTKIN:  Do you have that

7          Waiver of Immunity with you?

8                    MR. COGGINS:  Yes.

9                    MS. PLOTKIN:  I'd ask that that be

10         marked for identification as Grand Jury 10.

11                   (Handing.)

12                   (The above-referred to document,

13         Waiver of Immunity, was marked as Grand Jury

14         Exhibit Number 10 for identification; 3/17/05.)

15                   MS. PLOTKIN:  Mr. Coggins, has your

16         attorney explained to you the Waiver of

17         Immunity?

18                   MR. COGGINS:  Yes.

19                   MS. PLOTKIN:  Ms. Miller, have you

20         explained the Waiver of Immunity to your

21         client?

22                   MS. MILLER:  Yes, I have.

23                   MS. PLOTKIN:  Mr. Coggins, do you

24         understand that you have the right to have your

25         attorney here with you in the Grand Jury to

55

1                          March 17, 2005

2        advise you after you have signed and sworn to

3        this Waiver of Immunity?

4                    MR. COGGINS:   Yes.

5                    MS. PLOTKIN:   Do you understand what

6        this Waiver of Immunity means?

7                    MR. COGGINS:   Yes.

8                    MS. PLOTKIN:   The Waiver of Immunity

9        has been produced.

10                   Do you understand that if you sign

11       the Waiver of Immunity, anything you say can be

12       used against you?

13                   MR. COGGINS:   Yes.

14                   MS. PLOTKIN:   Do you understand

15       everything that I've told you so far?

16                   MR. COGGINS:   Yes.

17                   MS. PLOTKIN:   Has anyone made any

18       threats or promises to force you to appear

19       before the Grand Jury?

20                   MR. COGGINS:   No.

21                   MS. PLOTKIN:   Has anyone promised

22       you anything with respect to what action the

23       Grand Jury is going to take in this case?

24                   MR. COGGINS:   No.

25                   MS. PLOTKIN:   Do you still wish to

56

1                        March 17, 2005

2        testify and waive your immunity in this action?

3                MR. COGGINS:  Yes.

4                MS. PLOTKIN:  Do you have any

5        questions you want to ask me?

6                MR. COGGINS:  No.

7                MS. PLOTKIN:  Foreperson, I ask that

8        the oath administered to all witnesses now be

9        given.

10               THE FOREPERSON:  Do you swear that

11       the evidence you shall give to the Grand

12       Inquest upon this Complaint against Darryl

13       Coggins shall be the truth, the whole truth and

14       nothing but the truth, so help you God?

15               THE WITNESS:  I do.

16               MS. PLOTKIN:  Mr. Coggins, I'm

17       showing you what is Grand Jury number 10 for

18       identification, which is your Waiver of

19       Immunity.

20               I'll ask you if your signature

21       appears on this document by the number one.

22               THE WITNESS:  Yes.

23               MS. PLOTKIN:  If you now wish to

24       waive your immunity and testify before this

25       Grand Jury, I'd ask you to sign beside number

57

```
 1                        March 17, 2005
 2          two.
 3                    THE WITNESS:  (Complying.)
 4                    MS. PLOTKIN:  Again, to the
 5          foreperson --
 6                    Mr. Coggins, I'd ask that you rise
 7          again and that the oath be administered.
 8                    THE FOREPERSON:  Do you swear to the
 9          truth of the statements contained in your
10          Waiver of Immunity?
11                    THE WITNESS:  Yes, I do.
12                    MS. PLOTKIN:  Do you swear that your
13          signature appears next to the numbers one and
14          two on the Waiver of Immunity?
15                    THE WITNESS:  I do.
16                    MS. PLOTKIN:  You can be seated.
17                    THE WITNESS:  (Complying.)
18     EXAMINATION BY
19     MS. PLOTKIN:
20          Q     What is your name?
21          A     Darryl Coggins.
22          Q     Where do you live?
23          A     56 Woods Avenue, Roosevelt, New York
24     11575.
25                    MS. PLOTKIN:  The Waiver of Immunity
```

58

1                    March 17, 2005

2        is now in evidence as Grand Jury number 10.

3                  (Handing.)

4                  (Grand Jury Exhibit Number 10,

5        previously marked for identification, was

6        received and marked as Grand Jury Exhibit 10 in

7        evidence.)

8        Q     Prior to being sworn in as a witness, I

9    asked you a series of questions, and you gave a

10   series of answers, Mr. Coggins; is that true?

