LAW OFFICES OF
# FREDERICK K. BREWINGTON

*ATTORNEYS AND COUNSELORS AT LAW*

50 CLINTON STREET, SUITE 501

HEMPSTEAD, N.Y. 11550-4282

———

TELEPHONE: (516) 489-6959

FACSIMILE: (516) 489-6958

FREDERICK K. BREWINGTON
———
IRA FOGELGAREN
———
GREGORY CALLISTE, JR.
VALERIE M. CARTRIGHT
MILI MAKHIJANI
G. WILLIAM GERMANO, JR.
MARJORIE MESIDOR

March 15, 2010

Donna Napalitano, Esq.
Deputy Bureau Chief
Nassau County Attorney Office
One West Street
Mineola, New York 11501-4820

     Re:   <u>Darryl T. Coggins v County of Nassau, et al.</u>
             Docket No.: 07-CV-3624(JFB)(AKT)

Dear Ms. Napalitano:

     Enclosed please find the original and one copy of the testimony of Alexander J. Barnych, taken at an examination before trial on February 25, 2010 in the above-referenced matter.

     Please have the witness execute the original and return to us as soon as possible. Please note that any necessary changes are to be made on a separate sheet of paper and notarized, with the reason for the change or correction set forth.  The copy is for your files.

     Please note that if the original is not signed and returned to us within thirty days of the date hereof, we shall utilize the same at trial as if signed and sworn to.

Very truly yours,

VICTORIA ROBERTS
Legal Assistant

Enclosures
:vr

LAW OFFICES OF
# FREDERICK K. BREWINGTON

*ATTORNEYS AND COUNSELORS AT LAW*

50 CLINTON STREET, SUITE 501

HEMPSTEAD, N.Y. 11550-4282

———

TELEPHONE: (516) 489-6959

FACSIMILE: (516) 489-6958

FREDERICK K. BREWINGTON
———
IRA FOGELGAREN
———
GREGORY CALLISTE, JR.
VALERIE M. CARTRIGHT
MILI MAKHIJANI
G. WILLIAM GERMANO, JR.
MARJORIE MESIDOR

March 15, 2010

Donna Napalitano, Esq.
Deputy Bureau Chief
Nassau County Attorney Office
One West Street
Mineola, New York 11501-4820

Re:  Darryl T. Coggins v County of Nassau, et al.
Docket No.: 07-CV-3624(JFB)(AKT)

Dear Ms. Napalitano:

During the depositions of Defendants Alexander J. Barnych and Nicholas Occhino, request for documents were made.  To-date, we have no record of receiving the requested documents.  Please allow this to serve as a formal written demand for documents.  Requests were made as follows:

- **Defendant Alexander J. Barnych deposed February 25, 2010:**
  Page 79:     complete records of Internal Affairs Unit;

  Page 91:     document relating to vouchering of gun and magazine by Nassau County of Floral Park Police Departments;

  Page 94:     any photographs of gun, car or anything else taken at the time of the event; and

  Page 99:     case file.

- **Defendant Nicholas Occino deposed February 25, 2010:**
  Page 85:     entire file of Internal Affairs Unit.

As quite some time has passed since these requests were made, it would be greatly appreciated if this matter were given your immediate attention.

Thank you for your cooperation.  We look forward to hearing from you in the near future.

Very truly yours,

VICTORIA ROBERTS
Legal Assistant

Enclosures
:vr



1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
DARRYL T. COGGINS,

                     Plaintiff,

      - against -

COUNTY OF NASSAU, NASSAU COUNTY POLICE
DEPARTMENT, POLICE OFFICER JAMES VARA,
in his individual and official capacity,
and POLICE OFFICER CRAIG BUONORA, in his
individual and official capacity, and
JOHN DOES "1-10," in their individual
and official capacity,

                   Defendants.

Docket No. 07-CV-3624
------------------------------------------------x

                50 Clinton Street
                Hempstead, New York

                February 25, 2010
                1:53 p.m.


       Deposition of the Defendant, NASSAU

COUNTY POLICE DEPARTMENT by ALEXANDER J.

BARNYCH, pursuant to Notice, before Jennifer

Fuchs, a Notary Public of the State of New

York.


         REALTIME REPORTING, INC.
      124 East Main Street, Suite 202
        Babylon, New York 11702
           516-938-4000

2

```
 1
 2     A P P E A R A N C E S:
 3     LAW OFFICES OF FREDERICK K. BREWINGTON
 4     Attorney for Plaintiff
 5            50 Clinton Street, Suite 501
 6            Hempstead, New York 11550
 7     BY:   IRA FOGELGAREN, ESQ.
 8
 9     DONNA NAPOLITANO, ESQ.
10     Deputy Bureau Chief
11     Attorney for Defendants County of Nassau,
12     Nassau County Police Department and Police
13     Officer James Vara
14            Nassau County Attorney
15            One West Street
16            Mineola, New York 11501
17
18     LAW OFFICES OF LAURENCE JEFFREY WEINGARD, ESQ.
19     Attorney for Defendant Police Officer Craig
20     Buonora
21            250 West 57th Street, Suite 401
22            New York, New York 10107
23     BY:   LAURENCE JEFFREY WEINGARD, ESQ.
24
25
```

3

1

2          IT IS HEREBY STIPULATED AND

3     AGREED by and between the attorneys for

4     the respective parties herein, that the

5     filing, sealing and certification of the

6     within deposition be waived.

7          IT IS FURTHER STIPULATED AND

8     AGREED that all objections, except as to

9     the form of the question, shall be

10    reserved to the time of the trial.

11         IT IS FURTHER STIPULATED AND

12    AGREED that the within deposition may be

13    sworn to and signed before any officer

14    authorized to administer an oath with

15    the same force and effect as if signed

16    and sworn to before the Court.

17

18

19              - oOo -

20

21

22

23

24

25

4

1

2      A L E X A N D E R   J.   B A R N Y C H,

3              called as a witness, having been duly

4              sworn by a Notary Public, was examined

5              and testified as follows:

6      EXAMINATION BY

7      MR. FOGELGAREN:

8              Q.      Please state your full name for

9      the record.

10             A.      Alexander J. Barnych.

11             Q.      What is your address?

12             A.      1490 Franklin Avenue, Mineola,

13     New York 11501.

14             Q.      Good afternoon.

15             A.      Good afternoon.

16             Q.      My name is Ira Fogelgaren.  I

17     represent the plaintiff, Darryl Coggins, in

18     this matter, and I am going to be asking you

19     about the facts and circumstances surrounding

20     this lawsuit.

21             If at any time you don't

22     understand my questions, please let me know,

23     and I will try to rephrase them as best I can.

24     Please keep your answers verbal.  The reporter

25     can't take down nods of the head.  And please

5

Barnych

1

2      wait for me to finish my question before you

3      start to answer.  She can't take down both of

4      us speaking at the same time.  If at any time

5      you need a break, just let me know, and I will

6      accommodate you, okay?

7              A.      Very good.

8              Q.      Are you employed?

9              A.      Yes, I am.

10             Q.      Where?

11             A.      I work for David Lerner

12     Associates in Syosset, New York.

13             Q.      In what capacity?

14             A.      I'm an investment counselor.

15             Q.      How long have you been working

16     for them?

17             A.      Since October 1st of 2007.

18             Q.      What did you do before that?

19             A.      I was a police officer and

20     detective.

21             Q.      For who?

22             A.      Nassau County Police Department.

23             Q.      From when to when?

24             A.      May 31, 1985 through September

25     14, 2007.

6

Barnych

1   

2      Q.     When did you become a detective?

3      A.     June of 1998.

4          MR. WEINGARD:  Can I just get the

5  year?  You said May 31st.  I didn't

6  catch the year.

7          THE WITNESS:  1985.

8          MR. WEINGARD:  Thank you.

9      Q.     When you became a detective,

10  where were you first assigned?

11      A.     I was assigned to the 8th Squad

12  in Levittown.

13      Q.     Doing what?

14      A.     General precinct detective

15  assignments.

16      Q.     For how long were you with the

17  8th Squad?

18      A.     Up until December of 2001.

19      Q.     Where were you assigned to after

20  December of '01?

21      A.     The 3rd Squad detectives in

22  Williston Park.

23      Q.     What duties did you have at the

24  3rd Squad?

25      A.     General precinct detective

7

Barnych

1    assignments.

2        Q.     Prior to coming to this

3    deposition today, did you review any documents

4    to prepare for this deposition?

5        A.     Yes, I did.

6        Q.     What documents did you review?

7        A.     The arrest paperwork, case

8    report.

9        Q.     Anything else?

10       A.     No.

11       Q.     On October 9, 2004, were you

12   working as a police officer?

13       A.     Yes, I was.

14       Q.     Do you have any independent

15   recollection of the incident that occurred in

16   Floral Park at Jericho Turnpike and Holland

17   Avenue at that time?

18       A.     My recollection will be of what

19   happened when I was -- when I arrived there.

20   That would be several hours after the initial

21   point of contact.

22       Q.     On October 9, 2004, were you

23   working a tour?

24       A.     Yes, I was.

8

Barnych

1     Q.     From when to when?

3     A.     7:00 in the morning until 5 p.m.
4 in the afternoon.

5     Q.     Did you have a particular
6 assignment that day?

7     A.     I was assigned to the 3rd Squad.
8 My responsibilities were that of what they
9 call the squeal man.

10    Q.     Can you tell me what the duties
11 of a squeal man was at that time?

12    A.     Yes.  From the hours of 1:30 in
13 the morning on that date through 11:30 in the
14 morning, I was responsible for any cases that
15 came into the 3rd Squad that were assigned to
16 the detective division that needed follow-up.

17    Q.     When did you first learn of an
18 incident on October 9, 2004 that occurred in
19 Floral Park at Jericho Turnpike and Holland
20 Avenue?

21    A.     About 8:10 in the morning.

22    Q.     What did you learn?

23    A.     I learned that there was a car
24 stop at that location, that the police had
25 recovered a weapon at that location, and they

9

Barnych

1    were requesting detectives to respond to

2    assist in the investigation.

3        Q.      How did you learn that?

4        A.      I was notified by the front desk.

5        Q.      And you said you were notified by

6    the front desk.  Do you know who would sit at

7    the front desk at that time?

8        A.      Normally it would be the desk

9    officer and several other police officers that

10   are assigned to a variety of different

11   functions.  I don't remember specifically who

12   made the phone call, though.

13       Q.      After you were notified by the

14   desk officer, what did you do?

15       A.      I secured a radio, the keys to a

16   departmental vehicle.  I requested Detective

17   Occhino respond with me, and we proceeded to

18   the location where we were requested.

19       Q.      Prior to leaving the 3rd Precinct

20   at that time, did you learn when the incident

21   occurred at Floral Park?

22            MS. NAPOLITANO:  Objection to

23       form.

24            You can answer.

10

Barnych

1                  MR. WEINGARD:  I join.

2        A.     I believe during the course of

3  the conversation I was told that it happened

4  earlier in the morning.  But specifically as

5  what time, I don't remember.

6        Q.     After you secured the radio and

7  the departmental vehicle, what did you do?

8        A.     Myself and Detective Occhino

9  drove to a location on Jericho Turnpike and

10  Holland Avenue in Floral Park.

11        Q.     Did you carry a memo book on that

12  day?

13        A.     No.

14        Q.     Did you fill out any notes or

15  forms when you first learned about this

16  incident?

17                 MS. NAPOLITANO:  Objection.

18                 You can answer.

19        A.     No.

20        Q.     Do you recall what time you

21  arrived at the scene?

22        A.     Somewhere around 8:30 in the

23  morning.

24        Q.     What location did you bring your

11

Barnych

1   car to at that time?

2   A.      Jericho Turnpike and Holland

3   Avenue.

4   Q.      Did you get out of your vehicle

5   at that time?

6   A.      Yes, I did.

7   Q.      What did you observe when you got

8   out of your vehicle?

9   A.      There was several police units on

10  the scene, both of Nassau County and Floral

11  Park Village.  There was a black Mazda parked

12  on the westbound shoulder, which would be the

13  north side of Jericho Turnpike, probably about

14  50 to 60 feet west of Holland Avenue.  At the

15  time the Crime Scene Unit was there, as well

16  as emergency services officers, in addition to

17  precinct and village police officers.

18  Q.      Did you see any other individuals

19  other than police officers at that time?

20  MS. NAPOLITANO:   Objection.

21  You can answer.

22  A.      None that were remarkable, you

23  know.  It was a Saturday morning, so there are

24  people out and about.  It's a combination

12

1              Barnych

2    business/residential area.

3         Q.     I am just asking what you

4    recollect.

5              Do you recollect anybody beside

6    police officers being there?

7         A.     No.

8         Q.     While you were in the vehicle

9    from when you left the precinct up until the

10   time you arrived at the scene, did you have

11   any conversations with Detective Occhino?

12        A.     I'm sure I did, but I don't

13   specifically remember what we talked about.

14        Q.     Prior to arriving at the scene,

15   did you give any instructions to Detective

16   Occhino as to what he was to do at the scene?

17        A.     Nothing specific, no.

18        Q.     When you got out of your vehicle,

19   where did you go?

20        A.     The scene itself encompassed a

21   fairly large area, so I directed myself to go

22   over to where the suspect auto was.  That's

23   where the bulk of the police officers were at

24   that point.

25        Q.     Did Detective Occhino also get

13

Barnych

1     out of the car?

2

3          A.     Yes, sir.

4          Q.     Did he accompany you?

5          A.     Yes.

6          Q.     Did you arrive at the suspect

7     auto?

8          A.     Yes.

9          Q.     What did you observe there?

10         A.     It was a black Mazda automobile.

11    I believe it was model 626.  When I arrived

12    there, the passenger door was open.  In the

13    curb to the right of the passenger door was a

14    loaded magazine for a semiautomatic pistol.

15    Let me see.  There were several police

16    officers standing about.  Emergency services

17    officers had been completing their search of a

18    storm drain that was in close proximity to the

19    car, and there was a Crime Scene Unit that was

20    working as well.

21         Q.     The loaded magazine, where was it

22    in relation to that black Mazda vehicle?

23         A.     It was in the gutter on the right

24    side of the car, what would be consistent with

25    just outside the passenger door.

14

Barnych

1  

2      Q.    Was it a two-door or four-door

3  car, do you know?

4      A.    I don't remember.

5      Q.    Did you inspect that magazine?

6      A.    I observed it.  I didn't pick it

7  up and handle it in any way.

8      Q.    What did you observe about it at

9  that time?

10      A.    It was black metal, and through

11  the peepholes in the side of the magazine you

12  could see that there were rounds contained in

13  it, as well as one round at the top.

14      Q.    Could you tell what type of round

15  it was, what caliber it was?

16      A.    Not immediately, no.

17      Q.    While you were at the scene, did

18  you determine what caliber it was?

19      A.    I believe we determined it to be

20  a 380 caliber.

21      Q.    Do you know how that was

22  determined?

23      A.    It's very possible, but I don't

24  remember who did it and why.

25      Q.    After you got out of your

15

Barnych

1  vehicle, did you have any conversations with

2  any police officers at the scene?

3

4          A.      Yes, I did.

5          Q.      Who is the first police officer

6  you had a conversation with?

7          A.      Police Officer Vara.

8          Q.      Did you know Police Officer Vara

9  prior to that time?

10         A.      Yes.

11         Q.      How did you know him?

12         A.      He's employed in the 3rd Precinct

13  or assigned to the 3rd Precinct.

14         Q.      Had you worked on cases with him

15  previously?

16         A.      I can't say specifically on

17  cases, but I was aware that he was assigned to

18  that precinct.

19         Q.      What did you discuss with Police

20  Officer Vara at that time?

21         A.      I asked Officer Vara to tell me

22  what had happened, then I asked him to show me

23  what his path was after he told me that at one

24  point there was a foot pursuit, and he guided

25  me through the path that he took in the foot

16

Barnych

1    pursuit.

2         Q.      What did Officer Vara respond

3    when you asked him what happened?

4         A.      In sum and substance, he gave me

5    a detailed synopsis of everything that he did

6    from the point that he first observed this

7    particular car up until the point that he had

8    a foot pursuit and ultimately lost the

9    subject.

10        Q.      Did he mention anything about a

11   gun?

12        A.      During the course of

13   conversation?  Sure.

14        Q.      What did he say?

15        A.      That -- specifically when he was

16   in foot pursuit of the subject, the subject

17   went over a chain-link fence in the driveway

18   of a residence.  At that point he had heard a

19   metal object hit the ground, although he was

20   not certain what the metal object was.  Later

21   on he came to find out that it was, in fact, a

22   gun.  And he then informed me that the gun

23   that was located in the driveway was in the

24   same proximity to where he had heard that

17

Barnych

1    metal object hit the ground earlier during his

2    foot pursuit.

3

4         Q.      Did he say anything else to you

5    during that initial conversation?

6         A.      During the initial conversation?

7              MR. FOGELGAREN:  Yes.

8         A.      Like I said before, it was a

9    synopsis of everything that he had done from

10   the car stop.

11        Q.      Did you take any notes of what

12   was being said at the time?

13        A.      I may have.

14        Q.      How would you take the notes?

15        A.      There's a -- just a regular

16   stenographer's pad that you would take with

17   you, and any of those notes are then included

18   in the case jacket.

19        Q.      Did you ask Vara at that point to

20   show you the path that this incident took

21   place?

22        A.      Yes.

23        Q.      Prior to that time, had you

24   spoken to anybody else at the site other than

25   Vara?

18

1                      Barnych

2     A.      I spoke to Sergeant Gieshen.

3             MS. NAPOLITANO:  Spell it.

4             THE WITNESS:  J-I-E --

5             MS. NAPOLITANO:  G.

6             THE WITNESS:  Yes, G-I-E-S-H-E-N.

7     Don't hold me to that.  That's the best

8     I can do.

9     Q.      Who is Sergeant Gieshen?

10    A.      He's a patrol supervisor assigned

11    to the 3rd Precinct.

12    Q.      Do you know if he had arrived at

13    that scene before you?

14    A.      I know he did, yes.

15    Q.      What did you talk to him about?

16    A.      I asked him what he knew of the

17    incident, because he was there prior to my

18    arrival.  He indicated to me that the two

19    witnesses that were in that subject auto were

20    released earlier or prior to my arrival, and

21    that he was the day shift supervisor who

22    responded to the location, that he was not

23    there during the initial contact.

24    Q.      Did he tell you when he arrived

25    at that location?

19

Barnych

1      A.      If he did, I don't remember, but

2  it would have been after 6:30 in the morning.

4      Q.      Did Officer Vara indicate to you

5  as to why the black Nissan vehicle was

6  stopped?

7      A.      Sorry?

8      Q.      Did Officer Vara indicate to you

9  why the black Nissan vehicle was stopped?

10     A.      I believe it was a Mazda, not a

11 Nissan.

12              MR. FOGELGAREN:  Nissan, I'm

13         sorry.

14     A.      Initially he said he observed it

15 speeding on Jericho Turnpike.

16     Q.      Did he tell you how fast the

17 vehicle was going?

18     A.      I believe he said somewhere

19 between 50 and 55 miles per hour.

20     Q.      Did he say anything else with

21 regard to the operation of the vehicle before

22 it was stopped?

23     A.      No.

24     Q.      Did you have any discussion with

25 him about investigating whether the driver was

20

Barnych

1  
2   intoxicated?

3       A.      Yes.  He told me that as he

4   approached the vehicle, he detected the odor

5   of an alcoholic beverage on the driver's

6   breath, and he asked the driver to exit the

7   vehicle in order for Police Officer Vara to

8   conduct some standardized field sobriety

9   testing.

10      Q.      Vara was operating the vehicle at

11  that time?

12      A.      Vara was operating a marked

13  police vehicle at that time.

14      Q.      Was he working with anybody at

15  that time?

16              MS. NAPOLITANO:  Objection.

17              If you know.

18      A.      I don't believe he was in a

19  two-man car.  I believe it was a one-man car.

20      Q.      Did Vara tell you about any field

21  sobriety tests he did at the location?

22      A.      Yes, he did.

23      Q.      What did he tell you about that?

24      A.      He said that after he performed

25  his field sobriety test, that it indicated

21

Barnych

1  positive for alcohol involvement, and he was

2  going to attempt to place the individual into

3  custody for driving while under the influence.

4  And at that point the subject broke free and

5  fled eastbound along Jericho Turnpike, then

6  north on Holland Avenue and then turned west

7  into the driveway of a house approximately two

8  houses north of Jericho Turnpike, at which

9  point Police Officer Vara was in foot pursuit,

10  and then he heard the -- and observed the

11  defendant or the subject go over a

12  approximately 4-foot chain-link, metal gate.

13  Police Officer Vara did not follow him over

14  the gate.

15  At a point in time he doubled

16  back around to check on the occupants of the

17  car, because there was multiple occupants in

18  the car, and then he continued further west

19  to, I believe, Hinsdale Avenue in an attempt

20  to try and intercept the subject on the other

21  block.

22  Q.    Did Police Officer Vara have a

23  police radio with him at the time you saw him

24  on October 9, 2004?

22

Barnych

1

2    A.      I don't specifically recall

3    seeing one on his person, but it would be

4    normal for him to have one assigned to the car

5    that he can take as a portable radio.

6        Q.      Did you ask Officer Vara if he

7    requested backup at any point in time?

8        A.      I don't specifically recall

9    asking him if he had backup.  He did indicate

10   to me that there were other officers

11   responding to his location.

12       Q.      Did he say which officers were

13   responding?

14       A.      No.  He did let me know that

15   while he was conducting the sobriety test, he

16   observed a Floral Park Village officer, which

17   was, I want to say, about a hundred yards west

18   of his location facing eastbound.

19       Q.      Did Officer Vara indicate if the

20   Floral Park Village police officer did

21   anything with respect to what was going on at

22   that time?

23              MS. NAPOLITANO:   Objection.

24              You can answer.

25       A.      At what time?

23

Barnych

1

2     Q.      At the time he encountered this

3  person.

4     A.      The only thing Police Officer

5  Vara told me is that he conducted the field

6  sobriety test by himself.  He was not in the

7  company of any assisting officers directly at

8  that point.

9     Q.      Was there any type of procedure

10 in place at that time for an officer to

11 request backup when he was about to do a field

12 sobriety test?

13               MS. NAPOLITANO:   Objection.

14               You can answer.

15               MR. WEINGARD:   I'll join in the

16        objection.

17     A.      I'm not certain that there was

18 any specific departmental guideline or

19 regulation that says you must have an

20 assisting officer there to perform those

21 tests, so I don't know whether or not he

22 believed there to be so or not.

23     Q.      Was there a practice at the

24 Nassau County Police Department followed at

25 that time with regard to requesting additional

24

1           Barnych

2   officers when a field sobriety test would be

3   done?

4                   MS. NAPOLITANO:  Objection.

5                   You can answer.

6                   MR. WEINGARD:  Again, I join.

7           A.      I believe that would be left up

8   to the discretion of the individual officer.

9           Q.      The residence where the suspect

10  had turned into, how far was that from the

11  car?