11       A     Yes.

12       Q     Now that you're under oath, do you swear

13   that your answers to all my previous questions were,

14   in fact, the truth?

15       A     Yes.

16       Q     I'll ask you now to please tell the Grand

17   Jury your statement of events of October 9th, 2004,

18   at approximately 4:30 in the morning in the vicinity

19   of Jericho Turnpike and Holland Avenue in Floral

20   Park.

21            If, at any time, just so you know, you

22   wish to consult with your attorney, you have the

23   opportunity to step outside and speak with her.

24       A     Okay.

25       Q     Thank you, sir.

59

1                           March 17, 2005

2         A       Me and one of my friends, Aaron Simmons,

3    was going to another friend's house for a gathering

4    in Garden City Park, and the party was over around

5    1 o'clock.  That's the time we arrived there.

6               So we decided we was going to get

7    something to eat from our local diner.  And we was

8    driving down Jericho Turnpike and getting ready to

9    go to the Cross Island Parkway.

10              And no longer did I see, I look across

11   and I see an officer making a U-turn, got behind me,

12   pulled me over.

13              I asked him once I got out of the car

14   what am I being pulled over for.  Not once did he

15   ever say what it was for.

16              He said, relax, sit there, give me your

17   license.

18              He returned to his car, came back.  He

19   said to step out of the car.

20              And I kept asking him what am I being

21   pulled over for.  Once again, no response.

22              So I get out of the car.  He gave me the

23   breathalyzer test.  I take that.  He started going

24   through the procedures of all the other tests, and

25   kept asking him, you know, what am I being pulled

60

1                         March 17, 2005

2     over for.  No response once.

3            Next thing you know, he started to call

4     up a backup, and that's when I turned my head, like,

5     you trying to lock me up for what.

6            And he was, like, you know, don't turn

7     your back on me.  What are you doing.

8            I was, like, you don't have to grab me,

9     because when I turn sideways, he grabbed me, like,

10    you know, what are you doing.

11           I just said, you don't have to grab me.

12           As soon as I said that, he was, I'll do

13    more than that.

14           So he went to grab again, and I just

15    pulled away and I ran.  And all I heard him say was,

16    "Shoot him in the back, shoot him in the back."

17    Talking to another, a police officer.  And I mean,

18    my intentions were to stop running, because I do

19    have a two-year-old daughter, but once I'm hearing

20    "Shoot him in the back," there's no way.

21           So I guess they put out --

22    Q     Don't speculate, sir.  Just your

23    rendition of the events.

24    A     You know, I ran.  I seen the cab.  I got

25    in the cab.  I took a cab home.

61

1                         March 17, 2005

2                 The officers were already at my house,

3       but I wasn't there when they got there.

4                 Then they questioned my fiancee, say

5       because she came to the door.  First they started,

6       Darryl Coggins was in a serious accident and --

7            Q      Actually, would you confine your events

8       to approximately 4:30 in the morning on Jericho

9       Turnpike and Holland Avenue, which is really the

10      basis of this investigation.

11           A      Okay.

12                  I'm sorry.

13           Q      That's all right.

14                  Anything else you wish to add?

15           A      No.

16                  That's it.

17           Q      I'll ask you a few additional questions

18      myself.

19           A      Okay.

20           Q      It's your testimony today that you had

21      been to a party in the Garden City Park area?

22           A      Well, I was going, but when we arrived,

23      it was over.

24           Q      So you never attended a party that

25      evening?

62

|   |   |   |
|---|---|---|
| 1 | | March 17, 2005 |
| 2 | A | No. |
| 3 | Q | And did you have anything to drink that |
| 4 | evening? | |
| 5 | A | Yes. |
| 6 | Q | What did you have to drink? |
| 7 | A | I had a Corona. |
| 8 | Q | That's a beer? |
| 9 | A | Yes. |
| 10 | Q | Did you have more than one? |
| 11 | A | No.  I'm not too sure. |
| 12 | Q | You don't remember exactly, but at least |
| 13 | one Corona beer? | |
| 14 | A | Yes. |
| 15 | Q | And it's your testimony here today that |
| 16 | you had missed the party? | |
| 17 | A | Yes. |
| 18 | Q | And you were on Jericho Turnpike heading |
| 19 | westbound towards, I guess, Queens? | |
| 20 | A | Yes. |
| 21 | Q | And you were in the car with two of your |
| 22 | friends? | |
| 23 | A | Yes. |
| 24 | Q | And were you driving in excess of the |
| 25 | speed limit at that time, sir? | |

63

March 17, 2005

1

2      A      I'm sure I was doing the speed limit.  I

3   was not speeding.  I'm not a speeder.