12                  MS. NAPOLITANO:  Objection.

13                  If you understand.

14          Q.      The black Mazda.

15                  MS. NAPOLITANO:  Objection.

16          A.      The black Mazda was parked, when

17  I got there, anywhere from 50 to 60 feet west

18  of the northwest intersection of Jericho

19  Turnpike and Holland Avenue.  The driveway of

20  the house that was turned into, without a

21  measure, I would say was probably about

22  anywhere from 50 to 60 feet north of the

23  northwest corner of Jericho Turnpike and

24  Holland Avenue on the west side of Holland

25  Avenue.

25

1          Barnych

2          Q.     Were there any members of the

3  Crime Scene Unit present at the location when

4  you first got there?

5          A.     Yes, there was.

6          Q.     Who was there?

7          A.     Detective Michael Fannon.

8          Q.     Did you see what he was doing

9  when you first got there?

10         A.     I believe he was finishing up his

11  general scene photographs.

12         Q.     Did there come a point in time

13  where you observed the gun at that location?

14         A.     Yes.

15         Q.     Where was that located?

16         A.     I believe it was in the driveway.

17  My memory doesn't recall what the exact house

18  number was, but it was the driveway that

19  Police Officer Vara indicated that he had

20  followed the subject down.  It was -- the gate

21  was probably about 20 feet west of the

22  driveway apron, maybe 25 feet west of the

23  driveway apron, and the gun was on the west

24  side of that gate, so more within the

25  contained property.

26

Barnych

1

2          Q.      Where was the gun in relation to

3     the gate?

4          A.      It was west of the gate.

5          Q.      How far west, in feet?

6          A.      I would say about 6 or 7 feet

7     west of it, if I can remember.

8          Q.      What was it lying on?

9          A.      Concrete, driveway.

10         Q.      Do you recall how long the

11    driveway was?

12         A.      Maybe in total to the point of

13    the garage, maybe about 65, 70 feet.

14         Q.      How wide was it?

15         A.      One car width.

16         Q.      Were there any cars parked in the

17    driveway?

18         A.      I believe there was a minivan in

19    the driveway.

20         Q.      What did you observe about the

21    gun when you first saw it?

22         A.      It was lying on the driveway.

23         Q.      Do you recall what color it was?

24         A.      Dark metal.

25         Q.      Could you tell what type of a gun

27

Barnych

1     it was?

3         A.     Semiautomatic pistol.

4         Q.     Do you know what caliber?

5         A.     Not readily available.

6         Q.     Did you have a discussion about

7     the gun with anybody at the site?

8         A.     Detective Fannon.

9         Q.     Can you tell me what you

10    discussed with Detective Fannon?

11         A.     Well, closer observation, he

12    recorded the dimensions of the gun relative to

13    a ruler. I was present when he took his

14    photographs of the gun. I believe he made it

15    safe by placing a nylon loop through it, and

16    then he secured it into a evidence box to be

17    brought to the police department crime lab for

18    ballistics testing and trace evidence.

19         Q.     Were you informed as to who found

20    that gun at the scene?

21         MR. WEINGARD:   Objection as to

22      form.

23         MS. NAPOLITANO:   Objection.

24         You can answer.

25         A.     No.

28

Barnych

1         Q.     Did you ask anybody who found the

2 gun?

3         A.     No.

4         Q.     Did you have an assumption as to

5 who found the gun?

6              MS. NAPOLITANO:  Objection as to

7      form.

8              You can answer.

9              MR. WEINGARD:  I join.

10         A.     I just know a gun -- they told me

11 a gun was recovered.  I don't remember

12 specifically who told me who found what.

13         Q.     Did you have an assumption as to

14 whether a Nassau County police officer or a

15 Floral Park police officer found the gun?

16              MS. NAPOLITANO:  Objection to

17      form.

18              MR. WEINGARD:  Join in it.

19         A.     Could you reask that, please?

20         Q.     At the time you were at the site,

21 did you have an assumption as to whether a

22 Nassau County police officer or a Floral Park

23 police officer found the gun?

24         A.     I didn't make an assumption at

29

Barnych

1    that point.

2                MS. NAPOLITANO:  Objection as to

3         form.

4                You have to wait for me to

5         object.

6         Q.    Did Officer Vara tell you while

7    he was at that scene that he had found the

8    gun?

9         A.    No.

10        Q.    Do you know if any other evidence

11   was found at that site?

12        A.    Which site?

13        Q.    At the area in the vicinity of

14   the driveway.

15        A.    Which driveway, which house?  If

16   you could be specific, it would help me.

17        Q.    The house where the gun was

18   found.

19        A.    No, there was no specific

20   evidence, other than the gun, found at that

21   house.

22        Q.    Was a ring found in that area?

23        A.    It was found in the rear yard of

24   the home behind the home on Holland Avenue.

30

Barnych

1    

2   Q.   Do you know who found that ring?

3   A.   I don't recall who specifically

4   saw it for the first time, but I do remember

5   seeing it myself.

6   Q.   Where did you see it?

7   A.   It was in a vegetable garden.

8   Q.   What do you recall about the

9   appearance of that ring?

10   A.   It was a rather large yellow

11   metal ring with multiple clear white to white

12   stones on it.

13   Q.   Did you observe anything else in

14   that area, in that general area?

15   MS. NAPOLITANO:  Objection.

16   A.   Vegetables, dirt.

17   Q.   Anything else with regard to

18   evidence of what happened in this incident?

19   A.   For my benefit, let's at least

20   stipulate that in my mind there are three

21   separate and distinct scenes here, where the

22   vehicle was found on Jericho Turnpike, where

23   the gun is found on Holland Avenue and where

24   the ring is found in the backyard of a house

25   from Hinsdale.  If you could be kind --

31

Barnych

1

2      MR. WEINGARD:  What was that

3   street reference?

4      THE WITNESS:  Hinsdale,

5   H-I-N-S-D-A-L-E.

6      A.     If you could be a little more

7   specific as to which location you are talking

8   about, that would help me.

9      Q.     Let's start with the area where

10   the ring was found, was there anything else

11   found in relation to this incident?

12      A.     I don't recall anything else

13   being found.

14      Q.     Where the gun was found, was

15   there anything else found?

16      A.     No, as I stated before.

17      Q.     And going back to the vehicle.

18      A.     The vehicle was where we found

19   the loaded magazine for a gun that was not the

20   one that was found in the driveway.

21      Q.     Was anything else looked at in

22   that vehicle in that black Mazda?

23      A.     Yes.

24      Q.     What was looked at?

25      A.     The interior of the vehicle was

32

1              Barnych

2    observed.  The trunk of the vehicle was

3    observed.  There was a photograph that was

4    recovered from the dashboard of the vehicle

5    that depicted a male black who exactly matched

6    the picture of Darryl Coggins, and we believe

7    it was Darryl Coggins, because that was the

8    photo license that Police Officer Vara had

9    secured during the car stop.  So yeah, that

10   was recovered as well.

11        Q.     And you said that that ring

12   matched the ring in the photograph?

13        A.     I never said that.  Actually, let

14   me strike never.  I haven't said that yet.

15        Q.     Did you compare the ring that was

16   found at Hinsdale to the ring that was in the

17   photograph?

18             MS. NAPOLITANO:  Objection.

19        A.     We observed that the person in

20   the photograph was wearing a ring that exactly

21   matched the one that was recovered in the rear

22   yard in the vegetable garden.

23        Q.     Had you seen Darryl Coggins'

24   driver's license at --

25        A.     Yes, at that point I had.

33

                              Barnych

1

2              MS. NAPOLITANO:  You have to let

3        him finish.

4              Q.    Who showed you Darryl Coggins'

5        driver's license?

6              A.    Officer Vara.

7              Q.    Did Officer Vara tell you how he

8        got Darryl Coggins' driver's license?

9              A.    I don't specifically recall.

10             Q.    Did Officer Vara tell you he was

11       the sole officer who was pursuing Mr. Coggins

12       initially?

13             MS. NAPOLITANO:  Objection as to

14        form.

15             You can answer.

16             A.    I believe he said that he

17       initiated the foot pursuit and that he was

18       alone up to the point that he lost contact

19       with Mr. Coggins at the gate in the driveway,

20       but at that point he was aware that there was

21       an assisting officer coming up behind him from

22       Jericho Turnpike.

23             Q.    Did he indicate who that was?

24             A.    It was Officer Buonora.

25             Q.    Did he tell you this while you

34

1                        Barnych

2    were at that location?

3         A.      Which location?

4         Q.      The location that you responded

5    to.

6         A.      Jericho Turnpike and Hinsdale or

7    Holland Avenue?

8         Q.      Let me ask you this way.

9         A.      I want to be specific.

10        Q.      Let me ask you this way.  Where

11   were you when Officer Vara told you about

12   Officer Buonora approaching in his car?

13               MS. NAPOLITANO:  Objection, not

14          what the witness said.

15        Q.      What exactly did Officer Vara say

16   with regard to another officer approaching at

17   that time?

18        A.      At the point that he was running

19   up the driveway toward the gate, he was aware

20   of the fact that there was an assisting

21   officer behind him but a ways back, probably

22   at the corner of Jericho and Holland.

23               MR. WEINGARD:  I am going to

24          object, unless that's actually what Vara

25          said.  Did Vara actually say that, or

35

Barnych

1    are you just assuming that it was back

2    there?

3

4              THE WITNESS:  No.  It's in sum

5    and substance.

6              MS. NAPOLITANO:  I am going to

7    object.  Again, Mr. Weingard, you will

8    have an opportunity to ask him

9    questions.

10             MR. WEINGARD:  Will you let him

11   answer?

12             MS. NAPOLITANO:  He did answer.

13             MR. WEINGARD:  In sum and

14   substance.

15             Can we have the answer read back,

16   please.

17             (Record read.)

18        Q.    At the time you mentioned the

19   assisting officer, was the officer inside or

20   outside of a car?

21        A.     He mentioned that he was aware of

22   the fact that an officer had exited his car

23   and was now coming up behind him to assist

24   him.

25        Q.     Did he indicate how far behind

36

Barnych

1    him the other officer was?

2          A.    I don't have a specific

3    recollection of that.

4          Q.    And that officer was Officer

5    Buonora?

6          A.    Yes, sir.

7          Q.    And he told you this on October

8    9, 2004 at that location?

9                MS. NAPOLITANO:  Objection to

10         form.

11               You can answer.

12         A.    "He" meaning?

13         Q.    "He" meaning Officer Vara.

14         A.    Yes.

15         Q.    Do you know if that conversation

16   occurred by the vehicle, in the driveway or at

17   some other location?

18         A.    The conversation between Vara and

19   myself?

20         Q.    With regard to the other

21   assisting officer, yes.

22         A.    It was the driveway on Holland

23   Avenue.

24         Q.    Was Officer Buonora present in

37

Barnych

1  that location at that time?

2          MR. WEINGARD:  Objection as to

3      form.  How would he know if he was

4      present?  Except perhaps he might have

5      been told.

6          MR. FOGELGAREN:  Okay.  I will

7      rephrase it.

8      Q.     Did you see Officer Buonora at

9  that location at that time?

10     A.     No, I did not.

11     Q.     On October 9, 2004, did you see

12  Police Officer Buonora at any time that day?

13     A.     No.

14     Q.     Did Officer Vara mention anybody

15  else who assisted him at that location other

16  than the officer who was running up the

17  driveway toward the gate?

18     A.     He didn't mention any specific

19  other officers, but it was apparent that there

20  were other police officers there.

21     Q.     Did you have any conversations

22  with Detective Occhino while you were at the

23  site on October 9, 2004?

24          MS. NAPOLITANO:  Objection to

38

Barnych

1      form.
2              You can answer.
3      A.      I'm sure I did.
4      Q.      Do you recall any?
5      A.      Not specifically.  It was just
6  back and forth, you know.  We would have been
7  commenting on what each of us observed, what
8  he may have found out from the people he spoke
9  to versus who I spoke to, develop a strategy
10  for finding the subjects or witnesses.
11     Q.      Do you know how much time you
12  spent at that location?
13     A.      All total, I want to say probably
14  about two hours.
15     Q.      Do you recall any other
16  conversations you had with any other police
17  officers at that location other than what
18  you've told us up to now?
19     A.      Other than Detective Fannon, no.
20  I believe I spoke to one of the emergency
21  services officers who told me that they had
22  checked some rooftops and mailboxes, and they
23  were negative for recovery of any additional
24  weapons, and also the storm drain on the

39

Barnych

1    corner that they had finished searching.

2

3         Q.      Did they find anything at that

4    storm drain?

5         A.      No.

6         Q.      Did you speak to any civilians at

7    that location?

8         A.      No.

9         Q.      Did you speak to anybody else in

10   the Nassau County Police Department through

11   police radio while you were at that location?

12        A.      I don't remember having any radio

13   contact, no.

14        Q.      Do you know if any member of the

15   police department radioed any information

16   about Darryl Coggins to other members of the

17   police department from that location?

18               MS. NAPOLITANO:  Objection.

19               MR. WEINGARD:  Objection.

20        A.      I have no knowledge of that.

21        Q.      Did you give any instructions to

22   any police officers at that location prior to

23   leaving?

24        A.      Yes.

25        Q.      What were those directions?

40

1                           Barnych

2          A.       I directed that the vehicle in

3     question be impounded, and I informed Police

4     Officer Vara that it was his responsibility to

5     call in a completed case report at the

6     conclusion of his involvement.

7          Q.       What is a completed case report?

8          A.          Well, every police incident that

9     would fit the criteria for it being issued a

10    case report, the police officer that makes the

11    initial contact with data processing, if you

12    will, calls in what they call a preliminary

13    case report in order to get a sequence number

14    that allows assisting units, support units,

15    like crime scene, canine, emergency services,

16    that's how they track their involvement.

17             So what will happen is the

18    officer calls data processing.  He secures a

19    preliminary case report, and there's minor

20    information that has to go in there or very,

21    very limited amount.  At the point that their

22    involvement is done, they're obligated to call

23    data processing, fill in the details that

24    would normally be contained in that report

25    with regard to known subjects, vehicles,

41

Barnych

1    police action, any brief narrative of what had

2    transpired.

3

4         Q.    Do you know if any evidence was

5    inventoried at the site?

6         A.    Yes.

7         Q.    What evidence was inventoried?

8         A.    The loaded magazine that was

9    recovered from the car or the proximity of the

10   car, the gun that was found in the driveway,

11   the yellow metal ring that was found in the

12   vegetable garden, along with a men's wallet

13   and some other personal papers contained

14   therein, a few other items.  They would have

15   been itemized on a evidence invoice.  It's a

16   Form 106.

17             MR. FOGELGAREN:  Mark this as

18        Barnych 1.

19             (Barnych Exhibit 1, Property

20        Bureau Invoice, marked for

21        identification.)

22        Q.    I am going to show you what has

23   been marked as Exhibit Barnych 1 today's date,

24   and I am going to ask if you can identify that

25   form?

42

Barnych

1

2      A.      This is a photocopy of police

3      department form PDCN 106.  It bears the case

4      report number, the detective division number,

5      voucher number for property that's identified

6      in the body of it.  It bears my signature,

7      along with an itemized list of items that were

8      recovered and where they were recovered.

9      Q.      On this particular list, does

10     that include the gun that is recovered --

11     A.      No.

12     Q.      -- at the site?

13             MS. NAPOLITANO:  Let him finish.

14     A.      No, it does not.

15     Q.      Was there a separate form made

16     out for the gun that is recovered?

17     A.      Yes, sir.

18     Q.      Would it be the same type of

19     form?

20     A.      It should be.

21     Q.      On October 9, 2004, did you see

22     any forms that were filled out by the Floral

23     Park Police Department?

24     A.      No, I didn't.

25     Q.      Subsequent to October 9, 2004,

43

1                          Barnych

2    did you ever see any forms that were filled

3    out by the Floral Park Police Department with

4    regard to what occurred on October 9, 2004 at

5    the location?

6          A.      No, sir.

7          Q.      I will show you what has been

8    previously marked as Occhino 1 (handing).  I

9    am going to ask you if you can identify, start

10   with the top page.

11         A.      This is a Nassau County Police

12   Department arrest report dated 10/9 of 2004.

13   The defendant identified as Darryl Coggins,

14   and that's page 1.  And there's information on

15   here on how the original complaint was

16   received, who the booking officers were,

17   description of the subject with regards to

18   tattoos, any prior arrests he may have had.

19   That's on page 1.

20         Q.      Was there an arresting officer

21   designated?

22         A.      Yes.

23         Q.      Who was that?

24         A.      That would be me.

25         Q.      How were you designated the

44

Barnych

1       arresting officer?

2       A.      In the lower portion of the

3   sheet, it's in the arrest data section, it

4   says "booked by."  There is a number 6356 with

5   the first five letters of my last name, a

6   comma and then the numbers 7224 followed by

7   the first five letters of Detective Occhino's

8   name.

9               MR. FOGELGAREN:  Take a

10          five-minute break.

11              MS. NAPOLITANO:  Sure.

12              (Recess taken at 2:45 p.m.)

13              (Examination resumed at 2:51.)

14              (Barnych Exhibit 2, Floral Park

15          Police Department document, marked for

16          identification.)

17      Q.      I will show you what has been

18  marked as Barnych 2.  I ask you to take a look

19  at it.  It's a one-page document.  It says

20  Floral Park Police Department on top.

21      A.      You've done a good job of

22  identifying it.  I've never seen this before,

23  so I don't know what it is.

24      Q.      You've never seen this document

                                                45

                              Barnych

 1

 2     before today?

 3          A.      No.

 4                  MR. WEINGARD:   But it is marked

 5     as 2?

 6                  MR. FOGELGAREN:   Barnych 2.

 7          Q.      After you left the area in Floral

 8     Park on October 9, 2004, where did you go

 9     after that?

10          A.      Myself and Detective Occhino went

11     to, I believe it was, Woods Avenue in

12     Roosevelt.

13          Q.      What was your purpose of going

14     there at that time?

15          A.      We were looking to see if we

16     could locate Mr. Coggins.

17          Q.      Why did you go to that location?

18          A.      Because that was his known

19     address, as depicted on his driver's license.

20          Q.      Did you meet anybody at that

21     location?

22          A.      There was nobody there.

23          Q.      Did you speak to anybody else in

24     that area?

25          A.      I don't remember.

46

Barnych

1    Q.      Where did you go after that?

2    A.      We then went to a location in

3    Garden City Park.

4    Q.      What was your purpose in going

5    there?

6    A.      That was the address that we

7    believed was where we would find Ms. Jovan

8    Bates, who was the female passenger in the

9    earlier-discussed black Mazda.

10           MR. WEINGARD:  Can you spell that

11           for us, please.

12           THE WITNESS:  B-A-T-E-S, first

13           name J-O-V-A-N.

14   Q.      What was your reason for seeing

15   her at that time?

16   A.      To interview her to find out if

17   she can give us any insight as to where we

18   might be able to find Mr. Coggins and to also

19   find out what, if anything, she could provide,

20   as far as details from what had happened

21   earlier in the morning.

22   Q.      Did you speak to her at that

23   location?

24   A.      Yes, I did.

47

Barnych

1

2      Q.      Was anybody with you at that

3  time?

4      A.      Detective Occhino.

5      Q.      Can you tell me about the

6  conversation you had with her at that time?

7      A.      She did not give us any

8  indication as to where we could find

9  Mr. Coggins.  She was reluctant to give us any

10 information initially.  We did leave her with

11 the caveat that if she did hear from him, we

12 would appreciate it if she called us, and if

13 she could convince him to call us as well.

14     Q.      Did you ask her about what she

15 observed at the time that Mr. Coggins and

16 Officer Vara were together?

17     A.      No.

18     Q.      Was there any reason that you

19 didn't ask about what she observed at that

20 time?

21     A.      I was more focused on trying to

22 find Mr. Coggins at that point, and I really

23 didn't believe that she could have added any

24 details that altered what I already known had

25 happened earlier.

48

1                      Barnych

2          Q.      Did you speak to anybody else who

3    was a passenger in that vehicle other than

4    Ms. Bates?

5          A.      I believe we tried to find

6    Mr. Simmons, but I'm not certain whether or

7    not we actually located him or not.

8          Q.      After you spoke to Ms. Bates,

9    what did you do?

10         A.      We then went to where Mr. Simmons

11   was known or believed to have lived.

12                 MR. WEINGARD:   Can we get a first

13         name, please?

14                 THE WITNESS:   Aaron I believe his

15         first name was.

16         Q.      Did you meet Mr. Simmons at that

17   location?

18         A.      No.

19         Q.      Did you speak to anybody at that

20   location?

21         A.      I don't believe we found anybody

22   there, no.

23         Q.      Where did you go after that?

24         A.      I believe Detective Occhino and I

25   grabbed either a cup of coffee or a bite to

49

Barnych

1   eat, and then ultimately we ended up back at

2   the 3rd Precinct.

3       Q.      What did you do when you got back

4   to the 3rd Precinct?

5       A.      Went back up to the 3rd Squad,

6   checked the computer system to see what other

7   cases I may have been assigned, and then I

8   worked at my computer to open up this

9   particular case and add my detective's

10  narrative entries into it.

11      Q.      What detective narrative entries

12  did you enter?  And you can refer to Occhino 1

13  to point them out, please.

14      A.      Well, this particular packet of

15  information is comprised of an arrest report,

16  a crime report from this case.  There's a

17  document in here that's not at all applicable

18  to anything that we're discussing here.  It's

19  part of a case report from approximately four

20  years later.  There's an additional copy of

21  the crime report, and there's actually two

22  copies of the crime report attached to this,

23  but there is no case report here.

24      Q.      What information is contained on

50

1                          Barnych

2       the case report?

3            A.      Case report is the -- again, the

4       initial -- the date and time, place of

5       occurrence, the participants who were

6       involved, a narrative written by the police

7       officer called preliminary narrative,

8       description of vehicles and what the

9       disposition of those vehicles would be,

10      whether they were released, left legally

11      parked, impounded, et cetera.  That is the --

12      that is the initial police reporting system.

13      That document then gets electronically

14      assigned to the 3rd Squad, in this particular

15      case it would.  And then at that point I would

16      add my narrative, which is informally known as

17      a 262, but on that case report it's listed as

18      a detective's narrative, and then it would

19      detail my involvement in the case itself.

20           Q.      On page 3 of Occhino 1 there is a

21      narrative.  It goes on to page 4.

22           A.      Correct.

23           Q.      You see that?

24           A.      Yes, I do.

25           Q.      Do you know who prepared that

51

Barnych

1    narrative?

2         A.    Well, the first large paragraph

3    in here, if my recollection is correct, is a

4    transcription of what Police Officer Vara

5    would have put in the initial police narrative

6    in his case report, and the second paragraph,

7    which begins "On Saturday, 10/9/2004," that

8    would have been a narrative that was entered

9    by myself.  But this is on the arrest report,

10   which is part of the arrest package, not

11   necessarily the case report.

12        Q.    Would Officer Vara add anything

13   on to the case report?

14        A.    Yes.

15        Q.    What would he have entered?

16        A.    Initially -- the date and time of

17   occurrence, location of the occurrence,

18   probably the license, registration of the

19   vehicle that was stopped, a description of the

20   vehicle by year, make and model and color.

21   There should be a listing of any person or

22   persons that were involved in the case, either

23   as police officers or civilians, with their

24   respective name, date of birth, Social

52

Barnych

1   Security number, address.  And as I stated

2   before, his narrative of what had transpired

3   from point of initial contact to point of

4   calling in the case report.