4      Q      Do you recollect what speed you were

5   traveling at?

6      A      No more than forty.

7      Q      And the posted speed limit in the

8   village, are you aware, is thirty-five miles an

9   hour?

10     A      Okay.

11     Q      Are you aware of that?

12     A      No.

13     Q      Do you recall passing any signs?

14     A      No.

15     Q      There came a time that you were stopped

16  by a member of the Nassau County Police force?

17     A      Yes.

18     Q      You were asked for your license?

19     A      Yes.

20     Q      And you provided your license?

21     A      Yes.

22     Q      Which had a picture I.D., as well?

23     A      Yes.

24     Q      And you were asked where you were coming

25  from by the officer?

64

1          March 17, 2005

2          A     Yes.

3          Q     And I think you said you had picked up a

4     friend in Garden City?

5          A     Garden City Park.

6          Q     And you also told the officer that you

7     know, at least had some Corona beers that night?

8          A     I don't remember that.

9          Q     You don't recall that?

10         A     No.

11         Q     It's your testimony here today that some

12    standard field sobriety test or tests to determine

13    any impairment by alcohol were administered by the

14    officer?

15         A     Yes.

16         Q     You took those tests?

17         A     Yes.

18         Q     At some point, you're aware that another

19    Nassau County police officer arrived on the scene

20    for backup?

21         A     I seen him when I started to run.

22         Q     So it's your testimony that you did run

23    away from the scene?

24         A     Yes.

25         Q     And, in fact, you ran away from the scene

65

1                    **March 17, 2005**

2   **when Officer Vara told you you were being placed**

3   **under arrest for driving while intoxicated?**

4                MS. MILLER:  Objection.

5                Can we step outside a moment?

6                MS. PLOTKIN:  Mr. Coggins, why don't

7       you step outside for a moment.

8                And this will be continued.

9                (The Assistant District Attorney,

10      the attorney and the defendant left the room.)

11               (A break was taken at this time.)

12               MS. PLOTKIN:  Ladies and gentlemen,

13      this is going to be continued, the case against

14      Darryl Coggins.

15               I ask for you to remain in the Grand

16      Jury room for another few minutes.

17               (A short recess was taken.)

18               MS. PLOTKIN:  We'll step out of the

19      room with juror number eleven.

20               (The following ensued outside the

21      Grand Jury chamber:)

22               MS. PLOTKIN:  I'm here present with

23      Grand Juror number eleven.

24               He advised me this morning that he

25      knows a witness in the case against Darryl

1                    March 17, 2005

2       Coggins.

3                    Is that correct, sir?

4                    THE JUROR:  Correct.

5                    MS. PLOTKIN:  And I just wanted to

6       ask Grand Juror number eleven if you feel you

7       can be fair and impartial in deciding the case

8       before you now, or if you believe it would be

9       more appropriate if you'd like to be excused.

10                   THE JUROR:  Well, I haven't -- you

11      know, the case just began.  I haven't -- you

12      know, we're just getting into it, not all the

13      evidence has been presented.  So at this point,

14      you know, I would say yes, I can be fair.

15                   MS. PLOTKIN:  Okay.

16                   THE JUROR:  But if there comes a

17      point where I think that I couldn't be fair,

18      then I'll let you know.

19                   MS. PLOTKIN:  But at this point, you

20      feel you can be fair and impartial?

21                   THE JUROR:  Yes.

22                   MS. PLOTKIN:  Apart from the fact

23      that you do know a witness involved in this

24      case?

25                   THE JUROR:  Yes.  The gentleman I

1                       March 17, 2005

2       was speaking to in the hallway is, in fact,

3       going to be one of the witnesses.  I didn't

4       discuss with him, you know, what was going on

5       in here.

6                    MS. PLOTKIN:  I just wanted to

7       clarify and just appreciate that you brought

8       that to my attention.

9                    THE JUROR:  Thank you.

10                    (Back in the Grand Jury chamber:)

11                    MS. PLOTKIN:  This is the continued

12      case of the People of the State of New York

13      versus Darryl Coggins.

14                    I'm going to recall the defendant

15      who is testifying at present.

16                    (The defendant and his attorney

17      entered the Grand Jury chamber.)