5          Q.     In the narrative on the arrest

6   report in Occhino 1, the paragraph that you

7   said Officer Vara prepared, how did he do

8   that; did he orally call it into somebody, did

9   he write it down, type it up?

10                MS. NAPOLITANO:  Objection.

11                If you know.

12                MR. WEINGARD:  I join.

13                MR. FOGELGAREN:  If you know.

14         A.     In the normal course of police

15  operations, the police officer is required to

16  call the data processing bureau and update

17  them as to the complete details of the case as

18  they know them in order for the case to be

19  properly assigned up to the squad or kept at

20  the uniform level.  To do that he would have

21  had to call the data processing bureau and

22  dictate this information to a multikeyboard

23  operator, who would then type it into the

24  computer narrative.

53

Barnych

1

2      Q.      After Officer Vara submitted the

3   information that led to this paragraph, did

4   you review this paragraph?

5      A.      Yes.

6      Q.      Do you know when you reviewed it?

7      A.      When I initially opened up the

8   case report on the computer.

9      Q.      After reviewing it, did you speak

10   to Officer Vara?

11      A.      No.  You mean that day?

12          MR. FOGELGAREN:  That day, yes.

13      A.      No.

14      Q.      Did you have any contact with

15   Mr. Coggins on October 9, 2004?

16      A.      Yes, I did.

17      Q.      When did you first have contact

18   with Mr. Coggins?

19      A.      Somewhere just before 4 p.m.  I

20   was contacted by the front desk, and they

21   indicated to me that Mr. Coggins was present

22   in the lobby of the 3rd Precinct, along with

23   an attorney.  And I responded downstairs,

24   introduced myself to Mr. Coggins and his

25   attorney.

54

Barnych

1    Q.      Who was his attorney?

2    A.      I don't remember.  It was an

3    older, white gentleman at the time.  I believe

4    I kept his card in the case jacket, but I

5    don't remember his name.

6        Q.      Did you have any conversations

7    with Mr. Coggins at that time?

8        A.      My conversation was primarily

9    with the attorney, but I don't remember having

10   a specific conversation with Darryl Coggins.

11       Q.      Do you recall what the

12   conversation with the attorney was at that

13   time?

14       A.      The attorney had indicated to me

15   that he believed that we were looking for

16   Mr. Coggins relating to a DWI incident that

17   had happened earlier in the morning.  I

18   commented to the attorney that it would be

19   unlikely that we were looking for him for a

20   DWI this many hours later, and I informed him

21   that the true nature of the charges would be

22   related to possession of a weapon,

23   specifically a loaded firearm and defaced

24   firearm.

Barnych

1

2       At that point the attorney

3   commented to me that he was unaware of that

4   situation, and he requested that I not take

5   any statements from Mr. Coggins, as I told him

6   that it was our intention to arrest

7   Mr. Coggins and process him on those charges.

8       Q.      After that conversation ended,

9   what did you do?

10      A.      I brought Mr. Coggins upstairs to

11  the 3rd Squad, placed him in the arrest room,

12  got myself organized and then proceeded to

13  process the arrest.

14      Q.      What did you do with regard to

15  processing the arrest; what did you do

16  exactly?

17      A.      Specifically I opened up a

18  computer program, which was the Swift Justice

19  Arrest processing program.  I filled in the

20  data on a screen-by-screen basis that was

21  applicable, prepared the crime report, the

22  arrest report, the two district court

23  informations.  I also prepared the police

24  department Form 79, which is the physical

25  condition questionnaire of the defendant.

56

Barnych

1     What I had observed about Mr. Coggins, that he

2     had some scrapes on his forearm, I had to make

3     note that these scrapes were present.  I asked

4     him how he received those scrapes, and he

5     indicated to me during the foot pursuit by the

6     police, he cut himself when he went over the

7     fence.  I placed that comment in the Form 79

8     for the desk officer to review.

9          Q.     Do you know if anybody inspected

10    Mr. Coggins for any tattoos?

11         A.     I did.

12         Q.     Did you note any tattoos?

13         A.     Yes.  On the arrest report the

14    description of his tattoos is in there.  It

15    would be on page 1 of Occhino 1.  In the first

16    body of information it says, "SMT/clothing,"

17    SMT being an abbreviation for scars, marks or

18    tattoos, and it indicated the word Tamel,

19    T-A-M-E-L, on his right forearm, and it says

20    "Thou shall love thy father" on his back.

21    Said he was wearing a white T-shirt, blue

22    jeans and black sneakers.

23         Q.     Going to page 7 of Occhino 1.

24         A.     By 7 do you mean the stamped page

57

Barnych

1     at the bottom?

2            MR. FOGELGAREN:  Yes, 000007 of

3       Occhino 1.

4       Q.     Do you see that page?

5       A.     Yes, I do.

6       Q.     What is that; what form is that?

7       A.     This is the crime report, also

8    known as PDCN Form 85 ASJ, which stands for

9    Swift Justice, and then it bears the case

10   report number, and I believe this would be the

11   first page of a crime report.

12          Q.     There is a portion marked

13   "testimonials."

14          A.     Correct.

15          Q.     Who filled in that section?

16          A.     I did.

17          Q.     What information was supposed to

18   be placed in that section?

19          A.     Testimonials are the elements

20   that a particular witness, be it civilian or

21   police, would be able to articulate or testify

22   to.

23          Q.     The portion James Vara, where it

24   says "no statement," it says, "Recovered

58

Barnych

1  loaded handgun." Do you see that, on the

2  second line?

3

4        A.      Among other things, okay, yes.

5        Q.      Did you put that information into

6  that section?

7        A.      I typed it in, yes.

8        Q.      Did you learn that Officer Vara

9  had recovered the loaded handgun at the site?

10       A.      It was my belief that he was

11 instrumental in the recovery of the gun in one

12 level or another.  The semantics of who

13 specifically recovers something, in my

14 opinion, is open for debate, and we can have a

15 discussion on that.  But with specific regards

16 to this particular entry, yes, I made it,

17 because I believe that since this entire case

18 was initiated by him and he was ultimately

19 responsible for the car stop and the ensuing

20 foot pursuit, that there was a level of

21 involvement in the recovery, maybe not a

22 textbook definition of such.

23       Q.      Then there is an arrest narrative

24 in the bottom of the page that goes on to the

25 next page.

59

1                           Barnych

2          A.      7 on to 8?

3                  MR. FOGELGAREN:  Yes.

4          A.      Yep.

5          Q.      Again, that first paragraph, was

6      that prepared by Officer Vara?

7          A.      The bulk of it was, yes.

8          Q.      Was there any part of that first

9      paragraph that was not prepared by Officer

10     Vara?

11         A.      The second paragraph where again

12     it begins "On Saturday, 10/9/2004."

13         Q.      What I was asking was about the

14     paragraph prior to that, the first paragraph.

15         A.      This is a transfer of the

16     information that Police Officer Vara had

17     placed in the case report and transferred over

18     to the arrest report in order to give the

19     court a synopsis of what specific incident

20     happened and what the elements of that are

21     that would rise to the level of criminal

22     activity.

23         Q.      Other than what's contained in

24     Occhino 1, did you do any other investigation

25     with regard to the incident on October 9, 2004

60

```
1                      Barnych
2   involving Darryl Coggins in Floral Park?
3        A.      Other than what's already been
4   talked about?
5                MR. FOGELGAREN:  Yes.
6        A.      No.
7        Q.      Did you have any discussions with
8   any assistant district attorneys about the
9   case?
10       A.      Yes.
11       Q.      When was the first time you
12  discussed the case with an assistant district
13  attorney?
14       A.      I'm sorry.  When?
15       Q.      When.
16       A.      I believe it was March of 2005.
17       Q.      Was this after Mr. Coggins' case
18  was going to be presented to a grand jury?
19               MS. NAPOLITANO:  Objection to
20       form.
21       A.      No.  It was just prior to that.
22       Q.      Which assistant district attorney
23  did you talk to?
24       A.      I believe her name was Mindy
25  Plotkin.
```

                                                                    61
1                          Barnych

2          Q.        Where did you talk to her?

3          A.        At the district attorney's

4    office.

5          Q.        What was the purpose of talking

6    to her at that time?

7          A.        I was subpoenaed as the carrying

8    detective.  It was her intention to present

9    the evidence to the grand jury, and as such,

10   you know, my role in the case.

11         Q.        What discussions did you have

12   with her about your role in the case?

13         A.        Specifically that I was the

14   carrying detective, and in sum and substance

15   the details that were already reported in the

16   case and the fact that the defendant had

17   voluntarily surrendered to me at the 3rd

18   Precinct, and I processed him from that point.

19         Q.        What happened after that?

20         A.        With respect to?

21         Q.        Did you have any conversations

22   again with the district attorney, the

23   assistant district attorney, after that?

24              MS. NAPOLITANO:  Objection.

25              You can answer.

62

                              Barnych

1

2          A.      On that particular date or at any

3    time thereafter?

4          Q.      Any time after that, any time

5    after that.

6          A.      Yeah.   There was subsequent --

7    there was a subsequent suppression hearing

8    that I had to respond to or I was subpoenaed

9    to.

10         Q.      Did you appear before the grand

11   jury?

12         A.      No, sir.

13              MR. WEINGARD:   Do we have a date

14         for that suppression hearing or the date

15         of appearance?

16              THE WITNESS:   I believe the grand

17         jury was St. Patrick's Day, so it was

18         what, 3/17 of 2005?   I'm sure their

19         records will back that up.   I want to

20         believe that the suppression hearing

21         that I was called to was somewhere

22         either, I want to say, September or

23         October of 2005, maybe six, seven months

24         later.   I can't recall specifically, but

25         I'm sure there is a way to determine

63

Barnych

1          that.

2          Q.      Do you recall which district

3 attorney, assistant district attorney, that

4 you met with at that time?

5          A.      It was Mindy Plotkin.

6          Q.      Do you recall the conversation

7 you had with her at that time?

8          A.      Other than the fact that she

9 informed me that she was not going to put me

10 in to testify --

11                MR. WEINGARD:  I am going to

12          object.

13                MR. FOGELGAREN:  It's okay.  You

14          can answer.

15          A.      As I said, she was not going to

16 put me in to testify, but it was necessary to

17 be there, because I was the carrying

18 detective, and then we had a conversation

19 after the hearing.  That was a conversation

20 that was initiated by me.

21          Q.      What was that conversation about?

22          A.      There was a Floral Park police

23 officer that had also been requested to appear

24 that day, I believe his name was Police

25

64

Barnych

1   Officer Wilson, who had informed me that he,

2   in fact, recovered, by his definition of

3   recovery, the weapon in the driveway on

4   Holland Avenue and that he had broadcast radio

5   notifications of that fact over his police

6   radio, and he wanted to clear up any

7   misinformation regarding who had, in fact,

8   recovered the gun.

9              At that point I brought him into

10  Ms. Plotkin's office.  I informed her that

11  Police Officer Wilson wanted to give her

12  details on his involvement regarding recovery

13  of the gun, and at that point I left it in her

14  hands, and I went back to my squad.

15             MR. WEINGARD:  I'm sorry.  You

16        went back to?

17             THE WITNESS:  I went back to the

18        3rd Squad.

19        Q.    What was the significance of

20  Officer Wilson's statement to you at that

21  time?

22             MS. NAPOLITANO:  Objection.

23             MR. WEINGARD:  I join.

24        A.    That was the first time that I

65

Barnych

1    became aware that somebody other than a Nassau

2    County police member had, in fact, recovered

3    the gun, in whatever definition you want to

4    give the word recovery.  He seemed -- he

5    seemed pretty adamant over the fact that that

6    was important to him, and I felt it was

7    equally important to bring that to the

8    attention of Ms. Plotkin.

9        Q.    Did you have any discussions with

10   Officer Vara after you had this conversation

11   with Officer Wilson?

12       A.    I wouldn't say direct

13   conversations with him about -- you mean in

14   the assistant district attorney's office or at

15   any time thereafter?

16              MR. FOGELGAREN:  Anywhere.

17       A.    Well, we had discussed -- not at

18   length, but many weeks or a few weeks later,

19   when I was then summoned to the ADA's office

20   of Jim Clark, Officer Vara had contacted me at

21   the squad and wanted to know what it was all

22   about.  So I had told him that apparently

23   there's a problem with the case, and they want

24   to get our input on what happened.

66

1                    Barnych

2         Q.      Did you say anything else to

3    Detective Vara at that time?

4         A.      Police Officer Vara?

5         Q.      Police Officer Vara, I'm sorry.

6         A.      I don't recall any specific

7    conversation.

8         Q.      Did he say anything to you, other

9    than what you said?

10        A.      Other than what it was all about,

11   no.

12        Q.      Was anybody else with you when

13   you had this conversation other than yourself

14   and Vara?

15        A.      I can't tell you who was on his

16   side of the phone, but it was a phone

17   conversation.  I was by myself.

18        Q.      Did you meet ADA Clark?

19        A.      Yes.

20        Q.      Did you have a conversation with

21   ADA Clark?

22        A.      Yes, I did.

23        Q.      What did you discuss with ADA

24   Clark?

25        A.      They asked me what my involvement

67

1                         Barnych

2       was in this case, as the carrying detective.

3       I detailed to them, probably at the same level

4       of detail that I've provided to you here

5       today, what my involvement was, responded to

6       whatever questions they asked me at that time,

7       and that was pretty much it.

8               Q.      Did you appear at a grand jury

9       after that?

10              A.      Yes, I did.  Did I?  I don't

11      remember.  Honest to God, I don't know.  I

12      probably did.

13              Q.      Do you recall giving any

14      testimony with regard to what ADA Clark

15      elicited from you?

16              A.      I don't recall.  If you have

17      grand jury minutes with my name on it, I'll

18      acknowledge it.  I've been to the grand jury a

19      thousand times, if I've been there once, so it

20      all runs together after a while.

21                      MR. FOGELGAREN:  I don't, and I

22          am not trying to fool you.

23              Q.      After speaking to ADA Clark about

24      the matter, did you have any conversations

25      with anybody from the district attorney's

68

                              Barnych

1
2    office?

3         A.      After meeting with Jim Clark?

4                 MR. FOGELGAREN:  Yes.

5         A.      Nobody specifically from the DA's

6    office, no.

7         Q.      Did you have conversations with

8    anybody else about what occurred on October 9,

9    2004, after you met with ADA Clark?

10        A.      Yes.

11        Q.      Who was that?

12        A.      Detectives Association members,

13   you know, my union reps, Internal Affairs

14   supervisors, an attorney provided to me by the

15   union, Detective Occhino, my wife.  Nobody

16   else really.

17        Q.      What conversations did you have

18   with Detective Occhino about the incident?

19        A.      Just the fact that we were being

20   called to Internal Affairs over the incident,

21   and, you know, I was not completely thrilled

22   about it, but it was what it was, and I had to

23   go through that.

24        Q.      Did you speak to Officer Vara

25   about the Internal Affairs investigation?

69

Barnych

1

2        A.        Not that I recall.

3        Q.        Did you ever speak to Officer

4   Buonora about the Internal Affairs

5   investigation?

6        A.        Not about the Internal Affairs

7   investigation, no.

8        Q.        Did you ever have any

9   conversations with Officer Buonora about the

10  incident that occurred on October 9, 2004?

11       A.        No.

12       Q.        Did you ever have any

13  conversation with Officer Buonora about the

14  investigation that was going on about the

15  incident on October 9, 2004?

16       A.        Not specifically about the

17  incident or the investigation, just -- he

18  routinely would be at the doors of the station

19  house.  I would pass him on my way in, you

20  know, and said hello and exchanged

21  pleasantries, if you will, to whatever we

22  could.

23       Q.        Had you ever worked with Officer

24  Buonora prior to October 9, 2004?

25       A.        I can only recall one other

70

Barnych

1    instance where I had actually met Officer

2    Buonora prior to that.  It was a -- I believe

3    it was a gas station robbery in New Hyde Park,

4    probably about six or seven months before

5    that.

6               MR. FOGELGAREN:  Why don't we

7          mark this as Exhibit 3.

8               (Barnych Exhibit 3, Document

9          Bates-stamped Nassau County 000302

10         through 000305 with attached fax cover

11         page, marked for identification.)

12         Q.    I am going to ask you to look at

13    what has been marked as Barnych 3 and ask if

14    you can identify the document, which is a

15    four-page document with the heading Police

16    Department County of Nassau, New York Internal

17    Correspondence dated December 1, 2005.

18         A.    This is a photograph copy of my

19    statement to Internal Affairs of the Nassau

20    County Police Department.

21         Q.    This document, is this all in

22    your handwriting?

23         A.    Other than what has been printed

24    by a machine and items marked "copy," this

71

1                          Barnych

2      time stamp on it and there's some cross-outs

3      in here that I did not create, and there's

4      also a fax cover page attached to this.

5      Anything that's written by pen, including my

6      initials encircled, I would say is my

7      handwriting.

8           Q.     The Bates stamp Nassau County

9      000302, that bears your initials?

10          A.     On the bottom left-hand corner,

11     yes.  Well, it's been partially obliterated,

12     but those are mine.

13          Q.     And the handwriting on that page

14     is yours?

15          A.     Correct.

16          Q.     The next page, 000303, is the

17     same, your handwriting and your initials on

18     the bottom of the page?

19          A.     Yes.

20          Q.     The following page, 000304,

21     handwriting is yours and initials are yours?

22          A.     Yes, sir.

23          Q.     000305, the handwriting is yours?

24          A.     Up to and including where there's

25     a cross-out that says "D sergeant" something,

72

1                        Barnych

2      which is obliterated, his shield number and

3      the letters "IAU," but other than that, it's

4      mine.

5              Q.      And your signature appears on

6      this page?

7              A.      Yes, sir.

8              Q.      And your initials appear on the

9      bottom of the page as well; is that correct?

10             A.      Yes, sir.

11             Q.      Do you know where you wrote this

12     statement?

13             A.      At Nassau County police

14     headquarters.

15             Q.      Did you write this statement

16     after being interviewed by a member or members

17     of the Internal Affairs Unit?

18             A.      Yes, sir.

19             Q.      Do you know who interviewed you?

20             A.      I believe it was Lieutenant Fiel

21     and Sergeant Duryea.

22             Q.      Did they ask you anything with

23     regard to your knowledge, if any, if Officer

24     Buonora had been involved in the incident

25     involving Mr. Coggins on October 9, 2004?

73

Barnych

1
2          MR. WEINGARD:  Objection as to

3     the form of the question.

4          A.     They had asked me a number of

5     questions regarding my involvement, what I

6     believed Police Officer Vara's involvement

7     was, what the involvement was of Detective

8     Fannon up to and including other officers and,

9     in fact, Officer Buonora.

10         Q.     What did you tell them about

11    Officer Buonora?

12              MR. WEINGARD:  Objection.

13              MS. NAPOLITANO:  Objection.

14         A.     There was no volunteered

15    information on my part as to what Officer

16    Buonora's role was in this initial

17    investigation.  I also told them that at no

18    time did I instruct anybody to say they

19    recovered a specific weapon.  There was a

20    discussion about chain of evidence and

21    custody, things along those lines.  But with

22    specific regards to Buonora, no, there was no

23    direct, I guess, involvement on my end.

24         Q.     Were you asked anything by any

25    members of the Internal Affairs Unit about

74

1                        Barnych

2 what you knew about Detective Buonora's

3 involvement?

4                MR. WEINGARD:  Objection as to

5      the form.

6                MS. NAPOLITANO:  Objection to

7      form.

8      A.     There were a lot of questions

9 asked that day.  Specifically about Buonora, I

10 can't remember one from the other.  If there's

11 a record of it, it will be in that record.

12      Q.     Did you tell any members of the

13 Internal Affairs Unit about Buonora arriving

14 at that location where Officer Vara was

15 pursuing Mr. Coggins on October 9, 2004?

16                MR. WEINGARD:  Objection as to

17      the form of the question.

18                MS. NAPOLITANO:  Objection to the

19      form.

20      A.     I will object to it too, because

21 it was just too long for me to remember.  What

22 is it you are asking?

23      Q.     What I'm asking is did you say

24 anything during your interview with the

25 Internal Affairs Unit about what you learned

75

Barnych

1    about Officer Buonora arriving at the location

2    when Officer Vara had started to pursue

3    Mr. Coggins?

4              MR. WEINGARD:  Again, same

5         objection.

6              MS. NAPOLITANO:  Objection.

7         A.    I'm not sure how they may have

8    approached the subject or whether or not it

9    was a specific question directly related to

10   Buonora, and I don't even know if it was part

11   of the Internal Affairs investigation, but it

12   was my understanding that Buonora's

13   involvement was limited to being at the

14   driveway of that house for a period of time

15   and observing that no other persons had

16   entered that driveway.  As far as any

17   specifics, I don't remember any more from

18   there.

19        Q.    Is there anything contained in

20   your statement on Barnych 3 regarding Buonora

21   being present at that location on October 9,

22   2004?

23             MR. WEINGARD:  Do you want to

24        reference page 3?

76

1                        Barnych

2          A.       Okay.   On what would be my

3    written page 3 Bates-stamped number 000304 is

4    the only reference to Police Officer Buonora

5    in my letter to Internal Affairs, and it was

6    specifically addressing whether or not Buonora

7    was involved in the actual foot pursuit, as

8    far as that goes, but it didn't address any

9    other action or lack of action that Buonora

10   may or may not have taken.

11         Q.       You testified earlier that after

12   you learned about this incident when you were

13   at the 3rd Precinct, that you obtained a

14   police radio.

15         A.       Yeah.

16         Q.       Did you have a police radio prior

17   to that time?

18                  MS. NAPOLITANO:   Objection.

19                  MR. WEINGARD:   Objection as to

20         form.

21         Q.       On that day.

22         A.       The squad room has a bank of

23   radios that are kept in the supervisor's

24   office, okay.   Additionally, there is a police

25   radio that is out by the blotter where you

77

                    Barnych

1
2    would sign in and out of.  You would normally

3    obtain a set of departmental vehicle keys and

4    a radio from the supervisor's office before

5    leaving the building to go out and cover a

6    scene or go out and interview people.

7         Q.    Did you hear any police radio

8    transmissions regarding the incident on

9    October 9, 2004 at Floral Park prior to you

10   obtaining the police radio at the time you

11   were getting your car?

12        A.    No, sir.

13        Q.    After speaking to Internal

14   Affairs and preparing the statement marked as

15   Barnych 3, did you have any conversations with

16   anybody else at the Nassau County Police

17   Department with regard to the incident of

18   October 9, 2004 at Floral Park?

19        A.    I'm sorry.  Give me the time

20   parameters again.

21        Q.    After you prepared the statement,

22   Barnych 3.

23        A.    After I prepared this?

24        Q.    Yes.  Did you have any other

25   conversations with anybody at the Nassau

78

```
 1                         Barnych
 2     County Police Department with regard to the
 3     incident on October 9, 2004 in Floral Park
 4     involving Mr. Coggins?
 5                  MR. WEINGARD:  Ira, are we
 6              limiting that to Internal Affairs or
 7              anybody at all?
 8                  MR. FOGELGAREN:  Anybody at all
 9              in the Nassau County Police Department.
10                  MS. NAPOLITANO:  Can I just add?
11     Up from December 1, 2005 to today?
12                  MR. FOGELGAREN:  Yes.
13                  MS. NAPOLITANO:  You can answer.
14                  MR. WEINGARD:  I would object.
15     It's overbroad.
16          A.     Detective Walsh from the
17     Detectives Association.
18          Q.     What conversation did you have
19     with Detective Walsh?
20                  MR. WEINGARD:  Objection.
21          A.     I was inquiring if he knew what
22     the status was of the Internal Affairs
23     investigation.
24          Q.     Did you ever learn of any
25     findings of the Internal Affairs
```

79

Barnych

1        investigation?