18                    MS. PLOTKIN:  Mr. Coggins, if you

19      would step back into the witness box.  You can

20      be seated.

21                    THE WITNESS:  (Complying.)

22                    MS. PLOTKIN:  And I just remind you

23      that you are still under oath from this

24      morning.

25                    THE WITNESS:  Okay.

68

1                    March 17, 2005

2    EXAMINATION BY

3    MS. PLOTKIN:

4        Q    I'll ask you a few additional follow-up

5    questions, Mr. Coggins.

6                It's your testimony, based on your

7    testimony this morning, you did not -- you were not

8    told that you were under arrest by Officer Vara; is

9    that correct?

10       A    Yes.

11       Q    It is your testimony, however, that you

12   did run away from the scene?

13       A    Yes.

14       Q    And, in fact, you ran down Jericho

15   Turnpike?

16       A    Yes.

17       Q    And you jumped over a fence, as well; is

18   that true?

19       A    Yes.

20       Q    Mr. Coggins, in the course of running

21   down Jericho Turnpike and, actually, at the point

22   that you did jump over a fence, is it true that a

23   pistol dropped from your waistband?

24       A    No.

25       Q    So did you have a pistol on your person

69

1                          March 17, 2005

2     at the time?

3          A     No.

4          Q     Did you have any kind of weapon on your

5     person at the time?

6          A     No.

7          Q     So it's your testimony that you had no

8     weapon on you whatsoever?

9          A     Yes.

10                    MS. PLOTKIN:  I have nothing further

11              of this witness.

12                    Any questions from the Grand Jury

13              members?

14    EXAMINATION BY

15    A JUROR:

16          Q     Could you tell me what you were wearing?

17          A     I had a brown jersey and I believe some

18    black jeans.

19          Q     A brown jersey?

20          A     A brown jersey.

21          Q     And black jeans?

22          A     Black jeans.

23          Q     Were you wearing a jacket of any kind?

24          A     No.

25          Q     No?

70

1                       March 17, 2005

2          A      No.

3     EXAMINATION BY

4     MS. PLOTKIN:

5          Q      Was it a football jersey, sir?

6          A      No.

7                 Actually, I think it was.  I'm not sure.

8                 I'm not sure.  I'm sorry.

9                      MS. PLOTKIN:  Sir.

10    EXAMINATION BY

11    A JUROR:

12         Q      When you were pulled over and removed

13    from the car, did the officer give you a sobriety

14    test?

15         A      Yes.

16         Q      What kind of test did he give you?

17         A      He made me breathe into the -- I don't

18    know the correct name for it -- the machine, and it

19    didn't work at first, he said.  He went back to his

20    car and did it again, and then he had me count to

21    thirty on one foot, touch my nose, things like that.

22         Q      How did you perform on those?

23         A      I did them all.  I did every test he gave

24    me.  And he still insisted -- he went to call for

25    backup and that's when I got nervous.

1                    March 17, 2005

2                   MS. PLOTKIN:  Yes.

3    EXAMINATION BY

4    A JUROR:

5        Q    What time did you say you were going to

6    the party?

7        A    We were going -- I believe we left my

8    father's cocktail lounge around 12:30, 1 o'clock.

9    And we sat around at Jarvon's house for a few hours.

10   **EXAMINATION BY**

11   **A JUROR:**

12       Q    When you were pulled over, could you tell

13   me what was the condition of the day, what time of

14   the day it was?

15       A    It was early morning, early Sunday

16   morning.

17       Q    Was it light or dark out?

18       A    It was dark.

19       Q    Dark?

20       A    Yes.

21       Q    Okay.

22                   MS. PLOTKIN:  Ma'am.

23   EXAMINATION BY

24   A JUROR:

25       Q    Why did you run?

72

March 17, 2005

1

2      A      When the officer grabbed me.

3             Well, after we did the test, he called

4      for backup, I kind of turned my head to him, like,

5      in disbelief, and I asked him, are you gonna lock me

6      up.

7             And when I went to turn, that's when he

8      grabbed my arm. And I asked him, you don't have to

9      grab me like that.

10            And he said, you know, I'll do more than

11     that.

12            And he grabbed me again, and I ran.

13     Q      But why did you run?

14     A      Scared. I mean, I'm from a town,

15     Roosevelt. The majority is gangs. I mean, I

16     can't -- I can count on one hand how many times I

17     get pulled over, because I'm coming from the gym or

18     work, just, like, they label any African American in

19     Roosevelt as a gang member and arrest me.

20            MS. PLOTKIN: I would ask you to

21        confine your testimony to the events of the

22        day.