2                A.      No.

3                Q.      And you retired when?

4                A.      September 14, 2007.

5                Q.      What was your reason for

6        retiring?

7                A.      I got a better job.

8                        MR. FOGELGAREN:  I have no

9        further questions.

10                       MR. WEINGARD:  I will just be a

11       moment or two.

12                       MS. NAPOLITANO:  Are you holding

13       it open?

14   RQ                  MR. FOGELGAREN:  Yes.  I will

15       repeat my request for the complete

16       records of the Internal Affairs Unit.

17       And after reviewing that, if there are

18       other areas which require a further

19       deposition of this witness, I am

20       reserving my rights to that.

21                       MR. WEINGARD:  And I would join

22       in that application.

23                       Off the record.

24                       (Discussion off the record.)

80

Barnych

1    EXAMINATION BY

2    MR. WEINGARD:

3         Q.    As a result of what occurred

4    here, did you sustain any disciplinary charges

5    whatsoever?

6         A.    No.

7         Q.    I assume you were not dealt with

8    either administratively or through formal

9    charges when you respond to that?

10             MS. NAPOLITANO:  Objection as to

11        form.

12             MR. WEINGARD:  You can answer it.

13        A.    Up until the time I retired, I

14   was not provided with any list of any

15   departmental complaint or violation of any

16   rules or regulations.

17             MR. WEINGARD:  One moment or two.

18        Q.    I think when you gave your

19   initial testimony, you said that Officer Vara,

20   in essence, was chasing a person he now

21   believes to have been Coggins and that he saw

22   him jump a fence, and did you say he heard a

23   metal sound or did not hear a metal sound when

24   that occurred?

81

Barnych

1

2          MS. NAPOLITANO:  Objection to

3      form.

4          You can answer.

5      A.    Officer Vara told me that he

6  heard a metal object hit the ground.

7      Q.    Did he tell you that at the scene

8  that morning?

9      A.    Yes.

10      Q.    Because it does appear in his

11  report, but it does not appear in your

12  handwritten report, I don't believe.

13          Would you take a look at your

14  handwritten report, which I believe to be

15  Barnych 3.  You might look at page 2.  I'm

16  sorry, I apologize.  It does appear.

17          So he told you that he heard a

18  metal sound hit the ground?

19      A.    Yes.

20          MS. NAPOLITANO:  Objection.

21      Q.    Did he tell you he had seen what

22  it was?

23      A.    At the time that he told me he

24  first heard a metal object hit the ground, he

25  told me that he was not sure what that metal

82

```
1                     Barnych
2    object was.  He then learned later that it was
3    the gun.
4         Q.      From whom did he learn that, if
5    you know?
6                  MS. NAPOLITANO:  Objection.
7         A.      You'd have to ask him.
8         Q.      Did he mention a name to you?
9         A.      No.
10        Q.      Throughout the entire time that
11   you were at the scene, you said you never saw
12   Officer Buonora?
13        A.      That's correct.
14        Q.      Did his name come up in any
15   context whatsoever while you were there?
16                 MS. NAPOLITANO:  Objection to
17       form.
18                 You can answer.
19        A.      Yes.
20        Q.      Can you tell me what it was,
21   please?
22        A.      As I had testified earlier,
23   Officer Vara indicated that while he was
24   actively pursuing this subject, he was aware
25   of the fact that an assisting officer was
```

83

```
 1                    Barnych
 2   coming in behind him.  It was later determined
 3   that that was Officer Buonora.
 4          Q.     Do you have any understanding as
 5   to why Officer Buonora was no longer at the
 6   scene when you arrived?
 7                 MS. NAPOLITANO:  Objection to
 8          form.
 9                 MR. WEINGARD:  You can answer.
10                 THE WITNESS:  It's nice how you
11          say I can answer.
12                 MR. WEINGARD:  She'll tell you
13          to.
14                 MS. NAPOLITANO:  You can answer.
15          A.     To my understanding, he was
16   released from the scene by the patrol
17   supervisor, Sergeant Gieshen.
18          Q.     Do you know approximately what
19   time, based on your conversations with the
20   sergeant, Buonora was released?
21                 MS. NAPOLITANO:  Objection.
22                 If you know.
23          A.     No.
24          Q.     Incidentally, I'm a little
25   confused.  Perhaps you can clarify this for
```

84

Barnych

1    me.

2            I thought you were saying that

3    your crime scene investigator was putting some

4    strings or some materials through the gun at

5    the scene.  Did you say that to us before?

6        A.    No.  I didn't say strings.  What

7    normally would be done is a nylon -- almost --

8    what is commonly known as, let's say, a flex

9    cuff or a wire tie in the electrical business.

10   That's used to secure through the barrel and

11   the trigger, you know.  That's what should

12   have been done to keep the gun from rocking

13   through the transporting box as well.

14       Q.    Do you know whether or not that

15   gun was loaded at the time it was found?

16       A.    It was, in fact, determined to be

17   loaded, but I believe it was made safe for

18   transport.

19       Q.    Do you know where it was

20   transported to?

21           MS. NAPOLITANO:  Objection; asked

22       and answered.

23           You can answer again.

24       A.    Detective Fannon would be the

85

                          Barnych

1
2     best source on exactly where it was

3     transported to, but in the normal course of

4     operations, he would have brought it back to

5     the crime scene headquarters, prepared his

6     documentation on it and then forward it to

7     police headquarters to be tested at the

8     ballistics lab.

9          Q.     So if you had two police

10    departments at the scene and your Detective

11    Fannon would have processed this gun at the

12    scene, would he have brought that to the

13    Floral Park Police Department?

14               MS. NAPOLITANO:  Objection.

15               If you know.

16         A.     No, sir.  The 3rd Squad

17    detectives would be the overriding authority

18    at a scene within the Village of Floral Park

19    related to felony investigations.  That is

20    the, I guess, what's provided for in the

21    charter.  That's why we provide the services

22    that we do.

23         Q.     Do you have any idea as to how

24    the Floral Park Police Department came into

25    possession of the gun and the magazine?

86

Barnych

2          MS. NAPOLITANO:  Objection.

3     Q.     If you're not aware that they

4   had, that's okay.  You can tell me that.

5     A.     They were never in the strict

6   legal definition of possession of it.  That

7   wouldn't be their purvey.  They may have

8   observed it within the territorial confines of

9   their village.  But regardless of whether they

10  observed it or not, as long as Nassau County

11  personnel were present, specifically our Crime

12  Scene Unit, it would have been the

13  responsibility of crime scene to take that

14  evidence and bring it back to our -- because

15  ultimately it's going to end up there anyway,

16  whether we were involved or not.  If Floral

17  Park recovers a gun in a case unrelated to

18  this, they have to turn it over to the Nassau

19  County Police Department.

20    Q.     All right.  I think you were

21  shown Barnych 2.

22          If you look down at the narrative

23  on this, you will see that the weapon

24  involved, at least purportedly involved, and a

25  magazine were vouchered at the Floral Park

87

Barnych

1  Police Department.  Do you have any

2  explanation for that?

3

4          MS. NAPOLITANO:  Objection.  I

5      don't know that that's what this

6      document says.

7          THE WITNESS:  First of all, where

8      do you see voucher?

9          MR. WEINGARD:  I don't see the

10      word voucher.

11          THE WITNESS:  Where do you see a

12      voucher number that would indicate it

13      was vouchered?

14          MR. WEINGARD:  I was about to ask

15      you.

16      Q.     I see code numbers or numbers

17  next to the statement that a Police Officer

18  Wilson reports finding a 9 millimeter loaded

19  weapon at 6 Holland Avenue.  Weapon is a Hi

20  point mdl C, serial number is ground off, and

21  then it says -- bear with me for a moment.

22          MS. NAPOLITANO:  Where are you

23      reading?

24          THE WITNESS:  It's down here

25      (indicating).

88

Barnych

1       MR. WEINGARD:  Believe me, it's

2       there.  I'm not making it up.

3       Q.      And I think there is also a

4  reference to a clip, a 25 caliber clip.

5       A.      Um-hum.

6       Q.      Can you explain this document to

7  us, if you know?  If you don't know, it's

8  okay.

9       MS. NAPOLITANO:  Objection.

10       Q.      But if you do know, are you

11  suggesting that that doesn't mean that it was

12  vouchered at the Floral Park Police

13  Department?

14       MS. NAPOLITANO:  Objection to the

15       form of the question and to the

16       question.

17       You can answer.

18       A.      All right.  I am going to state

19  for the record that up until today, I have

20  never seen this form, despite working in the

21  3rd Squad for five years, okay.  This appears

22  to be an internal document that's generated

23  solely by the Floral Park Police Department.

24       MR. WEINGARD:  Yes.  That's what

89

Barnych

1    we say.

2         A.      And at that time, it would not

3    have been part of any investigation that I had

4    done, okay.  This was not an event that was

5    initiated by the Floral Park Police Department

6    for me to do follow-up on.  It was initiated

7    by Nassau County.

8              Furthermore, I can deduce from

9    what I see here, and it's fairly obvious, that

10   in the middle of it it itemizes the car

11   numbers that were involved, the ID numbers of

12   the officers from Floral Park, their names,

13   their particular role, the time that they were

14   dispatched and the time they arrived at that

15   particular scene.  And in the body of the

16   narrative that you cited just a moment ago,

17   those particular numbers, I would believe with

18   a strong amount of certainty that these are

19   the time entries based on radio or memo book

20   entries that this officer prepared,

21   specifically 0443 would be 4:43 in the morning

22   and sequentially down through and including

23   9:25, as far as that goes.  That's what that

24   is.  At least that's my perception of what it

90

Barnych

1    is.

2    MR. WEINGARD:  And we will accept

3    that for the moment.

4    Q.    My question to you is this:  Does

5    this suggest to you that Floral Park took

6    possession of either the gun or the magazine

7    at the crime scene?

8    A.    No.

9    MS. NAPOLITANO:  Objection.

10   MR. WEINGARD:  That's all I need

11   to know.

12   Q.    The reason I am asking is that is

13   if you look at Barnych Number 1, there is no

14   reference to a gun or a magazine.

15   A.    That's correct.

16   Q.    Can you explain why there would

17   be no reference to that on this particular

18   document?

19   A.    Because the gun and magazine were

20   secured by Detective Fannon.  He would have

21   prepared his individual Form 106 relative to

22   what he secured and transported, and that

23   document ultimately would make its way to the

24   3rd Squad and be incorporated as part of the

```
                                                         91
 1                          Barnych

 2    case.

 3          Q.      Is that part of your case file,

 4    if you remember?

 5          A.      I don't have my case file here.

 6    I have no way of knowing.

 7                  MR. WEINGARD:  Do we have such a

 8                  document?  And this is for the attorney.

 9                  MS. NAPOLITANO:  I don't know.

10                  If it was turned over, we have it.  If

11                  it wasn't turned over, we don't have it.

12                  I have no way of knowing with the amount

13                  of documents we turned over.

14    RQ              MR. WEINGARD:  I understand,

15                  Donna, and you must understand that I

16                  was not involved in that aspect of

17                  discovery.

18                      So what I am calling for is the

19                  production of any such document which

20                  relates to the vouchering by the Nassau

21                  County or Floral Park Police

22                  Departments, if you can, as it relates

23                  to Floral Park, but certainly with

24                  regard to the Nassau County Police

25                  Department and the vouchering of the gun
```

92

Barnych

1    and the magazine.

2        MS. NAPOLITANO:  Okay.  I am

3    going to ask you to reduce it to

4    writing.  I will take it under

5    advisement.  But I will tell you here

6    and now that I have absolutely no

7    control over Floral Park documents.

8        MR. WEINGARD:  We can subpoena

9    them.

10       MS. NAPOLITANO:  If, in fact,

11   there is a document PDCN 106, which

12   indicates that the gun and the clip were

13   vouchered by the Nassau County Police

14   Department, we will turn over that

15   document, if we have not already turned

16   it over.

17       MR. WEINGARD:  Do you have such a

18   document?

19       MR. FOGELGAREN:  I don't know,

20   and I would join in the request.

21           Off the record.

22       (Discussion off the record.)

23   Q.    Incidentally, did you ever see

24   the photograph of the gun?  Didn't you say a

93

Barnych

1    photograph was taken at the scene of the gun

2    as it lay where it was being secured?

3            MS. NAPOLITANO:  Objection.

4        Q.    By your crime scene people.

5            MS. NAPOLITANO:  I don't think

6        this witness testified to that.

7        Q.    I have "Have you seen a photo of

8    a gun" in my margin, based on the fact that

9    you said there were photographs being taken of

10   the gun; am I correct?

11       A.    Photographs were taken.  I

12   haven't seen the original photographs after

13   they were developed and printed.

14       Q.    Would they normally have come to

15   you so that they could be included within your

16   case file?

17       A.    Only if I requested them.

18       Q.    Otherwise, where would they be?

19       A.    Crime Scene Unit would keep --

20   well, the photo unit would more than likely

21   keep the negatives for those films under

22   whatever crime scene division number was

23   assigned to that case.

24       Q.    Would prints have been made of

94

Barnych

1    those negatives?

2         A.    It's very likely.  In many cases

3    the district attorney's office requests those

4    photographs, and they bypass the carrying

5    detective.

6    RQ         MR. WEINGARD:  I am going to

7         request any photographs of the gun, the

8         car or anything else that was taken at

9         the time of this event.

10             MS. NAPOLITANO:  I am going to

11        ask that you reduce it to writing, and I

12        will take it under advisement.

13             I will tell you that contained

14        within the IAU report are photocopies of

15        those pictures.

16             MR. WEINGARD:  Works for me.  I

17        mean, if you've got them, send them.

18             MS. NAPOLITANO:  I am just saying

19        it's contained in the IAU.

20             MR. WEINGARD:  I've seen my share

21        of 9 millimeters, so it's not that I

22        have to have the clearest definition of

23        the thing, but I do want to see what it

24        is.

95

Barnych

1   Q.    I'm sorry.  I may have gotten

2   myself lost, but did you say you never saw the

3   photograph or photographs of that particular

4   weapon?

5   A.    I never saw the initial printed

6   photographs of that weapon.

7   Q.    Any photocopies of it?

8   A.    I don't recall seeing any

9   photocopies of it.

10  Q.    When you were on the scene, were

11  you able to determine that the serial number

12  had been eradicated from that gun?

13  A.    I don't remember looking at the

14  gun that closely.  That's definitely something

15  that Detective Fannon would have been more in

16  a position to answer, because he physically

17  handled the weapon.  I did not.

18  Q.    What's the reason for eradicating

19  serial numbers on a weapon?

20  MS. NAPOLITANO:  Objection.

21  A.    We don't have enough time to

22  answer that question.

23  Q.    Why don't you give me your best

24  shot.

96

Barnych

1    A.    One of the reasons why someone

2    would want to eradicate the serial number is

3    to detect its ability to be traced to its

4    original owner and possibly cover up the fact

5    that the gun may or may not have been stolen

6    on a prior date.

7    Q.    Did you have any occasion

8    whatsoever after the arrest of Mr. Coggins to

9    conduct any further investigation related to

10   the gun or the magazine for that matter in

11   order to determine where it had originated and

12   how it had been defaced?

13   A.    Me personally?

14   MR. WEINGARD:  Yes.

15   A.    No.

16   Q.    Who would have done that at

17   Nassau police?

18   MS. NAPOLITANO:  Objection.

19   If you know.

20   A.    The gun itself, after Detective

21   Fannon photographs it and sends it over to the

22   crime lab, would have been examined by a

23   firearms expert who would make notations of

24   that, test the gun for operability, okay, and

97

Barnych

1    record his data there.  So it would be within

2    the purvey of the police department crime lab,

3    if you will, Forensic Evidence Bureau

4    specifically.

5            Q.      Would it be within the purview of

6    the ballistics unit or the general crime lab?

7                    MS. NAPOLITANO:  Objection.

8                    You can answer.

9            A.      It's a document that will be

10   provided, but the Forensic Evidence Bureau,

11   which is the official name for the crime lab,

12   is comprised of several compartments.

13   Ballistics or, you know, in that respect would

14   be one of those compartments.

15           Q.      When you went to see Jovan

16   Bates -- I think that's how you said it, Jovan

17   Bates?

18           A.      I said Jovan, tomato tomato.

19           Q.      When you spoke to the tomato --

20           A.      I didn't speak to a tomato.

21           Q.      Or a tomato.

22                   When you spoke to Jovan Bates,

23   did you ask her anything or any questions

24   whatsoever related to the magazine that was

98

1                        Barnych

2    found alongside the passenger door to the car?

3         A.      I don't recall specifically

4    having any conversation about that at this

5    time.  Is it possible that we did?  I don't

6    know.

7         Q.      If you had had such a

8    conversation, would you have taken that down

9    on the notepad you were describing earlier?

10        A.      Maybe, maybe not.

11        Q.      If you did do that, that would

12   end up in your case file?

13        A.      Whatever notes I would have taken

14   would have been in the case file.

15        Q.      And when you left as a detective,

16   what happened to that case file, if you know?

17        A.      I have no knowledge of what

18   happened.

19        Q.      What would normally happen when a

20   detective retires to his case file?

21        A.      Case files in and of themselves

22   are property of the police department, County

23   of Nassau.  Whether or not they reduce them to

24   microfilm or store them in a warehouse, I have

25   no clue.  I do know that they're kept in the

99

Barnych

1  building for a period of time after the case

2  is closed, whether the detective is retired or

3  active, but just because a detective retires

4  doesn't cause any specific action to be done

5  on that case.  It's really a matter of where

6  is the space to store the case jacket.

7       Q.     And at some point it's destroyed;

8  is that what I understand you to say?

9       A.     I don't know about destroyed.  I

10  would say archived is a better word.

11  RQ          MR. WEINGARD:  So again, I call

12          for the production of the case file.

13          MR. FOGELGAREN:  I join.

14          MS. NAPOLITANO:  I ask that it be

15          reduced to writing, and I will take it

16          under advisement.

17          MR. WEINGARD:  Thank you,

18          Detective Barnych.  I appreciate your

19          time.

20          MR. FOGELGAREN:  I have a couple

21          of follow-ups.

22  FURTHER EXAMINATION

23  BY MR. FOGELGAREN:

24       Q.     You said Sergeant Gieshen is it?

100

1                        Barnych

2          A.       Gieshen.

3          Q.       That he released Officer Buonora

4    from the scene?

5          A.       I said I believe he may have been

6    responsible for Officer Buonora being relieved

7    at the scene, okay.

8          Q.       You said you later determined

9    that it was Officer Buonora who came after

10   Officer Vara started to follow the suspect.

11         A.       Um-hum.

12         Q.       When did you determine that it

13   was Officer Buonora?

14         A.       While I was present at that

15   scene, somewhere within that two-hour time

16   frame.

17              MR. FOGELGAREN:  Thank you.  I

18         have no further questions.

19              MR. WEINGARD:  We're done,

20         subject only to the fact that if there

21         are additional materials, we will be

22         back to you.

23              (Time noted:  4:00 p.m.)

24

25

101

Barnych

A C K N O W L E D G M E N T

STATE OF NEW YORK      )
                       :ss
COUNTY OF              )


        I, ALEXANDER J. BARNYCH, hereby

certify that I have read the transcript of my

testimony taken under oath in my deposition of

February 25, 2010; that the transcript is a

true, complete and correct record of my

testimony, and that the answers on the record

as given by me are true and correct.