23            THE WITNESS: I'm sorry.

24            MS. PLOTKIN: That's all right.

25     EXAMINATION BY

73

1                           March 17, 2005

2    MS. PLOTKIN:

3        Q       Just so your testimony is clear, you ran

4    because you were scared?

5        A       Yes.

6        Q       And you did not run because you knew you

7    had a weapon on your person?

8        A       No.

9        Q       And because the likelihood, if you were

10   under arrest, you would be patted down?

11       A       Yes.

12               MS. PLOTKIN:  Okay.

13               Yes.

14   EXAMINATION BY

15   A JUROR:

16       Q       When you ran, how did you run?  Was it,

17   you know, were you leaning to one side, were you

18   running straight?

19       A       Well, the officer was on the right of me,

20   and I had to go around him.  He grabbed me and I put

21   my arm up and went around him.  I ran straight.  So

22   I -- to, I believe, the first corner, and I made a

23   left and from there, I don't know.  I don't know

24   anything about the area.

25       Q       Were you running regular?

74

1                        **March 17, 2005**

2       **A**     **Yes.**

3                    MS. PLOTKIN:  Sir.

4    EXAMINATION BY

5    A JUROR:

6       **Q     Were you aware that the officer was**

7    **behind you when you were running.**

8       **A     I never turned around.**

9            **Once he said, "Shoot him in the back," I**

10   **never turned around.**

11                   MS. PLOTKIN:  Ma'am.

12   EXAMINATION BY

13   A JUROR:

14      **Q     Where were your hands when you were**

15   **running?**

16      **A     In front, I believe.  In front.**

17      **Q     Front where on your body?**

18      **A     Yes.**

19      **Q     Where on your body?**

20                   MS. PLOTKIN:  Were they touching

21        your body?

22      **A     No.**

23           **I'm sorry, they were in front of me,**

24   **like, I'm running, to keep my balance.**

25                   MS. PLOTKIN:  Yes.

75

1                    March 17, 2005

2    EXAMINATION BY

3    A JUROR:

4         Q     You knew this was a police officer,

5    correct?

6         A     Yes, so he said.

7         Q     So can I ask what you were afraid of?

8              MS. PLOTKIN: Let me see if I can

9         put that into a different question.

10   EXAMINATION BY

11   MS. PLOTKIN:

12        Q     The police officer, the arresting officer

13   was in uniform?

14        A     Yes.

15        Q     He identified himself as a member of the

16   Nassau County Police Department?

17        A     Yes.  He had a uniform.  He didn't say he

18   was Nassau County.

19        Q     There was a police car in proximity which

20   you saw?

21        A     Yes.

22        Q     He activated his lights and sirens

23   initially upon stopping you on Jericho Turnpike?

24        A     Yes.

25        Q     He told you that he was going to

76

March 17, 2005

1

2    administer tests called standard field sobriety

3    tests, because they relate to possible alcohol

4    intoxication?

5        A        He never said that.

6        Q        He did tell you, at some point, you were

7    under arrest at the conclusion of the test?

8        A        No.

9        Q        He never told you you were under arrest?

10       A        No.

11               MS. PLOTKIN:  Does that in any way

12       answer your question, sir?

13               JUROR:  Yes.

14               MS. PLOTKIN:  Sir.

15   EXAMINATION BY

16   A JUROR:

17       Q        Were you ever under arrest?

18       A        No.

19       Q        No?

20       A        No.

21               MS. PLOTKIN:  Actually, I'm going to

22       ask you not to respond to that question.

23               Your testimony was you were never

24       told you were under arrest?

25               THE WITNESS:  Yes.

1          March 17, 2005

2                MS. PLOTKIN:   Yes.

3    EXAMINATION BY

4    A JUROR:

5        Q      Did you have any concerns about the two

6    people that were in your car?

7                MS. PLOTKIN:   Again, probably out of

8        the scope of Mr. Coggins' knowledge.

9        A      That's correct.

10       Q      Did you say anything to them at any

11   point?

12       A      Once I got out of the car and did the

13   test, like I said, again, he grabbed me.   I ran.

14               MS. PLOTKIN:   Then seeing no show of

15       hands, the witness is excused with the thanks

16       of the Grand Jury.

17               The defendant is excused.

18               (The defendant and his attorney left

19       the Grand Jury chamber.)

20

21

22

23

24

25