                    _____

                    ALEXANDER J. BARNYCH



Signed and subscribed to before
me, this              day
of                  , 2010.
_____
Notary Public, State of New York

102

```
--------------------I N D E X--------------------

WITNESS                    EXAMINATION BY        PAGE

ALEXANDER J. BARNYCH   MR. FOGELGAREN      4, 99

                       MR. WEINGARD            80


---------------DOCUMENT REQUEST--------------

PAGE   79   Complete records of Internal

            Affairs Unit

       91   Document relating to vouchering of

            gun and magazine by Nassau County

            or Floral Park Police Departments

       94   Any photographs of gun, car or

            anything else taken at time of

            event

       99   Case file

--------------------EXHIBITS--------------------

BARNYCH                                FOR I.D.

   1        Property Bureau Invoice        41

   2        Floral Park Police Department

            document                       44

   3        Document Bates-stamped Nassau

            County 000302 through 000305 with

            attached fax cover page         70

            (Counsel retained exhibits.)
```

**'**

**'01** [1] - 6:20

**0**

**000007** [1] - 57:3
**000302** [3] - 70:10, 71:9, 102:23
**000303** [1] - 71:16
**000304** [2] - 71:20, 76:3
**000305** [3] - 70:11, 71:23, 102:23
**0443** [1] - 89:22
**07-CV-3624** [1] - 1:11

**1**

**1** [18] - 41:18, 41:19, 41:23, 43:8, 43:14, 43:19, 49:13, 50:20, 52:7, 56:16, 56:24, 57:4, 59:24, 70:18, 78:11, 90:14, 102:19
**1-10** [1] - 1:9
**10/9** [1] - 43:12
**10/9/2004** [2] - 51:8, 59:12
**10107** [1] - 2:22
**106** [4] - 41:16, 42:3, 90:22, 92:12
**11501** [2] - 2:16, 4:13
**11550** [1] - 2:6
**11702** [1] - 1:24
**11:30** [1] - 8:13
**124** [1] - 1:24
**14** [2] - 5:25, 79:5
**1490** [1] - 4:12
**1985** [2] - 5:24, 6:7
**1998** [1] - 6:3
**1:30** [1] - 8:12
**1:53** [1] - 1:15
**1st** [1] - 5:17

**2**

**2** [7] - 44:15, 44:19, 45:5, 45:6, 81:15, 86:21, 102:20
**20** [1] - 25:21
**2001** [1] - 6:18
**2004** [24] - 7:12, 7:23, 8:18, 21:25, 36:9, 37:12, 37:24, 42:21, 42:25, 43:4, 43:12, 45:8, 53:15, 59:25, 68:9, 69:10, 69:15, 69:24, 72:25, 74:15, 75:23, 77:9,

77:18, 78:3
**2005** [5] - 60:16, 62:18, 62:23, 70:18, 78:11
**2007** [3] - 5:17, 5:25, 79:5
**2010** [4] - 1:14, 101:10, 101:20, 103:22
**202** [1] - 1:24
**25** [4] - 1:14, 25:22, 88:5, 101:10
**250** [1] - 2:21
**262** [1] - 50:17
**2:45** [1] - 44:13
**2:51** [1] - 44:14

**3**

**3** [11] - 50:20, 70:8, 70:9, 70:14, 75:21, 75:25, 76:3, 77:15, 77:22, 81:15, 102:22
**3/17** [1] - 62:18
**31** [1] - 5:24
**31st** [1] - 6:5
**380** [1] - 14:20
**3rd** [20] - 6:21, 6:24, 8:7, 8:15, 9:20, 15:12, 15:13, 18:11, 49:3, 49:5, 49:6, 50:14, 53:22, 55:11, 61:17, 64:19, 76:13, 85:16, 88:22, 90:25

**4**

**4** [3] - 50:21, 53:19, 102:4
**4-foot** [1] - 21:13
**401** [1] - 2:21
**41** [1] - 102:19
**44** [1] - 102:21
**4:00** [1] - 100:23
**4:43** [1] - 89:22

**5**

**5** [1] - 8:3
**50** [6] - 1:13, 2:5, 11:15, 19:19, 24:17, 24:22
**501** [1] - 2:5
**516-938-4000** [1] - 1:25
**55** [1] - 19:19
**57th** [1] - 2:21

**6**

**6** [2] - 26:6, 87:19

**60** [3] - 11:15, 24:17, 24:22
**626** [1] - 13:11
**6356** [1] - 44:5
**65** [1] - 26:13
**6:30** [1] - 19:3

**7**

**7** [4] - 26:6, 56:24, 56:25, 59:2
**70** [2] - 26:13, 102:24
**7224** [1] - 44:7
**79** [3] - 55:24, 56:8, 102:8
**7:00** [1] - 8:3
**7th** [1] - 103:21

**8**

**8** [1] - 59:2
**80** [1] - 102:5
**85** [1] - 57:9
**8:10** [1] - 8:21
**8:30** [1] - 10:23
**8th** [2] - 6:11, 6:17

**9**

**9** [25] - 7:12, 7:23, 8:18, 21:25, 36:9, 37:12, 37:24, 42:21, 42:25, 43:4, 45:8, 53:15, 59:25, 68:8, 69:10, 69:15, 69:24, 72:25, 74:15, 75:22, 77:9, 77:18, 78:3, 87:18, 94:22
**91** [1] - 102:10
**94** [1] - 102:13
**99** [2] - 102:4, 102:16
**9:25** [1] - 89:24

**A**

**Aaron** [1] - 48:14
**abbreviation** [1] - 56:18
**ability** [1] - 96:4
**able** [3] - 46:19, 57:22, 95:12
**absolutely** [1] - 92:7
**accept** [1] - 90:3
**accommodate** [1] - 5:6
**accompany** [1] - 13:4
**acknowledge** [1] - 67:18
**action** [5] - 41:2, 76:9, 99:5, 103:17

**active** [1] - 99:4
**actively** [1] - 82:24
**activity** [1] - 59:22
**actual** [1] - 76:7
**ADA** [6] - 66:18, 66:21, 66:23, 67:14, 67:23, 68:9
**ADA's** [1] - 65:20
**adamant** [1] - 65:6
**add** [4] - 49:10, 50:16, 51:13, 78:10
**added** [1] - 47:23
**addition** [1] - 11:17
**additional** [4] - 23:25, 38:24, 49:21, 100:21
**additionally** [1] - 76:24
**address** [5] - 4:11, 45:19, 46:7, 52:2, 76:8
**addressing** [1] - 76:6
**administer** [1] - 3:14
**administratively** [1] - 80:9
**advisement** [3] - 92:6, 94:13, 99:17
**Affairs** [18] - 68:13, 68:20, 68:25, 69:4, 69:6, 70:20, 72:17, 73:25, 74:13, 74:25, 75:12, 76:5, 77:14, 78:6, 78:22, 78:25, 79:17, 102:9
**afternoon** [3] - 4:14, 4:15, 8:4
**ago** [1] - 89:17
**AGREED** [3] - 3:3, 3:8, 3:12
**alcohol** [1] - 21:2
**alcoholic** [1] - 20:5
**ALEXANDER** [5] - 1:18, 101:7, 101:17, 102:4, 103:10
**Alexander** [1] - 4:10
**allows** [1] - 40:14
**almost** [1] - 84:8
**alone** [1] - 33:18
**alongside** [1] - 98:2
**altered** [1] - 47:24
**amount** [2] - 40:21, 89:19, 91:12
**AND** [3] - 3:2, 3:7, 3:11
**answer** [29] - 5:3, 9:25, 10:19, 11:22, 22:24, 23:14, 24:5, 27:24, 28:9, 33:15, 35:11, 35:12, 35:15, 36:12, 38:3, 61:25, 63:15, 78:13, 80:13,

81:4, 82:18, 83:9, 83:11, 83:14, 84:24, 88:18, 95:17, 95:23, 97:9
**answered** [1] - 84:23
**answers** [2] - 4:24, 101:12
**anyway** [1] - 86:15
**apologize** [1] - 81:16
**apparent** [1] - 37:20
**appear** [7] - 62:10, 63:24, 67:8, 72:8, 80:10, 81:11, 81:16
**appearance** [2] - 30:9, 62:15
**applicable** [2] - 49:18, 55:21
**application** [1] - 79:23
**appreciate** [2] - 47:12, 99:19
**approached** [2] - 20:4, 75:9
**approaching** [2] - 34:12, 34:16
**apron** [2] - 25:22, 25:23
**archived** [1] - 99:11
**area** [9] - 12:2, 12:21, 29:14, 29:23, 30:14, 31:9, 45:7, 45:24
**areas** [1] - 79:19
**arrest** [16] - 7:8, 43:12, 44:4, 49:16, 51:10, 51:11, 52:6, 55:6, 55:11, 55:13, 55:15, 55:22, 56:14, 58:23, 59:18, 96:9
**Arrest** [1] - 55:19
**arresting** [2] - 43:20, 44:2
**arrests** [1] - 43:18
**arrival** [2] - 18:18, 18:20
**arrive** [1] - 13:6
**arrived** [8] - 7:20, 10:22, 12:10, 13:11, 18:12, 18:24, 83:6, 89:15
**arriving** [3] - 12:14, 74:13, 75:2
**articulate** [1] - 57:22
**ASJ** [1] - 57:9
**aspect** [1] - 91:16
**assigned** [14] - 6:10, 6:11, 6:19, 8:7, 8:15, 9:11, 15:13, 15:17, 18:10, 22:4, 49:8, 50:14, 52:20, 93:24
**assignment** [1] - 8:6

**assignments** [2] - 6:15, 7:2
**assist** [2] - 9:3, 35:23
**assistant** [6] - 60:8, 60:12, 60:22, 61:23, 63:4, 65:15
**assisted** [1] - 37:16
**assisting** [8] - 23:7, 23:20, 33:21, 34:20, 35:19, 36:22, 40:14, 82:25
**Associates** [1] - 5:12
**Association** [2] - 68:12, 78:17
**assume** [1] - 80:8
**assuming** [1] - 35:2
**assumption** [4] - 28:5, 28:14, 28:22, 28:25
**attached** [4] - 49:23, 70:11, 71:4, 102:24
**attempt** [2] - 21:3, 21:20
**attention** [1] - 65:9
**attorney** [16] - 53:23, 53:25, 54:2, 54:10, 54:13, 54:15, 54:19, 55:2, 60:13, 60:22, 61:22, 61:23, 63:4, 68:14, 91:8
**Attorney** [4] - 2:4, 2:11, 2:14, 2:19
**attorney's** [4] - 61:3, 65:15, 67:25, 94:4
**attorneys** [2] - 3:3, 60:8
**authority** [1] - 85:17
**authorized** [1] - 3:14
**auto** [3] - 12:22, 13:7, 18:19
**automobile** [1] - 13:10
**available** [1] - 27:5
**Avenue** [18] - 4:12, 7:18, 8:20, 10:11, 11:4, 11:15, 21:7, 21:20, 24:19, 24:24, 24:25, 29:25, 30:23, 34:7, 36:24, 45:11, 64:5, 87:19
**aware** [7] - 15:17, 33:20, 34:19, 35:21, 65:2, 82:24, 86:3

**B**

**Babylon** [1] - 1:24
**backup** [3] - 22:7, 22:9, 23:11
**backyard** [1] - 30:24
**ballistics** [4] - 27:18,

**assignments** [2] - 6:15, 7:2
85:8, 97:7, 97:14
**bank** [1] - 76:22
**BARNYCH** [6] - 1:19, 101:7, 101:17, 102:4, 102:18, 103:10
**Barnych** [16] - 4:10, 41:18, 41:19, 41:23, 44:15, 44:19, 45:6, 70:9, 70:14, 75:21, 77:15, 77:22, 81:15, 86:21, 90:14, 99:19
**barrel** [1] - 84:11
**based** [3] - 83:19, 89:20, 93:9
**basis** [1] - 55:20
**Bates** [10] - 46:9, 48:4, 48:8, 70:10, 71:8, 76:3, 97:17, 97:18, 97:23, 102:22
**BATES** [1] - 46:13
**Bates-stamped** [3] - 70:10, 76:3, 102:22
**bear** [1] - 87:21
**bears** [4] - 42:3, 42:6, 57:10, 71:9
**became** [2] - 6:9, 65:2
**become** [1] - 6:2
**begins** [2] - 51:8, 59:12
**behind** [6] - 29:25, 33:21, 34:21, 35:23, 35:25, 83:2
**belief** [1] - 58:10
**believes** [1] - 80:22
**benefit** [1] - 30:19
**beside** [1] - 12:5
**best** [4] - 4:23, 18:7, 85:2, 95:24
**better** [2] - 79:8, 99:11
**between** [3] - 3:3, 19:19, 36:19
**beverage** [1] - 20:5
**birth** [1] - 51:25
**bite** [1] - 48:25
**black** [12] - 11:12, 13:10, 13:22, 14:10, 19:5, 19:9, 24:14, 24:16, 31:22, 32:5, 46:10, 56:23
**block** [1] - 21:22
**blood** [1] - 103:17
**blotter** [1] - 76:25
**blue** [1] - 56:22
**body** [3] - 42:6, 56:17, 89:16
**book** [2] - 10:12, 89:20
**booked** [1] - 44:5
**booking** [1] - 43:16

**bottom** [5] - 57:2, 58:24, 71:10, 71:18, 72:9
**box** [2] - 27:16, 84:14
**break** [2] - 5:5, 44:11
**breath** [1] - 20:6
**BREWINGTON** [1] - 2:3
**brief** [1] - 41:2
**bring** [1] - 10:25, 65:8, 86:14
**broadcast** [1] - 64:5
**broke** [1] - 21:5
**brought** [5] - 27:17, 55:10, 64:10, 85:4, 85:12
**building** [2] - 77:5, 99:2
**bulk** [2] - 12:23, 59:7
**Buonora** [32] - 2:20, 33:24, 34:12, 36:6, 36:25, 37:9, 37:13, 69:4, 69:9, 69:13, 69:24, 70:3, 72:24, 73:9, 73:11, 73:22, 74:9, 74:13, 75:2, 75:11, 75:21, 76:4, 76:6, 76:9, 82:12, 83:3, 83:5, 83:20, 100:3, 100:6, 100:9, 100:13
**BUONORA** [1] - 1:8
**Buonora's** [3] - 73:16, 74:2, 75:13
**bureau** [2] - 52:17, 52:22
**Bureau** [5] - 2:10, 41:20, 97:4, 97:11, 102:19
**business** [1] - 84:10
**business/residential** [1] - 12:2
**BY** [6] - 2:7, 2:23, 4:6, 80:2, 99:24, 102:3
**bypass** [1] - 94:5

**C**

**caliber** [5] - 14:15, 14:18, 14:20, 27:4, 88:5
**canine** [1] - 40:15
**capacity** [4] - 1:7, 1:8, 1:9, 5:13
**car** [27] - 8:23, 11:2, 13:2, 13:19, 13:24, 14:3, 16:8, 17:10, 20:19, 21:18, 21:19, 22:4, 24:11, 26:15,

32:9, 34:12, 35:20, 35:22, 41:9, 41:10, 58:19, 77:11, 89:11, 94:9, 98:2, 102:13
**card** [1] - 54:5
**carry** [1] - 10:12
**carrying** [5] - 61:7, 61:14, 63:18, 67:2, 94:5
**cars** [1] - 26:16
**case** [52] - 7:8, 17:18, 40:5, 40:7, 40:10, 40:13, 40:19, 42:3, 49:10, 49:17, 49:20, 49:24, 50:2, 50:3, 50:15, 50:17, 50:19, 51:7, 51:12, 51:14, 51:23, 52:5, 52:18, 52:19, 53:8, 54:5, 57:10, 58:17, 59:17, 60:9, 60:12, 60:17, 61:10, 61:12, 61:16, 65:24, 67:2, 86:17, 91:2, 91:3, 91:5, 93:17, 93:24, 98:12, 98:14, 98:16, 98:20, 98:21, 99:2, 99:6, 99:7, 99:13
**Case** [1] - 102:16
**cases** [5] - 8:14, 15:14, 15:17, 49:8, 94:3
**catch** [1] - 6:6
**caveat** [1] - 47:11
**certain** [3] - 16:21, 23:17, 48:6
**certainly** [1] - 91:23
**certainty** [1] - 89:19
**certification** [1] - 3:5
**certify** [3] - 101:8, 103:9, 103:15
**cetera** [1] - 50:11
**chain** [3] - 16:18, 21:13, 73:20
**chain-link** [2] - 16:18, 21:13
**charges** [4] - 54:22, 55:7, 80:5, 80:10
**charter** [1] - 85:21
**chasing** [1] - 80:21
**check** [1] - 21:17
**checked** [2] - 38:23, 49:7
**Chief** [1] - 2:10
**circumstances** [1] - 4:19
**cited** [1] - 89:17
**City** [1] - 46:4
**civilian** [1] - 57:21
**civilians** [2] - 39:6, 51:24

**clarify** [1] - 83:25
**Clark** [8] - 65:21, 66:18, 66:21, 66:24, 67:14, 67:23, 68:3, 68:9
**clear** [2] - 30:11, 64:7
**clearest** [1] - 94:23
**Clinton** [2] - 1:13, 2:5
**clip** [3] - 88:5, 92:13
**close** [1] - 13:18
**closed** [1] - 99:3
**closely** [1] - 95:15
**closer** [1] - 27:11
**clue** [1] - 98:25
**code** [1] - 87:16
**coffee** [1] - 48:25
**COGGINS** [1] - 1:3
**Coggins** [31] - 4:17, 32:6, 32:7, 33:11, 33:19, 39:16, 43:13, 45:16, 46:19, 47:9, 47:15, 47:22, 53:15, 53:18, 53:21, 53:24, 54:8, 54:11, 54:17, 55:5, 55:7, 55:10, 56:2, 56:11, 60:2, 72:25, 74:15, 75:4, 78:4, 80:22, 96:9
**Coggins'** [4] - 32:23, 33:4, 33:8, 60:17
**color** [2] - 26:23, 51:21
**combination** [1] - 11:25
**coming** [4] - 7:3, 33:21, 35:23, 83:2
**comma** [1] - 44:7
**comment** [1] - 56:8
**commented** [2] - 54:19, 55:3
**commenting** [1] - 38:8
**commonly** [1] - 84:9
**company** [1] - 23:7
**compare** [1] - 32:15
**compartments** [2] - 97:13, 97:15
**complaint** [2] - 43:15, 80:16
**Complete** [1] - 102:8
**complete** [2] - 52:18, 79:16, 101:11
**completed** [2] - 40:5, 40:7
**completely** [1] - 68:21
**completing** [1] - 13:17
**comprised** [2] -

104

49:16, 97:13
  **computer** [5] - 49:7, 49:9, 52:25, 53:8, 55:18
  **conclusion** [1] - 40:6
  **concrete** [1] - 26:9
  **condition** [1] - 55:25
  **conduct** [2] - 20:8, 96:10
  **conducted** [1] - 23:5
  **conducting** [1] - 22:15
  **confines** [1] - 86:8
  **confused** [1] - 83:25
  **consistent** [1] - 13:24
  **contact** [8] - 7:22, 18:23, 33:18, 39:13, 40:11, 52:4, 53:14, 53:17
  **contacted** [2] - 53:20, 65:21
  **contained** [9] - 14:12, 25:25, 40:24, 41:13, 49:25, 59:23, 75:20, 94:14, 94:20
  **context** [1] - 82:15
  **continued** [1] - 21:19
  **control** [1] - 92:8
  **conversation** [25] - 10:4, 15:6, 16:14, 17:5, 17:6, 36:16, 36:19, 47:6, 54:9, 54:11, 54:13, 55:8, 63:7, 63:19, 63:20, 63:22, 65:11, 66:7, 66:13, 66:17, 66:20, 69:13, 78:18, 98:4, 98:8
  **conversations** [14] - 12:11, 15:2, 37:22, 38:17, 54:7, 61:21, 65:14, 67:24, 68:7, 68:17, 69:9, 77:15, 77:25, 83:19
  **convince** [1] - 47:13
  **copies** [1] - 49:23
  **copy** [3] - 49:21, 70:19, 70:25
  **corner** [4] - 24:23, 34:22, 39:2, 71:10
  **correct** [10] - 50:22, 51:4, 57:15, 71:15, 72:9, 82:13, 90:16, 93:11, 101:11, 101:13
  **Correspondence** [1] - 70:18
  **Counsel** [1] - 102:25
  **counselor** [1] - 5:14
  **COUNTY** [5] - 1:6, 1:18, 101:5, 103:5

**County** [28] - 2:11, 2:12, 2:14, 5:22, 11:11, 23:24, 28:15, 28:23, 39:10, 43:11, 65:3, 70:10, 70:17, 70:21, 71:8, 72:13, 77:16, 78:2, 78:9, 86:10, 86:19, 89:8, 91:21, 91:24, 92:14, 98:22, 102:11, 102:23
  **couple** [1] - 99:21
  **course** [4] - 10:3, 16:13, 52:15, 85:3
  **court** [1] - 55:22, 59:19
  **COURT** [1] - 1:2
  **Court** [1] - 3:16
  **cover** [5] - 70:11, 71:4, 77:5, 96:5, 102:24
  **Craig** [1] - 2:19
  **CRAIG** [1] - 1:8
  **create** [1] - 71:3
  **Crime** [5] - 11:16, 13:19, 25:3, 86:11, 93:20
  **crime** [18] - 27:17, 40:15, 49:17, 49:22, 49:23, 55:21, 57:8, 57:12, 84:4, 85:5, 86:13, 90:8, 93:5, 93:23, 96:23, 97:3, 97:7, 97:12
  **criminal** [1] - 59:21
  **criteria** [1] - 40:9
  **cross** [2] - 71:2, 71:25
  **cross-out** [1] - 71:25
  **cross-outs** [1] - 71:2
  **cuff** [1] - 84:10
  **cup** [1] - 48:25
  **curb** [1] - 13:13
  **custody** [2] - 21:4, 73:21
  **cut** [1] - 56:7

**D**

**DA's** [1] - 68:5
  **dark** [1] - 26:24
  **Darryl** [10] - 4:17, 32:6, 32:7, 32:23, 33:4, 33:8, 39:16, 43:13, 54:11, 60:2
  **DARRYL** [1] - 1:3
  **dashboard** [1] - 32:4
  **data** [8] - 40:11, 40:18, 40:23, 44:4, 52:17, 52:22, 55:20, 97:2
  **date** [9] - 8:13,

41:23, 50:4, 51:17, 51:25, 62:2, 62:13, 62:14, 96:7
  **dated** [2] - 43:12, 70:18
  **David** [1] - 5:11
  **dealt** [1] - 80:8
  **debate** [1] - 58:14
  **December** [4] - 6:18, 6:20, 70:18, 78:11
  **deduce** [1] - 89:9
  **defaced** [2] - 54:24, 96:13
  **defendant** [4] - 21:12, 43:13, 55:25, 61:16
  **Defendant** [2] - 1:17, 2:19
  **Defendants** [2] - 1:10, 2:11
  **definitely** [1] - 95:15
  **definition** [5] - 58:22, 64:3, 65:4, 86:6, 94:23
  **department** [7] - 27:17, 39:15, 39:17, 42:3, 55:24, 97:3, 98:22
  **DEPARTMENT** [2] - 1:7, 1:18
  **Department** [24] - 2:12, 5:22, 23:24, 39:10, 42:23, 43:3, 43:12, 44:16, 44:21, 70:17, 70:21, 77:17, 78:2, 78:9, 85:13, 85:24, 86:19, 87:2, 88:4, 88:24, 89:6, 91:25, 92:15, 102:20
  **departmental** [5] - 9:17, 10:8, 23:18, 77:3, 80:16
  **departments** [1] - 85:10
  **Departments** [2] - 91:22, 102:12
  **depicted** [2] - 32:5, 45:19
  **Deposition** [1] - 1:17
  **deposition** [5] - 3:6, 3:12, 7:4, 7:5, 79:20, 101:9, 103:11, 103:13
  **Deputy** [1] - 2:10
  **describing** [1] - 98:9
  **description** [4] - 43:17, 50:8, 51:20, 56:15
  **designated** [2] - 43:21, 43:25
  **desk** [7] - 9:5, 9:7, 9:8, 9:9, 9:15, 53:20,

56:9
  **despite** [1] - 88:21
  **destroyed** [2] - 99:8, 99:10
  **detail** [2] - 50:19, 67:4
  **detailed** [2] - 16:6, 67:3
  **details** [6] - 40:23, 46:21, 47:24, 52:18, 61:15, 64:13
  **detect** [1] - 96:4
  **detected** [1] - 20:4
  **detective** [20] - 5:20, 6:2, 6:9, 6:14, 6:25, 8:16, 25:7, 27:8, 42:4, 49:12, 61:8, 61:14, 63:19, 67:2, 78:16, 94:6, 98:15, 98:20, 99:3, 99:4
  **Detective** [24] - 9:17, 10:9, 12:11, 12:15, 12:25, 27:10, 37:23, 38:20, 44:8, 45:10, 47:4, 48:24, 66:3, 68:15, 68:18, 73:7, 74:2, 78:19, 84:25, 85:10, 90:21, 95:16, 96:21, 99:19
  **detective's** [2] - 49:10, 50:18
  **Detectives** [1] - 78:17
  **detectives** [4] - 6:21, 9:2, 68:12, 85:17
  **determine** [5] - 14:18, 62:25, 95:12, 96:12, 100:12
  **determined** [5] - 14:19, 14:22, 83:2, 84:17, 100:8
  **develop** [1] - 38:10
  **developed** [1] - 93:14
  **dictate** [1] - 52:23
  **different** [1] - 9:11
  **dimensions** [1] - 27:12
  **direct** [2] - 65:13, 73:23
  **directed** [2] - 12:21, 40:2
  **directions** [1] - 39:25
  **directly** [2] - 23:7, 75:10
  **dirt** [1] - 30:16
  **disciplinary** [1] - 80:5
  **discovery** [1] - 91:17
  **discretion** [1] - 24:8
  **discuss** [2] - 15:19,

66:23
  **discussed** [4] - 27:10, 46:10, 60:12, 65:18
  **discussing** [1] - 49:19
  **discussion** [4] - 19:24, 27:6, 58:15, 73:20
  **Discussion** [2] - 79:25, 92:23
  **discussions** [3] - 60:7, 61:11, 65:10
  **dispatched** [1] - 89:15
  **disposition** [1] - 50:9
  **distinct** [1] - 30:21
  **district** [12] - 55:22, 60:8, 60:12, 60:22, 61:3, 61:22, 61:23, 63:3, 63:4, 65:15, 67:25, 94:4
  **DISTRICT** [2] - 1:2, 1:2
  **division** [3] - 8:16, 42:4, 93:23
  **Docket** [1] - 1:11
  **document** [20] - 44:16, 44:20, 44:25, 49:18, 50:13, 70:15, 70:16, 70:22, 87:6, 88:7, 88:23, 90:19, 90:24, 91:8, 91:19, 92:12, 92:16, 92:19, 97:10, 102:21
  **Document** [3] - 70:9, 102:10, 102:22
  **DOCUMENT** [1] - 102:7
  **documentation** [1] - 85:6
  **documents** [4] - 7:4, 7:7, 91:13, 92:8
  **DOES** [1] - 1:9
  **done** [10] - 17:9, 24:3, 40:22, 44:22, 84:8, 84:13, 89:5, 96:17, 99:5, 100:19
  **DONNA** [1] - 2:9
  **Donna** [1] - 91:15
  **door** [6] - 13:12, 13:13, 13:25, 14:2, 98:2
  **doors** [1] - 69:18
  **doubled** [1] - 21:16
  **down** [8] - 4:25, 5:3, 25:20, 52:10, 86:22, 87:24, 89:23, 98:8
  **downstairs** [1] - 53:23
  **drain** [3] - 13:18,

38:25, 39:4
 **driver** [2] - 19:25, 20:6
 **driver's** [5] - 20:5, 32:24, 33:5, 33:8, 45:19
 **driveway** [25] - 16:18, 16:24, 21:8, 24:19, 25:16, 25:18, 25:22, 25:23, 26:9, 26:11, 26:17, 26:19, 26:22, 29:15, 29:16, 31:20, 33:19, 34:19, 36:17, 36:23, 37:18, 41:10, 64:4, 75:15, 75:17
 **driving** [1] - 21:4
 **drove** [1] - 10:10
 **duly** [2] - 4:3, 103:12
 **during** [9] - 10:3, 16:13, 17:2, 17:5, 17:6, 18:23, 32:9, 56:6, 74:24
 **Duryea** [1] - 72:21
 **duties** [2] - 6:23, 8:10
 **DWI** [2] - 54:17, 54:21

**E**

 **earlier-discussed** [1] - 46:10
 **East** [1] - 1:24
 **eastbound** [2] - 21:6, 22:18
 **EASTERN** [1] - 1:2
 **eat** [1] - 49:2
 **effect** [1] - 3:15
 **either** [5] - 48:25, 51:23, 62:22, 80:9, 90:7
 **electrical** [1] - 84:10
 **electronically** [1] - 50:13
 **elements** [2] - 57:20, 59:20
 **elicited** [1] - 67:15
 **emergency** [4] - 11:17, 13:16, 38:21, 40:15
 **employed** [2] - 5:8, 15:12
 **encircled** [1] - 71:6
 **encompassed** [1] - 12:20
 **encountered** [1] - 23:2
 **end** [3] - 73:23, 86:15, 98:12
 **ended** [2] - 49:2,

55:8
 **ensuing** [1] - 58:19
 **enter** [1] - 49:13
 **entered** [3] - 51:9, 51:16, 75:17
 **entire** [2] - 58:17, 82:10
 **entries** [4] - 49:11, 49:12, 89:20, 89:21
 **entry** [1] - 58:16
 **equally** [1] - 65:8
 **eradicate** [1] - 96:3
 **eradicated** [1] - 95:13
 **eradicating** [1] - 95:19
 **ESQ** [4] - 2:7, 2:9, 2:18, 2:23
 **essence** [1] - 80:21
 **et** [1] - 50:11
 **event** [3] - 89:5, 94:10, 102:15
 **Evidence** [2] - 97:4, 97:11
 **evidence** [11] - 27:16, 27:18, 29:11, 29:21, 30:18, 41:4, 41:7, 41:15, 61:9, 73:20, 86:14
 **exact** [1] - 25:17
 **exactly** [5] - 32:5, 32:20, 34:15, 55:16, 85:2
 **EXAMINATION** [4] - 4:6, 80:2, 99:23, 102:3
 **Examination** [1] - 44:14
 **examined** [2] - 4:4, 96:23
 **except** [2] - 3:8, 37:5
 **exchanged** [1] - 69:20
 **Exhibit** [5] - 41:19, 41:23, 44:15, 70:8, 70:9
 **EXHIBITS** [1] - 102:17
 **exhibits** [1] - 102:25
 **exit** [1] - 20:6
 **exited** [1] - 35:22
 **expert** [1] - 96:24
 **explain** [2] - 88:7, 90:17
 **explanation** [1] - 87:3

**F**

 **facing** [1] - 22:18
 **fact** [18] - 16:22,

34:20, 35:22, 61:16, 63:9, 64:3, 64:6, 64:8, 65:3, 65:6, 68:19, 73:9, 82:25, 84:17, 92:11, 93:9, 96:5, 100:20
 **facts** [1] - 4:19
 **fairly** [2] - 12:21, 89:10
 **Fannon** [10] - 25:7, 27:8, 27:10, 38:20, 73:8, 84:25, 85:11, 90:21, 95:16, 96:22
 **far** [7] - 24:10, 26:5, 35:25, 46:21, 75:17, 76:8, 89:24
 **fast** [1] - 19:16
 **father** [1] - 56:21
 **fax** [3] - 70:11, 71:4, 102:24
 **February** [2] - 1:14, 101:10
 **feet** [8] - 11:15, 24:17, 24:22, 25:21, 25:22, 26:5, 26:6, 26:13
 **felony** [1] - 85:19
 **felt** [1] - 65:7
 **female** [1] - 46:9
 **fence** [3] - 16:18, 56:8, 80:23
 **few** [2] - 41:14, 65:19
 **Fiel** [1] - 72:20
 **field** [6] - 20:8, 20:20, 20:25, 23:5, 23:11, 24:2
 **file** [6] - 91:3, 91:5, 93:17, 98:12, 98:14, 98:16, 98:20, 99:13, 102:16
 **files** [1] - 98:21
 **filing** [1] - 3:5
 **fill** [2] - 10:15, 40:23
 **filled** [4] - 42:22, 43:2, 55:19, 57:16
 **films** [1] - 93:22
 **findings** [1] - 78:25
 **finish** [3] - 5:2, 33:3, 42:13
 **finished** [1] - 39:2
 **finishing** [1] - 25:10
 **firearm** [2] - 54:24, 54:25
 **firearms** [1] - 96:24
 **first** [25] - 6:10, 8:17, 10:16, 15:5, 16:7, 25:4, 25:9, 26:21, 30:4, 44:6, 44:8, 46:13, 48:12, 48:15, 51:3, 53:17, 56:16, 57:12, 59:5, 59:8,

59:14, 60:11, 64:25, 81:24, 87:7
 **fit** [1] - 40:9
 **five** [4] - 44:6, 44:8, 44:11, 88:22
 **five-minute** [1] - 44:11
 **fled** [1] - 21:6
 **flex** [1] - 84:9
 **Floral** [34] - 7:17, 8:19, 9:22, 10:11, 11:11, 22:16, 22:20, 28:16, 28:23, 42:22, 43:3, 44:15, 44:21, 45:7, 60:2, 63:23, 77:9, 77:18, 78:3, 85:13, 85:18, 85:24, 86:16, 86:25, 88:13, 88:24, 89:6, 89:13, 90:6, 91:21, 91:23, 92:8, 102:12, 102:20
 **focused** [1] - 47:21
 **Fogelgaren** [1] - 4:16
 **FOGELGAREN** [28] - 2:7, 4:7, 17:7, 19:12, 37:7, 41:17, 44:10, 45:6, 52:14, 53:12, 57:3, 59:3, 60:5, 63:14, 65:17, 67:21, 68:4, 70:7, 78:8, 78:12, 79:9, 79:15, 92:20, 99:14, 99:21, 99:24, 100:17, 102:4
 **follow** [5] - 8:16, 21:14, 89:7, 99:22, 100:10
 **follow-up** [2] - 8:16, 89:7
 **follow-ups** [1] - 99:22
 **followed** [3] - 23:24, 25:20, 44:7
 **following** [1] - 71:20
 **follows** [1] - 4:5
 **fool** [1] - 67:22
 **foot** [10] - 15:24, 15:25, 16:9, 16:17, 17:3, 21:10, 33:17, 56:6, 58:20, 76:7
 **FOR** [1] - 102:18
 **force** [1] - 3:15
 **forearm** [2] - 56:3, 56:20
 **Forensic** [2] - 97:4, 97:11
 **Form** [5] - 41:16, 55:24, 56:8, 57:9, 90:22
 **form** [28] - 3:9, 9:24, 27:22, 28:8, 28:18,

29:4, 33:14, 36:11, 37:4, 38:2, 41:25, 42:3, 42:15, 42:19, 57:7, 60:20, 73:3, 74:5, 74:7, 74:17, 74:19, 76:20, 80:12, 81:3, 82:17, 83:8, 88:16, 88:21
 **formal** [1] - 80:9
 **forms** [3] - 10:16, 42:22, 43:2
 **forth** [2] - 38:7, 103:12
 **forward** [1] - 85:6
 **four** [3] - 14:2, 49:20, 70:16
 **four-door** [1] - 14:2
 **four-page** [1] - 70:16
 **frame** [1] - 100:16
 **Franklin** [1] - 4:12
 **FREDERICK** [2] - 2:3
 **free** [1] - 21:5
 **front** [4] - 9:5, 9:7, 9:8, 53:20
 **Fuchs** [1] - 1:20
 **FUCHS** [2] - 103:7, 103:25
 **full** [1] - 4:8
 **functions** [1] - 9:12
 **FURTHER** [3] - 3:7, 3:11, 99:23
 **furthermore** [1] - 89:9

**G**

 **G-I-E-S-H-E-N** [1] - 18:6
 **garage** [1] - 26:13
 **Garden** [1] - 46:4
 **garden** [3] - 30:7, 32:22, 41:12
 **gas** [1] - 70:4
 **gate** [9] - 21:13, 21:15, 25:20, 25:24, 26:3, 26:4, 33:19, 34:19, 37:18
 **general** [5] - 6:14, 6:25, 25:11, 30:14, 97:7
 **generated** [1] - 88:23
 **gentleman** [1] - 54:4
 **Gieshen** [5] - 18:2, 18:9, 83:17, 99:25, 100:2
 **given** [2] - 101:13, 103:14
 **God** [1] - 67:11
 **grabbed** [1] - 48:25
 **grand** [7] - 60:18, 61:9, 62:10, 62:16,

67:8, 67:17, 67:18
**ground** [6] - 16:20, 17:2, 81:6, 81:18, 81:24, 87:20
**guess** [2] - 73:23, 85:20
**guided** [1] - 15:24
**guideline** [1] - 23:18
**gun** [56] - 16:12, 16:23, 25:13, 25:23, 26:2, 26:21, 26:25, 27:7, 27:12, 27:14, 27:20, 28:3, 28:6, 28:11, 28:12, 28:16, 28:24, 29:9, 29:18, 29:21, 30:23, 31:14, 31:19, 41:10, 42:10, 42:16, 58:11, 64:9, 64:14, 65:4, 82:3, 84:5, 84:13, 84:16, 85:11, 85:25, 86:17, 90:7, 90:15, 90:20, 91:25, 92:13, 92:25, 93:2, 93:9, 93:11, 94:8, 95:13, 95:15, 96:6, 96:11, 96:21, 96:25, 102:11, 102:13
**gutter** [1] - 13:23

**H**

**H-I-N-S-D-A-L-E** [1] - 31:5
**hand** [2] - 71:10, 103:21
**handgun** [2] - 58:2, 58:9
**handing** [1] - 43:8
**handle** [1] - 14:7
**handled** [1] - 95:18
**hands** [3] - 64:15
**handwriting** [6] - 70:23, 71:7, 71:13, 71:17, 71:21, 71:23
**handwritten** [2] - 81:12, 81:14
**head** [1] - 4:25
**heading** [1] - 70:16
**headquarters** [3] - 72:14, 85:5, 85:7
**hear** [3] - 47:11, 77:7, 80:24
**heard** [7] - 16:19, 16:25, 21:11, 80:23, 81:6, 81:17, 81:24
**hearing** [4] - 62:7, 62:14, 62:20, 63:20
**hello** [1] - 69:20
**help** [2] - 29:17, 31:8
**Hempstead** [2] - 1:13, 2:6

**hereby** [2] - 101:7, 103:9
**HEREBY** [1] - 3:2
**herein** [1] - 3:4
**hereinbefore** [1] - 103:11
**hereunto** [1] - 103:21
**Hi** [1] - 87:19
**himself** [2] - 23:6, 56:7
**Hinsdale** [5] - 21:20, 30:25, 31:4, 32:16, 34:6
**hit** [5] - 16:20, 17:2, 81:6, 81:18, 81:24
**hold** [1] - 18:7
**holding** [1] - 79:13
**Holland** [16] - 7:17, 8:19, 10:11, 11:3, 11:15, 21:7, 24:19, 24:24, 29:25, 30:23, 34:7, 34:22, 36:23, 64:5, 87:19
**home** [2] - 29:25
**honest** [1] - 67:11
**hour** [2] - 19:19, 100:15
**hours** [4] - 7:21, 8:12, 38:15, 54:21
**house** [9] - 21:8, 24:20, 25:17, 29:16, 29:18, 29:22, 30:24, 69:19, 75:15
**houses** [1] - 21:9
**hum** [2] - 88:6, 100:11
**hundred** [1] - 22:17
**Hyde** [1] - 70:4

**I**

**I.D** [1] - 102:18
**IAU** [3] - 72:3, 94:15, 94:20
**ID** [1] - 89:12
**idea** [1] - 85:23
**identification** [3] - 41:21, 44:17, 70:12
**identified** [2] - 42:5, 43:13
**identify** [3] - 41:24, 43:9, 70:15
**identifying** [1] - 44:23
**immediately** [1] - 14:16
**important** [2] - 65:7, 65:8
**impounded** [2] - 40:3, 50:11

**IN** [1] - 103:20
**INC** [1] - 1:23
**incident** [22] - 7:16, 8:18, 9:21, 10:17, 17:20, 18:17, 30:18, 31:11, 40:8, 54:17, 59:19, 59:25, 68:18, 68:20, 69:10, 69:15, 69:17, 72:24, 76:12, 77:8, 77:17, 78:3
**incidentally** [2] - 83:24, 92:24
**include** [1] - 42:10
**included** [2] - 17:17, 93:16
**including** [4] - 71:5, 71:24, 73:8, 89:23
**incorporated** [1] - 90:25
**independent** [1] - 7:15
**indicate** [7] - 19:4, 19:8, 22:9, 22:19, 33:23, 35:25, 87:12
**indicated** [8] - 18:18, 20:25, 25:19, 53:21, 54:15, 56:6, 56:19, 82:23
**indicates** [1] - 92:13
**indicating** [1] - 87:25
**indication** [1] - 47:8
**individual** [6] - 1:7, 1:8, 1:9, 21:3, 24:8, 90:22
**individuals** [1] - 11:19
**influence** [1] - 21:4
**informally** [1] - 50:16
**information** [13] - 39:15, 40:20, 43:14, 47:10, 49:16, 49:25, 52:23, 53:3, 56:17, 57:18, 58:5, 59:16, 73:15
**informations** [1] - 55:23
**informed** [7] - 16:23, 27:19, 40:3, 54:21, 63:10, 64:2, 64:11
**initial** [12] - 7:21, 17:5, 17:6, 18:23, 40:11, 50:4, 50:12, 51:6, 52:4, 73:16, 80:20, 95:6
**initials** [5] - 71:6, 71:9, 71:17, 71:21, 72:8
**initiated** [5] - 33:17, 58:18, 63:21, 89:6, 89:7

**input** [1] - 65:25
**inquiring** [1] - 78:21
**inside** [1] - 35:19
**insight** [1] - 46:18
**inspect** [1] - 14:5
**inspected** [1] - 56:10
**instance** [1] - 70:2
**instruct** [1] - 73:18
**instructions** [2] - 12:15, 39:21
**instrumental** [1] - 58:11
**intention** [2] - 55:6, 61:8
**intercept** [1] - 21:21
**interested** [1] - 103:18
**interior** [1] - 31:25
**internal** [1] - 88:23
**Internal** [19] - 68:13, 68:20, 68:25, 69:4, 69:6, 70:17, 70:20, 72:17, 73:25, 74:13, 74:25, 75:12, 76:5, 77:13, 78:6, 78:22, 78:25, 79:17, 102:8
**intersection** [1] - 24:18
**interview** [3] - 46:17, 74:24, 77:6
**interviewed** [2] - 72:16, 72:19
**intoxicated** [1] - 20:2
**introduced** [1] - 53:24
**inventoried** [2] - 41:5, 41:7
**investigating** [1] - 19:25
**investigation** [13] - 9:3, 59:24, 68:25, 69:5, 69:7, 69:14, 69:17, 73:17, 75:12, 78:23, 79:2, 89:4, 96:10
**investigations** [1] - 85:19
**investigator** [1] - 84:4
**investment** [1] - 5:14
**invoice** [1] - 41:15
**Invoice** [1] - 41:20, 102:19
**involved** [9] - 50:6, 51:23, 72:24, 76:7, 86:16, 86:24, 89:12, 91:16
**involvement** [1] - 21:2, 40:6, 40:16, 40:22, 50:19, 58:21, 64:13, 66:25, 67:5,

73:5, 73:6, 73:7, 73:23, 74:3, 75:14
**involving** [3] - 60:2, 72:25, 78:4
**Ira** [2] - 4:16, 78:5
**IRA** [1] - 2:7
**IS** [3] - 3:2, 3:7, 3:11
**issued** [1] - 40:9
**IT** [3] - 3:2, 3:7, 3:11
**itemized** [2] - 41:15, 42:7
**itemizes** [1] - 89:11
**items** [3] - 41:14, 42:7, 70:25
**itself** [3] - 12:20, 50:19, 96:21

**J**

**J-O-V-A-N** [1] - 46:14
**jacket** [3] - 17:18, 54:5, 99:7
**JAMES** [1] - 1:7
**James** [2] - 2:13, 57:24
**jeans** [1] - 56:23
**JEFFREY** [1] - 2:18, 2:23
**JENNIFER** [2] - 103:7, 103:25
**Jennifer** [1] - 1:19
**Jericho** [14] - 7:17, 8:19, 10:10, 11:3, 11:14, 19:15, 21:6, 21:9, 24:18, 24:23, 30:22, 33:22, 34:6, 34:22
**JIE** [1] - 18:4
**Jim** [2] - 65:21, 68:3
**job** [2] - 44:22, 79:8
**JOHN** [1] - 1:9
**join** [10] - 10:2, 23:15, 24:6, 28:10, 28:19, 52:13, 64:24, 79:22, 92:21, 99:14
**Jovan** [5] - 46:8, 97:16, 97:17, 97:19, 97:23
**jump** [1] - 80:23
**June** [1] - 6:3
**jury** [7] - 60:18, 61:9, 62:11, 62:17, 67:8, 67:17, 67:18
**Justice** [1] - 55:18, 57:10

**K**

**keep** [4] - 4:24, 84:13, 93:20, 93:22
**kept** [4] - 52:20,

54:5, 76:23, 98:25
**keys** [2] - 9:16, 77:3
**kind** [1] - 30:25
**knowing** [2] - 91:6, 91:12
**knowledge** [3] - 39:20, 72:23, 98:17
**known** [7] - 40:25, 45:18, 47:24, 48:11, 50:16, 57:9, 84:9

**L**

**lab** [6] - 27:17, 85:8, 96:23, 97:3, 97:7, 97:12
**lack** [1] - 76:9
**large** [3] - 12:21, 30:10, 51:3
**last** [1] - 44:6
**LAURENCE** [2] - 2:18, 2:23
**LAW** [2] - 2:3, 2:18
**lawsuit** [1] - 4:20
**lay** [1] - 93:3
**learn** [7] - 8:17, 8:22, 9:4, 9:21, 58:8, 78:24, 82:4
**learned** [5] - 8:23, 10:16, 74:25, 76:12, 82:2
**least** [3] - 30:19, 86:24, 89:25
**leave** [1] - 47:10
**leaving** [3] - 9:20, 39:23, 77:5
**led** [1] - 53:3
**left** [7] - 12:9, 24:7, 45:7, 50:10, 64:14, 71:10, 98:15
**left-hand** [1] - 71:10
**legal** [1] - 86:6
**legally** [1] - 50:10
**length** [1] - 65:19
**Lerner** [1] - 5:11
**letter** [1] - 76:5
**letters** [3] - 44:6, 44:8, 72:3
**level** [5] - 52:21, 58:12, 58:20, 59:21, 67:3
**Levittown** [1] - 6:12
**license** [6] - 32:8, 32:24, 33:5, 33:8, 45:19, 51:19
**Lieutenant** [1] - 72:20
**likely** [2] - 93:21, 94:3
**limited** [2] - 40:21, 75:14

**limiting** [1] - 78:6
**line** [1] - 58:3
**lines** [1] - 73:21
**link** [2] - 16:18, 21:13
**list** [3] - 42:7, 42:9, 80:15
**listed** [1] - 50:17
**listing** [1] - 51:22
**lived** [1] - 48:11
**loaded** [10] - 13:14, 13:21, 31:19, 41:8, 54:24, 58:2, 58:9, 84:16, 84:18, 87:18
**lobby** [1] - 53:22
**locate** [1] - 45:16
**located** [3] - 16:24, 25:15, 48:7
**location** [38] - 8:24, 8:25, 9:19, 10:10, 10:25, 18:22, 18:25, 20:21, 22:11, 22:18, 25:3, 25:13, 31:7, 34:2, 34:3, 34:4, 36:9, 36:18, 37:2, 37:10, 37:16, 38:13, 38:18, 39:7, 39:11, 39:17, 39:22, 43:5, 45:17, 45:21, 46:3, 46:24, 48:17, 48:20, 51:18, 74:14, 75:2, 75:22
**look** [6] - 44:19, 70:13, 81:13, 81:15, 86:22, 90:14
**looked** [2] - 31:21, 31:24
**looking** [4] - 45:15, 54:16, 54:20, 95:14
**loop** [1] - 27:15
**lost** [3] - 16:9, 33:18, 95:3
**love** [1] - 56:21
**lower** [1] - 44:3
**lying** [2] - 26:8, 26:22

**M**

**machine** [1] - 70:25
**magazine** [15] - 13:14, 13:21, 14:5, 14:11, 31:19, 41:8, 85:25, 86:25, 90:7, 90:15, 90:20, 92:2, 96:11, 97:25, 102:11
**mailboxes** [1] - 38:23
**Main** [1] - 1:24
**male** [1] - 32:5
**man** [4] - 8:9, 8:11, 20:19
**March** [2] - 60:16,

103:22
**margin** [1] - 93:9
**mark** [2] - 41:17, 70:8
**marked** [12] - 20:12, 41:20, 41:23, 43:8, 44:16, 44:19, 45:4, 57:13, 70:12, 70:14, 70:25, 77:14
**marks** [1] - 56:18
**marriage** [1] - 103:17
**matched** [2] - 32:5, 32:12, 32:21
**materials** [2] - 84:5, 100:21
**matter** [5] - 4:18, 67:24, 96:11, 99:6, 103:19
**Mazda** [8] - 11:12, 13:10, 13:22, 19:10, 24:14, 24:16, 31:22, 46:10
**mdl** [1] - 87:20
**mean** [5] - 53:11, 56:25, 65:14, 88:12, 94:18
**meaning** [2] - 36:13, 36:14
**measure** [1] - 24:21
**meet** [3] - 45:20, 48:16, 66:18
**meeting** [1] - 68:3
**member** [3] - 39:14, 65:3, 72:16
**members** [6] - 25:2, 39:16, 68:12, 72:16, 73:25, 74:12
**memo** [2] - 10:12, 89:20
**memory** [1] - 25:17
**men's** [1] - 41:12
**mention** [4] - 16:11, 37:15, 37:19, 82:8
**mentioned** [2] - 35:18, 35:21
**met** [3] - 63:5, 68:9, 70:2
**metal** [14] - 14:10, 16:20, 16:21, 17:2, 21:13, 26:24, 30:11, 41:11, 80:24, 81:6, 81:18, 81:24, 81:25
**Michael** [1] - 25:7
**microfilm** [1] - 98:24
**middle** [1] - 89:11
**might** [3] - 37:5, 46:19, 81:15
**miles** [1] - 19:19
**millimeter** [1] - 87:18
**millimeters** [1] - 94:22

**mind** [1] - 30:20
**Mindy** [2] - 60:24, 63:6
**mine** [2] - 71:12, 72:4
**Mineola** [2] - 2:16, 4:12
**minivan** [1] - 26:18
**minor** [1] - 40:19
**minute** [1] - 44:11
**minutes** [1] - 67:17
**misinformation** [1] - 64:8
**model** [2] - 13:11, 51:21
**moment** [5] - 79:12, 80:18, 87:21, 89:17, 90:4
**months** [2] - 62:23, 70:5
**morning** [12] - 8:3, 8:13, 8:14, 8:21, 10:5, 10:24, 11:24, 19:3, 46:22, 54:18, 81:8, 89:22
**MR** [84] - 4:7, 6:4, 6:8, 10:2, 17:7, 19:12, 23:15, 24:6, 27:21, 28:10, 28:19, 31:2, 34:23, 35:10, 35:13, 37:3, 37:7, 39:19, 41:17, 44:10, 45:4, 45:6, 46:11, 48:12, 52:13, 52:14, 53:12, 57:3, 59:3, 60:5, 62:13, 63:12, 63:14, 64:16, 64:24, 65:17, 67:21, 68:4, 70:7, 73:2, 73:12, 74:4, 74:16, 75:5, 75:24, 76:19, 78:5, 78:8, 78:12, 78:14, 78:20, 79:9, 79:11, 79:15, 79:22, 80:3, 80:13, 80:18, 83:9, 83:12, 87:9, 87:14, 88:2, 88:25, 90:3, 90:11, 91:7, 91:14, 92:9, 92:18, 92:20, 94:7, 94:17, 94:21, 96:15, 99:12, 99:14, 99:18, 99:21, 99:24, 100:17, 100:19, 102:4, 102:5
**MS** [65] - 9:23, 10:18, 11:21, 18:3, 18:5, 20:16, 22:23, 23:13, 24:4, 24:12, 24:15, 27:23, 28:7, 28:17, 29:3, 30:15, 32:18, 33:13, 34:13, 35:6, 35:12, 36:10, 37:25, 39:18, 42:13, 44:12, 52:11, 60:19, 61:24, 64:23, 73:13, 74:6, 74:18, 75:7, 76:18, 78:10, 78:13, 79:13, 80:11, 81:2, 81:20, 82:6, 82:16, 83:7, 83:14, 83:21, 84:22, 85:14, 86:2, 87:4, 87:22, 88:10, 88:15, 90:10, 91:9, 92:3, 92:11, 93:4, 93:6, 94:11, 94:19, 95:21, 96:19, 97:8, 99:15

52:11, 60:19, 61:24, 64:23, 73:13, 74:6, 74:18, 75:7, 76:18, 78:10, 78:13, 79:13, 80:11, 81:2, 81:20, 82:6, 82:16, 83:7, 83:14, 83:21, 84:22, 85:14, 86:2, 87:4, 87:22, 88:10, 88:15, 90:10, 91:9, 92:3, 92:11, 93:4, 93:6, 94:11, 94:19, 95:21, 96:19, 97:8, 99:15
**multikeyboard** [1] - 52:23
**multiple** [2] - 21:18, 30:11
**must** [2] - 23:19, 91:15

**N**

**name** [15] - 4:8, 4:16, 44:6, 44:9, 46:14, 48:13, 48:15, 51:25, 54:6, 60:24, 63:25, 67:17, 82:8, 82:14, 97:12
**names** [1] - 89:13
**NAPOLITANO** [67] - 2:9, 9:23, 10:18, 11:21, 18:3, 18:5, 20:16, 22:23, 23:13, 24:4, 24:12, 24:15, 27:23, 28:7, 28:17, 29:3, 30:15, 32:18, 33:2, 33:13, 34:13, 35:6, 35:12, 36:10, 37:25, 39:18, 42:13, 44:12, 52:11, 60:19, 61:24, 64:23, 73:13, 74:6, 74:18, 75:7, 76:18, 78:10, 78:13, 79:13, 80:11, 81:2, 81:20, 82:6, 82:16, 83:7, 83:14, 83:21, 84:22, 85:14, 86:2, 87:4, 87:22, 88:10, 88:15, 90:10, 91:9, 92:3, 92:11, 93:4, 93:6, 94:11, 94:19, 95:21, 96:19, 97:8, 99:15
**narrative** [17] - 41:2, 49:11, 49:12, 50:6, 50:7, 50:16, 50:18, 50:21, 51:2, 51:6, 51:9, 52:3, 52:6, 52:25, 58:23, 86:22, 89:17
**NASSAU** [4] - 1:6, 1:17, 103:5

108

**Nassau** [29] - 2:11, 2:12, 2:14, 5:22, 11:11, 13:24, 28:15, 28:23, 39:10, 43:11, 65:2, 70:10, 70:17, 70:20, 71:8, 72:13, 77:16, 77:25, 78:9, 86:10, 86:18, 89:8, 91:20, 91:24, 92:14, 96:18, 98:23, 102:11, 102:22

**nature** [1] - 54:22

**necessarily** [1] - 51:12

**necessary** [1] - 63:17

**need** [2] - 5:5, 90:11

**needed** [1] - 8:16

**negative** [1] - 38:24

**negatives** [2] - 93:22, 94:2

**never** [9] - 32:13, 32:14, 44:23, 44:25, 82:11, 86:5, 88:21, 95:3, 95:6

**NEW** [3] - 1:2, 101:4, 103:3

**New** [13] - 1:13, 1:20, 1:24, 2:6, 2:16, 2:22, 4:13, 5:12, 70:4, 70:17, 101:22, 103:8

**next** [3] - 58:25, 71:16, 87:17

**nice** [1] - 83:10

**Nissan** [4] - 19:5, 19:9, 19:11, 19:12

**nobody** [3] - 45:22, 68:5, 68:15

**none** [1] - 11:23

**normal** [3] - 22:4, 52:15, 85:3

**normally** [6] - 9:9, 40:24, 77:2, 84:8, 93:15, 98:19

**north** [4] - 11:14, 21:7, 21:9, 24:22

**northwest** [2] - 24:18, 24:23

**Notary** [4] - 1:20, 4:4, 101:22, 103:7

**notations** [1] - 96:24

**note** [2] - 56:4, 56:13

**noted** [1] - 100:23

**notepad** [1] - 98:9

**notes** [5] - 10:15, 17:11, 17:14, 17:17, 98:13

**nothing** [1] - 12:17

**Notice** [1] - 1:19

**notifications** [1] - 64:6

**notified** [3] - 9:5, 9:6, 9:14

**number** [16] - 25:18, 40:13, 42:4, 42:5, 44:5, 52:2, 57:11, 72:2, 73:4, 76:3, 87:12, 87:20, 93:23, 95:12, 96:3

**Number** [1] - 90:14

**numbers** [7] - 44:7, 87:16, 89:12, 89:18, 95:20

**nylon** [2] - 27:15, 84:8

**O**

**oath** [2] - 3:14, 101:9

**object** [12] - 16:20, 16:21, 17:2, 29:6, 34:24, 35:7, 63:13, 74:20, 78:14, 81:6, 81:24, 82:2

**objection** [58] - 9:23, 10:18, 11:21, 20:16, 22:23, 23:13, 23:16, 24:4, 24:12, 24:15, 27:21, 27:23, 28:7, 28:17, 29:3, 30:15, 32:18, 33:13, 34:13, 36:10, 37:3, 37:25, 39:18, 39:19, 52:11, 60:19, 61:24, 64:23, 73:2, 73:12, 73:13, 74:4, 74:6, 74:16, 74:18, 75:6, 75:7, 76:18, 76:19, 78:20, 80:11, 81:2, 81:20, 82:6, 82:16, 83:7, 83:21, 84:22, 85:14, 86:2, 87:4, 88:10, 88:15, 90:10, 93:4, 95:21, 96:19, 97:8

**objections** [1] - 3:8

**obligated** [1] - 40:22

**obliterated** [2] - 71:11, 72:2

**observation** [1] - 27:11

**observe** [5] - 11:8, 13:9, 14:8, 26:20, 30:13

**observed** [15] - 14:6, 16:7, 19:14, 21:11, 22:16, 25:13, 32:2, 32:3, 32:19, 38:8, 47:15, 47:19, 56:2, 86:8, 86:10

**observing** [1] - 75:16

**obtain** [1] - 77:3

**obtained** [1] - 76:13

**obtaining** [1] - 77:10

**obvious** [1] - 89:10

**occasion** [1] - 96:8

**Occhino** [19] - 9:18, 10:9, 12:11, 12:16, 12:25, 37:23, 43:8, 45:10, 47:4, 48:24, 49:13, 50:20, 52:7, 56:16, 56:24, 57:4, 59:24, 68:15, 68:18

**Occhino's** [1] - 44:8

**occupants** [2] - 21:17, 21:18

**occurred** [9] - 7:16, 8:18, 9:22, 36:17, 43:4, 68:8, 69:10, 80:4, 80:25

**occurrence** [3] - 50:5, 51:18

**October** [25] - 5:17, 7:12, 7:23, 8:18, 21:25, 36:8, 37:12, 37:24, 42:21, 42:25, 43:4, 45:8, 53:15, 59:25, 62:23, 68:8, 69:10, 69:15, 69:24, 72:25, 74:15, 75:22, 77:9, 77:18, 78:3

**odor** [1] - 20:4

**OF** [8] - 1:2, 1:6, 2:3, 2:18, 101:4, 101:5, 103:3, 103:5

**office** [9] - 61:4, 64:11, 65:15, 65:20, 68:2, 68:6, 76:24, 77:4, 94:4

**Officer** [78] - 2:13, 2:19, 15:7, 15:8, 15:20, 15:21, 16:3, 19:4, 19:8, 20:7, 21:10, 21:14, 21:23, 22:6, 22:19, 23:4, 25:19, 29:7, 32:8, 33:6, 33:7, 33:10, 33:24, 34:11, 34:12, 34:15, 36:5, 36:14, 36:25, 37:9, 37:13, 37:15, 40:4, 47:16, 51:5, 51:13, 52:8, 53:2, 53:10, 58:8, 59:6, 59:9, 59:16, 64:2, 64:12, 64:21, 65:11, 65:12, 65:21, 66:4, 66:5, 68:24, 69:3, 69:9, 69:13, 69:23, 70:2, 72:23, 73:6, 73:9, 73:11, 73:15, 74:14, 75:2, 75:3, 76:4, 80:20, 81:5, 82:12, 82:23, 83:3, 83:5, 87:17, 100:3, 100:6, 100:9,

100:10, 100:13

**OFFICER** [2] - 1:7, 1:8

**officer** [36] - 3:13, 5:19, 7:13, 9:10, 9:15, 15:5, 22:16, 22:20, 23:10, 23:20, 24:8, 28:15, 28:16, 28:23, 28:24, 33:11, 33:21, 34:16, 34:21, 35:19, 35:22, 36:2, 36:5, 36:22, 37:17, 40:10, 40:18, 43:20, 44:2, 50:7, 52:16, 56:9, 63:24, 82:25, 89:21

**officers** [22] - 9:10, 11:17, 11:18, 11:20, 12:6, 12:23, 13:16, 13:17, 15:3, 22:10, 22:12, 23:7, 24:2, 37:20, 37:21, 38:18, 38:22, 39:22, 43:16, 51:24, 73:8, 89:13

**OFFICES** [2] - 2:3, 2:18

**official** [4] - 1:7, 1:8, 1:9, 97:12

**older** [1] - 54:4

**once** [1] - 67:19

**One** [1] - 2:15

**one** [16] - 14:13, 15:23, 20:19, 22:3, 22:4, 26:15, 31:20, 32:21, 38:21, 44:20, 58:11, 69:25, 74:10, 80:18, 96:2, 97:15

**one-man** [1] - 20:19

**one-page** [1] - 44:20

**oOo** [1] - 3:19

**open** [4] - 13:12, 49:9, 58:14, 79:14

**opened** [2] - 53:7, 55:17

**operability** [1] - 96:25

**operating** [2] - 20:10, 20:12

**operation** [1] - 19:21

**operations** [2] - 52:16, 85:4

**operator** [1] - 52:24

**opinion** [1] - 58:14

**opportunity** [1] - 35:8

**orally** [1] - 52:9

**order** [5] - 20:7, 40:13, 52:19, 59:18, 96:12

**organized** [1] - 55:12

**original** [2] - 43:15, 93:13, 96:5

**originated** [1] - 96:12

**otherwise** [1] - 93:19

**outcome** [1] - 103:18

**outs** [1] - 71:2

**outside** [2] - 13:25, 35:20

**overbroad** [1] - 78:15

**overriding** [1] - 85:17

**owner** [1] - 96:5

**P**

**p.m** [5] - 1:15, 8:3, 44:13, 53:19, 100:23

**package** [1] - 51:11

**packet** [1] - 49:15

**pad** [1] - 17:16

**PAGE** [2] - 102:3, 102:8

**page** [26] - 43:10, 43:14, 43:19, 44:20, 50:20, 50:21, 56:16, 56:24, 56:25, 57:5, 57:12, 58:24, 58:25, 70:12, 70:16, 71:4, 71:13, 71:16, 71:18, 71:20, 72:6, 72:9, 75:25, 76:3, 81:15, 102:24

**papers** [1] - 41:13

**paperwork** [1] - 7:8

**paragraph** [10] - 51:3, 51:7, 52:7, 53:3, 53:4, 59:5, 59:9, 59:11, 59:14

**parameters** [1] - 77:20

**Park** [37] - 6:22, 7:17, 8:19, 9:22, 10:11, 11:12, 22:16, 22:20, 28:16, 28:23, 42:23, 43:3, 44:15, 44:21, 45:8, 46:4, 60:2, 63:23, 70:4, 77:9, 77:18, 78:3, 85:13, 85:18, 85:24, 86:17, 86:25, 88:13, 88:24, 89:6, 89:13, 90:6, 91:21, 91:23, 92:8, 102:12, 102:20

**parked** [4] - 11:12, 24:16, 26:16, 50:11

**part** [8] - 49:20, 51:11, 59:8, 73:15, 81:16, 89:4, 90:25, 91:3

**partially** [1] - 71:11

**participants** [1] -

50:5
 **particular** [14] - 8:5, 16:8, 42:9, 49:10, 49:15, 50:14, 57:21, 58:16, 62:2, 89:14, 89:16, 89:18, 90:18, 95:4
 **parties** [2] - 3:4, 103:16
 **pass** [1] - 69:19
 **passenger** [6] - 13:12, 13:13, 13:25, 46:9, 48:3, 98:2
 **path** [3] - 15:23, 15:25, 17:20
 **Patrick's** [1] - 62:17
 **patrol** [2] - 18:10, 83:16
 **PDCN** [3] - 42:3, 57:9, 92:12
 **peepholes** [1] - 14:11
 **pen** [1] - 71:5
 **people** [4] - 11:25, 38:9, 77:6, 93:5
 **per** [1] - 19:19
 **perception** [1] - 89:25
 **perform** [1] - 23:20
 **performed** [1] - 20:24
 **perhaps** [2] - 37:5, 83:25
 **period** [2] - 75:15, 99:2
 **person** [5] - 22:3, 23:3, 32:19, 51:22, 80:21
 **personal** [1] - 41:13
 **personally** [1] - 96:14
 **personnel** [1] - 86:11
 **persons** [2] - 51:23, 75:16
 **phone** [3] - 9:13, 66:16
 **photo** [3] - 32:8, 93:8, 93:21
 **photocopies** [3] - 94:15, 95:8, 95:10
 **photocopy** [1] - 42:2
 **photograph** [8] - 32:3, 32:12, 32:17, 32:20, 70:19, 92:25, 93:2, 95:4
 **photographs** [11] - 25:11, 27:14, 93:10, 93:12, 93:13, 94:5, 94:8, 95:4, 95:7, 96:22, 102:13
 **physical** [1] - 55:24

 **physically** [1] - 95:17
 **pick** [1] - 14:6
 **picture** [1] - 32:6
 **pictures** [1] - 94:16
 **pistol** [2] - 13:14, 27:3
 **place** [4] - 17:21, 21:3, 23:10, 50:4
 **placed** [4] - 55:11, 56:8, 57:19, 59:17
 **placing** [1] - 27:15
 **plaintiff** [1] - 4:17
 **Plaintiff** [2] - 1:4, 2:4
 **pleasantries** [1] - 69:21
 **Plotkin** [3] - 60:25, 63:6, 65:9
 **Plotkin's** [1] - 64:11
 **point** [31] - 7:22, 12:24, 15:24, 16:7, 16:8, 16:19, 17:19, 21:5, 21:10, 21:16, 22:7, 23:8, 25:12, 26:12, 29:2, 32:25, 33:18, 33:20, 34:18, 40:21, 47:22, 49:14, 50:15, 52:4, 55:2, 61:18, 64:10, 64:14, 87:20, 99:8
 **Police** [49] - 2:12, 2:19, 5:22, 15:7, 15:8, 15:19, 20:7, 21:10, 21:14, 21:23, 23:4, 23:24, 25:19, 32:8, 37:13, 39:10, 40:3, 42:23, 43:3, 43:11, 44:16, 44:21, 51:5, 59:16, 63:25, 64:12, 66:4, 66:5, 70:16, 70:21, 73:6, 76:4, 77:16, 78:2, 78:9, 85:13, 85:24, 86:19, 87:2, 87:17, 88:13, 88:24, 89:6, 91:21, 91:24, 92:14, 102:12, 102:20
 **POLICE** [4] - 1:6, 1:7, 1:8, 1:18
 **police** [53] - 5:19, 7:13, 8:24, 9:10, 11:10, 11:18, 11:20, 12:6, 12:23, 13:15, 15:3, 15:5, 20:13, 21:24, 22:20, 27:17, 28:15, 28:16, 28:23, 28:24, 37:21, 38:17, 39:11, 39:15, 39:17, 39:22, 40:8, 40:10, 41:2, 42:2, 50:6, 50:12, 51:6, 51:24, 52:15, 52:16, 55:23, 56:7, 57:22, 63:23,

64:6, 65:3, 72:13, 76:14, 76:16, 76:24, 77:7, 77:10, 85:7, 85:9, 96:18, 97:3, 98:22
 **portable** [1] - 22:5
 **portion** [3] - 44:3, 57:13, 57:24
 **position** [1] - 95:17
 **positive** [1] - 21:2
 **possession** [4] - 54:23, 85:25, 86:6, 90:7
 **possible** [2] - 14:23, 98:5
 **possibly** [1] - 96:5
 **practice** [1] - 23:23
 **Precinct** [9] - 9:20, 15:12, 15:13, 18:11, 49:3, 49:5, 53:22, 61:18, 76:13
 **precinct** [5] - 6:14, 6:25, 11:18, 12:9, 15:18
 **preliminary** [3] - 40:12, 40:19, 50:7
 **prepare** [1] - 7:5
 **prepared** [11] - 50:25, 52:8, 55:21, 55:23, 59:6, 59:9, 77:21, 77:23, 85:5, 89:21, 90:22
 **preparing** [1] - 77:14
 **present** [10] - 25:3, 27:13, 36:25, 37:5, 53:21, 56:4, 61:8, 75:22, 86:11, 100:14
 **presented** [1] - 60:18
 **pretty** [2] - 65:6, 67:7
 **previously** [2] - 15:15, 43:8
 **primarily** [1] - 54:9
 **printed** [3] - 70:24, 93:14, 95:6
 **prints** [1] - 93:25
 **problem** [1] - 65:24
 **procedure** [1] - 23:9
 **proceeded** [2] - 9:18, 55:12
 **process** [2] - 55:7, 55:13
 **processed** [2] - 61:18, 85:11
 **processing** [7] - 40:11, 40:18, 40:23, 52:17, 52:22, 55:15, 55:19
 **production** [2] - 91:19, 99:13
 **program** [2] - 55:18, 55:19

 **properly** [1] - 52:20
 **property** [3] - 25:25, 42:5, 98:22
 **Property** [2] - 41:19, 102:19
 **provide** [1] - 46:20, 85:21
 **provided** [5] - 67:4, 68:14, 80:15, 85:20, 97:11
 **proximity** [3] - 13:18, 16:25, 41:9
 **Public** [4] - 1:20, 4:4, 101:22, 103:8
 **purportedly** [1] - 86:24
 **purpose** [2] - 45:13, 46:5, 61:5
 **pursuant** [1] - 1:19
 **pursue** [1] - 75:3
 **pursuing** [3] - 33:11, 74:15, 82:24
 **pursuit** [10] - 15:24, 16:2, 16:9, 16:17, 17:3, 21:10, 33:17, 56:6, 58:20, 76:7
 **purvey** [2] - 86:7, 97:3
 **purview** [1] - 97:6
 **put** [4] - 51:6, 58:5, 63:10, 63:17
 **putting** [1] - 84:4

 **Q**

 **questionnaire** [1] - 55:25
 **questions** [8] - 4:22, 35:9, 67:6, 73:5, 74:8, 79:10, 97:24, 100:18

 **R**

 **radio** [15] - 9:16, 10:7, 21:24, 22:5, 39:11, 39:12, 64:5, 64:7, 76:14, 76:16, 76:25, 77:4, 77:7, 77:10, 89:20
 **radioed** [1] - 39:15
 **radios** [1] - 76:23
 **rather** [1] - 30:10
 **read** [3] - 35:15, 35:17, 101:8
 **readily** [1] - 27:5
 **reading** [1] - 87:23
 **really** [3] - 47:22, 68:16, 99:6
 **REALTIME** [1] - 1:23
 **rear** [2] - 29:24, 32:21

 **reask** [1] - 28:20
 **reason** [5] - 46:15, 47:18, 79:6, 90:13, 95:19
 **reasons** [1] - 96:2
 **received** [2] - 43:16, 56:5
 **recess** [1] - 44:13
 **recollect** [2] - 12:4, 12:5
 **recollection** [4] - 7:16, 7:19, 36:4, 51:4
 **Record** [1] - 35:17
 **record** [12] - 4:9, 74:11, 79:24, 79:25, 88:20, 92:22, 92:23, 97:2, 101:11, 101:12, 103:13
 **recorded** [1] - 27:12
 **records** [3] - 62:19, 79:17, 102:8
 **Recovered** [1] - 57:25
 **recovered** [15] - 8:25, 28:12, 32:4, 32:10, 32:21, 41:9, 42:8, 42:10, 42:16, 58:9, 64:3, 64:9, 65:3, 73:19
 **recovers** [2] - 58:13, 86:17
 **recovery** [6] - 38:24, 58:11, 58:21, 64:4, 64:13, 65:5
 **reduce** [3] - 92:4, 94:12, 98:23
 **reduced** [1] - 99:16
 **refer** [1] - 49:13
 **reference** [6] - 31:3, 75:25, 76:4, 88:5, 90:15, 90:18
 **regard** [14] - 19:21, 23:25, 30:17, 34:16, 36:21, 40:25, 43:4, 55:14, 59:25, 67:14, 72:23, 77:17, 78:2, 91:24
 **regarding** [5] - 64:8, 64:13, 73:5, 75:21, 77:8
 **regardless** [1] - 86:9
 **regards** [3] - 43:17, 58:15, 73:22
 **registration** [1] - 51:19
 **regular** [1] - 17:15
 **regulation** [1] - 23:19
 **regulations** [1] - 80:17
 **related** [6] - 54:23,

75:10, 85:19, 96:10, 97:25, 103:16
**relates** [2] - 91:20, 91:22
**relating** [2] - 54:17, 102:10
**relation** [3] - 13:22, 26:2, 31:11
**relative** - 27:12, 90:22
**released** [5] - 18:20, 50:10, 83:16, 83:20, 100:3
**relieved** [1] - 100:6
**reluctant** [1] - 47:9
**remarkable** [1] - 11:23
**remember** [20] - 9:12, 10:6, 12:13, 14:4, 14:24, 19:2, 26:7, 28:12, 30:4, 39:12, 45:25, 54:3, 54:6, 54:10, 67:11, 74:10, 74:21, 75:18, 91:4, 95:14
**repeat** [1] - 79:16
**rephrase** [2] - 4:23, 37:8
**report** [37] - 7:9, 40:5, 40:7, 40:10, 40:13, 40:19, 40:24, 42:4, 43:12, 49:16, 49:17, 49:20, 49:22, 49:23, 49:24, 50:2, 50:3, 50:17, 51:7, 51:10, 51:12, 51:14, 52:5, 52:7, 53:8, 55:21, 55:22, 56:14, 57:8, 57:11, 57:12, 59:17, 59:18, 81:11, 81:12, 81:14, 94:15
**reported** [1] - 61:15
**reporter** [1] - 4:24
**REPORTING** [1] - 1:23
**reporting** [1] - 50:12
**reports** [1] - 87:18
**represent** [1] - 4:17
**reps** [1] - 68:13
**request** [4] - 23:11, 79:16, 92:21, 94:8
**REQUEST** [1] - 102:7
**requested** [6] - 9:17, 9:19, 22:7, 55:4, 63:24, 93:18
**requesting** [2] - 9:2, 23:25
**requests** [1] - 94:4
**require** [1] - 79:19
**required** [1] - 52:16

**reserved** [1] - 3:10
**reserving** [1] - 79:21
**residence** [2] - 16:19, 24:9
**respect** [3] - 22:21, 61:20, 97:14
**respective** [2] - 3:4, 51:25
**respond** [5] - 9:2, 9:18, 16:3, 62:8, 80:10
**responded** [4] - 18:22, 34:4, 53:23, 67:5
**responding** [2] - 22:11, 22:13
**responsibilities** [1] - 8:8
**responsibility** [2] - 40:4, 86:13
**responsible** [3] - 8:14, 58:19, 100:6
**result** [1] - 80:4
**resumed** [1] - 44:14
**retained** [1] - 102:25
**retired** [3] - 79:4, 80:14, 99:3
**retires** [2] - 98:20, 99:4
**retiring** [1] - 79:7
**review** [4] - 7:4, 7:7, 53:4, 56:9
**reviewed** [1] - 53:6
**reviewing** [2] - 53:9, 79:18
**rights** [1] - 79:21
**ring** [12] - 29:23, 30:2, 30:9, 30:11, 30:24, 31:10, 32:11, 32:12, 32:15, 32:16, 32:20, 41:11
**rise** [1] - 59:21
**robbery** [1] - 70:4
**rocking** [1] - 84:13
**role** [4] - 61:10, 61:12, 73:16, 89:14
**rooftops** [1] - 38:23
**room** [2] - 55:11, 76:22
**Roosevelt** [1] - 45:12
**round** [2] - 14:13, 14:14
**rounds** [1] - 14:12
**routinely** [1] - 69:18
**RQ** [4] - 79:15, 91:14, 94:7, 99:12
**ruler** [1] - 27:13
**rules** [1] - 80:17
**running** [2] - 34:18, 37:17
**runs** [1] - 67:20

**S**

**safe** [2] - 27:15, 84:18
**Saturday** [3] - 11:24, 51:8, 59:12
**saw** [7] - 21:24, 26:21, 30:4, 80:22, 82:11, 95:3, 95:6
**scars** [1] - 56:18
**Scene** [5] - 11:16, 13:19, 25:3, 86:12, 93:20
**scene** [34] - 10:22, 11:11, 12:10, 12:14, 12:16, 12:20, 14:17, 15:3, 18:13, 25:11, 27:20, 29:8, 40:15, 77:6, 81:7, 82:11, 83:6, 83:16, 84:4, 84:6, 85:5, 85:10, 85:12, 85:18, 86:13, 89:16, 90:8, 93:2, 93:5, 93:23, 95:11, 100:4, 100:7, 100:15
**scenes** [1] - 30:21
**scrapes** [3] - 56:3, 56:4, 56:5
**screen** [2] - 55:20
**screen-by-screen** [1] - 55:20
**sealing** [1] - 3:5
**search** [1] - 13:17
**searching** [1] - 39:2
**second** [3] - 51:7, 58:3, 59:11
**section** [4] - 44:4, 57:16, 57:19, 58:6
**secure** [1] - 84:11
**secured** [7] - 9:16, 10:7, 27:16, 32:9, 90:21, 90:23, 93:3
**secures** [1] - 40:18
**Security** [1] - 52:2
**see** [23] - 11:19, 13:15, 14:12, 25:8, 30:6, 37:9, 37:12, 42:21, 43:2, 45:15, 49:7, 50:23, 57:5, 58:2, 86:23, 87:8, 87:9, 87:11, 87:16, 89:10, 92:24, 94:24, 97:16
**seeing** [4] - 22:3, 30:5, 46:15, 95:9
**semantics** [1] - 58:12
**semiautomatic** [2] - 13:14, 27:3
**send** [1] - 94:18
**sends** [1] - 96:22

**separate** [2] - 30:21, 42:15
**September** [3] - 5:24, 62:22, 79:5
**sequence** [1] - 40:13
**sequentially** [1] - 89:23
**sergeant** [2] - 71:25, 83:20
**Sergeant** [5] - 18:2, 18:9, 72:21, 83:17, 99:25
**serial** [4] - 87:20, 95:12, 95:20, 96:3
**services** [5] - 11:17, 13:16, 38:22, 40:15, 85:21
**set** [3] - 77:3, 103:12, 103:21
**seven** [2] - 62:23, 70:5
**several** [5] - 7:21, 9:10, 11:10, 13:15, 97:13
**shall** [2] - 3:9, 56:21
**share** [1] - 94:21
**sheet** [1] - 44:4
**shield** [1] - 72:2
**shift** [1] - 18:21
**shirt** [1] - 56:22
**shot** [1] - 95:25
**shoulder** [1] - 11:13
**show** [5] - 15:22, 17:20, 41:22, 43:7, 44:18
**showed** [1] - 33:4
**shown** [1] - 86:21
**side** [6] - 11:14, 13:24, 14:11, 24:24, 25:24, 66:16
**sign** [1] - 77:2
**signature** [2] - 42:6, 72:5
**signed** [2] - 3:13, 3:15
**Signed** [1] - 101:19
**significance** [1] - 64:20
**Simmons** [3] - 48:6, 48:10, 48:16
**sit** [1] - 9:7
**site** [9] - 17:24, 27:7, 28:21, 29:12, 29:13, 37:24, 41:5, 42:12, 58:9
**situation** [1] - 55:4
**six** [2] - 62:23, 70:5
**SMT** [1] - 56:18
**SMT/clothing** [1] - 56:17
**sneakers** [1] - 56:23

**sobriety** [7] - 20:8, 20:21, 20:25, 22:15, 23:6, 23:12, 24:2
**Social** [1] - 51:25
**sole** [1] - 33:11
**solely** [1] - 88:24
**someone** [1] - 96:2
**somewhere** [5] - 10:23, 19:18, 53:19, 62:21, 100:15
**sorry** [5] - 19:7, 19:13, 60:14, 64:16, 66:5, 77:19, 81:16, 95:2
**sound** [3] - 80:24, 81:18
**source** [1] - 85:2
**space** [1] - 99:7
**speaking** [3] - 5:4, 67:23, 77:13
**specific** [16] - 12:17, 23:18, 29:17, 29:20, 31:7, 34:9, 36:3, 37:19, 54:11, 58:15, 59:19, 66:6, 73:19, 73:22, 75:10, 99:5
**specifically** [24] - 9:12, 10:5, 12:13, 15:16, 16:16, 22:2, 22:8, 28:13, 30:3, 33:9, 38:6, 54:24, 55:17, 58:13, 61:13, 62:24, 68:5, 69:16, 74:9, 76:6, 86:11, 89:22, 97:5, 98:3
**specifics** [1] - 75:18
**speeding** [1] - 19:15
**spell** [2] - 18:3, 46:11
**spent** [1] - 38:13
**spoken** [1] - 17:24
**squad** [4] - 52:20, 64:15, 65:22, 76:22
**Squad** [13] - 6:11, 6:17, 6:21, 6:24, 8:7, 8:15, 49:6, 50:14, 55:11, 64:19, 85:16, 88:22, 90:25
**squeal** [2] - 8:9, 8:11
**ss** [2] - 101:4, 103:4
**St** [1] - 62:17
**stamp** [2] - 71:2, 71:8
**stamped** [4] - 56:25, 70:10, 76:3, 102:22
**standardized** [1] - 20:8
**standing** [1] - 13:16
**stands** [1] - 57:9
**start** [3] - 5:3, 31:9, 43:9
**started** [2] - 75:3,

**100**:10
**State** [3] - 1:20,
101:22, 103:8
**state** [2] - 4:8, 88:19
**STATE** [2] - 101:4,
103:3
**statement** [9] -
57:25, 64:21, 70:20,
72:12, 72:15, 75:21,
77:14, 77:21, 87:17
**statements** [1] - 55:5
**STATES** [1] - 1:2
**station** [2] - 69:18,
70:4
**status** [1] - 78:22
**stenographer's** [1] -
17:16
**stipulate** [1] - 30:20
**STIPULATED** [3] -
3:2, 3:7, 3:11
**stolen** [1] - 96:6
**stones** [1] - 30:12
**stop** [4] - 8:24,
17:10, 32:9, 58:19
**stopped** [4] - 19:6,
19:9, 19:22, 51:20
**store** [2] - 98:24,
99:7
**storm** [3] - 13:18,
38:25, 39:4
**strategy** [1] - 38:10
**Street** [5] - 1:13,
1:24, 2:5, 2:15, 2:21
**street** [1] - 31:3
**strict** [1] - 86:5
**strike** [1] - 32:14
**strings** [2] - 84:5,
84:7
**strong** [1] - 89:19
**subject** [12] - 16:10,
16:17, 18:19, 21:5,
21:12, 21:21, 25:20,
43:17, 75:9, 82:24,
100:20
**subjects** [2] - 38:11,
40:25
**submitted** [1] - 53:2
**subpoena** [1] - 92:9
**subpoenaed** [2] -
61:7, 62:8
**subscribed** [1] -
101:19
**subsequent** [3] -
42:25, 62:6, 62:7
**substance** [4] - 16:5,
35:5, 35:14, 61:14
**suggest** [1] - 90:6
**suggesting** [1] -
88:12
**Suite** [3] - 1:24, 2:5,
2:21

**sum** [4] - 16:5, 35:4,
35:13, 61:14
**summoned** [1] -
65:20
**supervisor** [3] -
18:10, 18:21, 83:17
**supervisor's** [2] -
76:23, 77:4
**supervisors** [1] -
68:14
**support** [1] - 40:14
**supposed** [1] - 57:18
**suppression** [3] -
62:7, 62:14, 62:20
**surrendered** [1] -
61:17
**surrounding** [1] -
4:19
**suspect** [4] - 12:22,
13:6, 24:9, 100:10
**sustain** [1] - 80:5
**Swift** [2] - 55:18,
57:10
**sworn** [4] - 3:13,
3:16, 4:4, 103:12
**synopsis** [3] - 16:6,
17:9, 59:19
**Syosset** [1] - 5:12
**system** [2] - 49:7,
50:12

**T**

**T-shirt** [1] - 56:22
**Tamel** [1] - 56:19
**TAMEL** [1] - 56:20
**tattoos** [5] - 43:18,
56:11, 56:13, 56:15,
56:19
**territorial** [1] - 86:8
**test** [6] - 20:25,
22:15, 23:6, 23:12,
24:2, 96:25
**tested** [1] - 85:7
**testified** [4] - 4:5,
76:11, 82:22, 93:7
**testify** [3] - 57:22,
63:11, 63:17
**testimonials** [2] -
57:14, 57:20
**testimony** [5] -
67:14, 80:20, 101:9,
101:12, 103:14
**testing** [2] - 20:9,
27:18
**tests** [2] - 20:21,
23:21
**textbook** [1] - 58:22
**THE** [13] - 6:7, 18:4,
18:6, 31:4, 35:4,
46:13, 48:14, 62:16,

**64**:18, 83:10, 87:7,
87:11, 87:24
**themselves** [1] -
98:21
**thereafter** [2] - 62:3,
65:16
**therein** [1] - 41:14
**Thou** [1] - 56:21
**thousand** [1] - 67:19
**three** [1] - 30:20
**thrilled** [1] - 68:21
**throughout** [1] -
82:10
**thy** [1] - 56:21
**tie** [1] - 84:10
**today** [5] - 7:4, 45:2,
67:5, 78:11, 88:20
**today's** [1] - 41:23
**together** [2] - 47:16,
67:20
**tomato** [1] - 97:19,
97:20, 97:21, 97:22
**took** [4] - 15:25,
17:20, 27:13, 90:6
**top** [3] - 14:13,
43:10, 44:21
**total** [2] - 26:12,
38:14
**tour** [1] - 7:24
**toward** [2] - 34:19,
37:18
**trace** [1] - 27:18
**traced** [1] - 96:4
**track** [1] - 40:16
**transcript** [2] -
101:8, 101:10
**transcription** [1] -
51:5
**transfer** [1] - 59:15
**transferred** [1] -
59:17
**transmissions** [1] -
77:8
**transpired** [2] - 41:3,
52:3
**transport** [1] - 84:19
**transported** [3] -
84:21, 85:3, 90:23
**transporting** [1] -
84:14
**trial** [1] - 3:10
**tried** [1] - 48:5
**trigger** [1] - 84:12
**true** [4] - 54:22,
101:11, 101:13,
103:13
**trunk** [1] - 32:2
**try** [2] - 4:23, 21:21
**trying** [2] - 47:21,
67:22
**turn** [1] - 86:18,

**92**:15
**turned** [7] - 21:7,
24:10, 24:20, 91:10,
91:11, 91:13, 92:16
**Turnpike** [13] - 7:17,
8:19, 10:10, 11:3,
11:14, 19:15, 21:6,
21:9, 24:19, 24:23,
30:22, 33:22, 34:6
**two** [11] - 14:2,
18:18, 20:19, 21:8,
38:15, 49:22, 55:22,
79:12, 80:18, 85:9,
100:15
**two-door** [1] - 14:2
**two-hour** [1] -
100:15
**two-man** [1] - 20:19
**type** [8] - 14:14,
23:9, 26:25, 42:18,
52:10, 52:24
**typed** [1] - 58:7

**U**

**ultimately** [5] - 16:9,
49:2, 58:18, 86:15,
90:24
**um-hum** [2] - 88:6,
100:11
**unaware** [1] - 55:3
**under** [6] - 21:4,
92:5, 93:22, 94:13,
99:17, 101:9
**uniform** [1] - 52:21
**union** [2] - 68:13,
68:15
**unit** [2] - 93:21, 97:7
**Unit** [11] - 11:16,
13:19, 25:3, 72:17,
73:25, 74:13, 74:25,
79:17, 86:12, 93:20,
102:9
**UNITED** [1] - 1:2
**units** [3] - 11:10,
40:14
**unless** [1] - 34:24
**unlikely** [1] - 54:20
**unrelated** [1] - 86:17
**up** [33] - 6:18, 8:16,
12:9, 14:7, 16:8, 24:7,
25:10, 33:18, 33:21,
34:19, 35:23, 37:17,
38:19, 49:2, 49:6,
49:9, 52:10, 52:20,
53:7, 55:17, 62:19,
64:7, 71:24, 73:8,
78:11, 80:14, 82:14,
86:15, 88:3, 88:20,
89:7, 96:5, 98:12
**update** [1] - 52:17

**ups** [1] - 99:22
**upstairs** [1] - 55:10

**V**

**Vara** [58] - 2:13, 15:7,
15:8, 15:20, 15:21,
16:3, 17:19, 17:25,
19:4, 19:8, 20:7,
20:10, 20:12, 20:20,
21:10, 21:14, 21:23,
22:6, 22:19, 23:5,
25:19, 29:7, 32:8,
33:6, 33:7, 33:10,
34:11, 34:15, 34:24,
34:25, 36:14, 36:19,
37:15, 40:4, 47:16,
51:5, 51:13, 52:8,
53:2, 53:10, 57:24,
58:8, 59:6, 59:10,
59:16, 65:11, 65:21,
66:3, 66:4, 66:5,
66:14, 68:24, 74:14,
75:3, 80:20, 81:5,
82:23, 100:10
**VARA** [1] - 1:7
**Vara's** [1] - 73:6
**variety** [1] - 9:11
**vegetable** [3] - 30:7,
32:22, 41:12
**vegetables** [1] -
30:16
**vehicle** [29] - 9:17,
10:8, 11:5, 11:9, 12:8,
12:18, 13:22, 15:2,
19:5, 19:9, 19:17,
19:21, 20:4, 20:7,
20:10, 20:13, 30:22,
31:17, 31:18, 31:22,
31:25, 32:2, 32:4,
36:17, 40:2, 48:3,
51:20, 51:21, 77:3
**vehicles** [3] - 40:25,
50:8, 50:9
**verbal** [1] - 4:24
**versus** [1] - 38:10
**vicinity** [1] - 29:14
**Village** [4] - 11:12,
22:16, 22:20, 85:18
**village** [2] - 11:18,
86:9
**violation** [1] - 80:16
**voluntarily** [1] -
61:17
**volunteered** [1] -
73:14
**voucher** [4] - 42:5,
87:8, 87:10, 87:12
**vouchered** [4] -
86:25, 87:13, 88:13,
92:14

112

113

**vouchering** [3] - 91:20, 91:25, 102:10

**W**

**wait** [2] - 5:2, 29:5
**waived** [1] - 3:6
**wallet** [1] - 41:12
**Walsh** [2] - 78:16, 78:19
**warehouse** [1] - 98:24
**ways** [1] - 34:21
**weapon** [11] - 8:25, 54:23, 64:4, 73:19, 86:23, 87:19, 95:5, 95:7, 95:18, 95:20
**weapons** [1] - 38:25
**wearing** [2] - 32:20, 56:22
**weeks** [1] - 65:19
**WEINGARD** [59] - 2:18, 2:23, 6:4, 6:8, 10:2, 23:15, 24:6, 27:21, 28:10, 28:19, 31:2, 34:23, 35:10, 35:13, 37:3, 39:19, 45:4, 46:11, 48:12, 52:13, 62:13, 63:12, 64:16, 64:24, 73:2, 73:12, 74:4, 74:16, 75:5, 75:24, 76:19, 78:5, 78:14, 78:20, 79:11, 79:22, 80:3, 80:13, 80:18, 83:9, 83:12, 87:9, 87:14, 88:2, 88:25, 90:3, 90:11, 91:7, 91:14, 92:9, 92:18, 94:7, 94:17, 94:21, 96:15, 99:12, 99:18, 100:19, 102:5
**Weingard** [1] - 35:7
**west** [12] - 11:15, 21:7, 21:19, 22:17, 24:17, 24:24, 25:21, 25:22, 25:23, 26:4, 26:5, 26:7
**West** [2] - 2:15, 2:21
**westbound** [1] - 11:13
**whatsoever** [4] - 80:6, 82:15, 96:9, 97:25
**WHEREOF** [1] - 103:20
**white** [4] - 30:11, 54:4, 56:22
**wide** [1] - 26:14
**width** [1] - 26:15
**wife** [1] - 68:15

**Williston** [1] - 6:22
**Wilson** [4] - 64:2, 64:12, 65:12, 87:18
**Wilson's** [1] - 64:21
**wire** [1] - 84:10
**witness** [7] - 4:3, 34:14, 57:21, 79:20, 93:7, 103:11, 103:14
**WITNESS** [15] - 6:7, 18:4, 18:6, 31:4, 35:4, 46:13, 48:14, 62:16, 64:18, 83:10, 87:7, 87:11, 87:24, 102:3, 103:20
**witnesses** [2] - 18:19, 38:11
**Woods** [1] - 45:11
**word** [4] - 56:19, 65:5, 87:10, 99:11
**works** [1] - 94:17
**write** [2] - 52:10, 72:15
**writing** [3] - 92:5, 94:12, 99:16
**written** [3] - 50:6, 71:5, 76:3
**wrote** [1] - 72:11

**Y**

**yard** [2] - 29:24, 32:22
**yards** [1] - 22:17
**year** [3] - 6:5, 6:6, 51:21
**years** [2] - 49:21, 88:22
**yellow** [2] - 30:10, 41:11
**YORK** [3] - 1:2, 101:4, 103:3
**York** [12] - 1:13, 1:21, 1:24, 2:6, 2:16, 2:22, 4:13, 5:12, 70:17, 101:22, 103:9
**yourself** [1] - 66:13

114

```
1
2                 C E R T I F I C A T E
3      STATE OF NEW YORK        )
4                               ) ss.:
5      COUNTY OF NASSAU         )
6
7              I, JENNIFER FUCHS, a Notary
8      Public within and for the State of New
9      York, do hereby certify:
10             That ALEXANDER J. BARNYCH, the
11     witness whose deposition is hereinbefore
12     set forth, was duly sworn by me and that
13     such deposition is a true record of the
14     testimony given by such witness.
15             I further certify that I am not
16     related to any of the parties to this
17     action by blood or marriage; and that I
18     am in no way interested in the outcome
19     of this matter.
20             IN WITNESS WHEREOF, I have
21     hereunto set my hand this 7th day of
22     March, 2010.
23
24     --------------------------
25              JENNIFER FUCHS
```