LAW OFFICES OF
# FREDERICK K. BREWINGTON

*ATTORNEYS AND COUNSELORS AT LAW*

50 CLINTON STREET, SUITE 501

HEMPSTEAD, N.Y. 11550-4282

—————

TELEPHONE: (516) 489-6959

FACSIMILE: (516) 489-6958

FREDERICK K. BREWINGTON

IRA FOGELGAREN

GREGORY CALLISTE, JR.
VALERIE M. CARTRIGHT
MILI MAKHIJANI
G. WILLIAM GERMANO, JR.
MARJORIE MESIDOR

March 15, 2010

Donna Napalitano, Esq.
Deputy Bureau Chief
Nassau County Attorney Office
One West Street
Mineola, New York 11501-4820

Re:   Darryl T. Coggins v County of Nassau, et al.
Docket No.: 07-CV-3624(JFB)(AKT)

Dear Ms. Napalitano:

Enclosed please find the original and one copy of the testimony of Nicholas Occhino, taken at an examination before trial on February 25, 2010 in the above-referenced matter.

Please have the witness execute the original and return to us as soon as possible. Please note that any necessary changes are to be made on a separate sheet of paper and notarized, with the reason for the change or correction set forth.  The copy is for your files.

Please note that if the original is not signed and returned to us within thirty days of the date hereof, we shall utilize the same at trial as if signed and sworn to.

Very truly yours,

VICTORIA ROBERTS
Legal Assistant

Enclosures
:vr

LAW OFFICES OF
# FREDERICK K. BREWINGTON

*ATTORNEYS AND COUNSELORS AT LAW*
50 CLINTON STREET, SUITE 501
HEMPSTEAD, N.Y. 11550-4282

TELEPHONE: (516) 489-6959
FACSIMILE: (516) 489-6958

FREDERICK K. BREWINGTON

IRA FOGELGAREN

GREGORY CALLISTE, JR.
VALERIE M. CARTRIGHT
MILI MAKHIJANI
G. WILLIAM GERMANO, JR.
MARJORIE MESIDOR

March 15, 2010

Donna Napalitano, Esq.
Deputy Bureau Chief
Nassau County Attorney Office
One West Street
Mineola, New York 11501-4820

Re:   Darryl T. Coggins v County of Nassau, et al.
Docket No.: 07-CV-3624(JFB)(AKT)

Dear Ms. Napalitano:

During the depositions of Defendants Alexander J. Barnych and Nicholas Occhino, request for documents were made. To-date, we have no record of receiving the requested documents. Please allow this to serve as a formal written demand for documents. Requests were made as follows:

- **Defendant Alexander J. Barnych deposed February 25, 2010:**
  Page 79:      complete records of Internal Affairs Unit;

  Page 91:      document relating to vouchering of gun and magazine by Nassau County of Floral Park Police Departments;

  Page 94:      any photographs of gun, car or anything else taken at the time of the event; and

  Page 99:      case file.

- **Defendant Nicholas Occino deposed February 25, 2010:**
  Page 85:      entire file of Internal Affairs Unit.

As quite some time has passed since these requests were made, it would be greatly appreciated if this matter were given your immediate attention.

Thank you for your cooperation. We look forward to hearing from you in the near future.

Very truly yours,

VICTORIA ROBERTS
Legal Assistant

Enclosures
:vr

COPY

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
DARRYL T. COGGINS,

                            Plaintiff,

            - against -

COUNTY OF NASSAU, NASSAU COUNTY POLICE
DEPARTMENT, POLICE OFFICER JAMES VARA,
in his individual and official capacity,
and POLICE OFFICER CRAIG BUONORA, in his
individual and official capacity, and
JOHN DOES "1-10," in their individual
and official capacity,

                            Defendants.

Docket No. 07-CV-3624
------------------------------------------------x

                            50 Clinton Street
                            Hempstead, New York

                            February 25, 2010
                            10:20 a.m.


            Deposition of the Defendant, NASSAU

COUNTY POLICE DEPARTMENT by NICHOLAS OCCHINO,

pursuant to Notice, before Jennifer Fuchs, a

Notary Public of the State of New York.



            REALTIME REPORTING, INC.
        124 East Main Street, Suite 202
            Babylon, New York 11702
                516-938-4000

```
 1
 2       A P P E A R A N C E S :
 3       LAW OFFICES OF FREDERICK K. BREWINGTON
 4       Attorney for Plaintiff
 5             50 Clinton Street, Suite 501
 6             Hempstead, New York 11550
 7       BY:   IRA FOGELGAREN, ESQ.
 8
 9       DONNA NAPOLITANO, ESQ.
10       Deputy Bureau Chief
11       Attorney for Defendants County of Nassau,
12       Nassau County Police Department and Police
13       Officer James Vara
14             Nassau County Attorney
15             One West Street
16             Mineola, New York 11501
17
18       LAW OFFICES OF LAURENCE JEFFREY WEINGARD, ESQ.
19       Attorney for Defendant Police Officer Craig
20       Buonora
21             250 West 57th Street, Suite 401
22             New York, New York 10107
23       BY:   LAURENCE JEFFREY WEINGARD, ESQ.
24
25
```

3

1

2           IT IS HEREBY STIPULATED AND

3    AGREED by and between the attorneys for

4    the respective parties herein, that the

5    filing, sealing and certification of the

6    within deposition be waived.

7           IT IS FURTHER STIPULATED AND

8    AGREED that all objections, except as to

9    the form of the question, shall be

10   reserved to the time of the trial.

11          IT IS FURTHER STIPULATED AND

12   AGREED that the within deposition may be

13   sworn to and signed before any officer

14   authorized to administer an oath with

15   the same force and effect as if signed

16   and sworn to before the Court.

17

18

19               - oOo -

20

21

22

23

24

25

4

1

2     N I C H O L A S    O C C H I N O,   called as a

3          witness, having been duly sworn by a

4          Notary Public, was examined and

5          testified as follows:

6     EXAMINATION BY

7     MR. FOGELGAREN:

8          Q.      Please state your full name for

9     the record.

10          A.      Nicholas Occhino.

11          Q.      What is your address?

12          A.      1490 Franklin Avenue, Mineola,

13     New York 11501.

14          Q.      Good morning, Mr. Occhino.

15          A.      Good morning.

16          Q.      My name is Ira Fogelgaren.  I

17     represent the plaintiff, Darryl Coggins, in

18     this action.  I am going to be asking you some

19     questions about the facts and circumstances in

20     this lawsuit.

21               If at any time you don't

22     understand my question, please let me know,

23     and I will try and rephrase it as best I can.

24     Please keep your answers verbal.  The reporter

25     cannot take down nods of the head.  Please

5

Occhino

1    wait for me to finish my questions before you

2    start your answers.  She can't take down both

3    of us speaking at the same time.  Is that

4    okay?

5         A.    Yes.

6         Q.    If at any time you need a break,

7    let me know, and we will accommodate you.

8              Are you employed currently?

9         A.    Yes.

10        Q.    Where are you employed?

11        A.    Nassau County Police Department.

12        Q.    When did you first start

13   employment at the Nassau County Police

14   Department?

15        A.    October 19, 1990.

16        Q.    What position do you currently

17   hold with the Nassau County Police Department?

18        A.    Detective.

19        Q.    How long have you been a

20   detective?

21        A.    Approximately nine years.

22        Q.    Are you assigned to a certain

23   squad at the present time?

24        A.    Yes.

25

6

Occhino

1  Q.     Which one?

2  A.     The District Attorney Squad.

3  Q.     How long have you been with the

4  District Attorney Squad?

5  A.     Approximately six months.

6  Q.     What are your duties at the

7  District Attorney Squad?

8  A.     We conduct wiretaps and

9  undercover operations.

10  Q.     Prior to being on the District

11  Attorney Squad, where were you assigned prior,

12  immediately prior, to that?

13  A.     The 3rd Squad.

14  Q.     From when to when were you on the

15  3rd Squad?

16  A.     I was there approximately six

17  years.

18  Q.     Were you a detective that entire

19  time?

20  A.     Yes.

21  Q.     What were your duties at the 3rd

22  Squad?

23  A.     General duties, respond to

24  scenes, interview persons, whether that be

7

1          Occhino

2    witnesses, victims, arrest offenders.

3          Q.     Were you working in the 3rd Squad

4    on October 9, 2004?

5          A.     Yes.

6          Q.     Prior to being in the 3rd Squad,

7    where were you assigned?

8          A.     The 7th Squad.

9          Q.     Do you recall from when to when?

10          A.     I was there just shy of three

11    years.

12          Q.     Do you recall what your duties

13    were at the 7th Squad?

14          A.     The same as the 3rd Squad,

15    respond to scenes, arrest offenders, interview

16    people.

17          Q.     Where were you assigned prior to

18    the 7th Squad?

19          A.     The Bureau of Special Operations.

20               MR. WEINGARD:  Can I just

21          interrupt?

22               How many years were you at the

23          7th?

24               THE WITNESS:  Approximately three

25          years, perhaps a little bit less.

8

Occhino

1

2      Q.      Were you a detective when you

3  were at the Bureau of Special Operations?

4      A.      No.

5      Q.      What position did you have at

6  that time?

7      A.      Police officer.

8      Q.      What were your duties at the

9  Bureau of Special Operations?

10      A.      We were the SWAT team.  We

11  responded to barricades and emergency

12  situations, and we also did street-level

13  crimes, drugs, narcotics.

14      Q.      I'm sorry.  Did you say for how

15  long you were at the Bureau of Special

16  Operations?

17      A.      Approximately a little over three

18  years.

19      Q.      Where were you assigned prior to

20  that?

21      A.      The 7th Precinct.

22      Q.      Do you recall from when to when?

23      A.      From sometime in 1991 to sometime

24  in 1997.

25      Q.      What were your duties there?

9

Occhino

1

2      A.      General patrol duties.  I also

3  worked plainclothes.

4      Q.      Did you have an assignment with

5  the Nassau County Police Department prior to

6  that one, prior to being at the 7th Precinct?

7      A.      Well, I was in the police

8  academy.

9      Q.      Which police academy did you

10  attend?

11      A.      Nassau County.

12      Q.      When did you attend the Nassau

13  County Police Academy?

14      A.      Well, I was hired October 19,

15  1990, so I started the police academy shortly

16  thereafter.

17      Q.      What's your date of birth?

18      A.      February 5, 1962.

19      Q.      What's your highest level of

20  education?

21      A.      Associate degree.

22      Q.      From where?

23      A.      Nassau Community College.

24      Q.      When did you get it?

25      A.      I'm trying to think.

10

Occhino

1   Q.      If you can't remember --

2        MR. WEINGARD:  We can leave a

3   blank, and you can fill it in.

4   A.      I could only speculate.

5        MS. NAPOLITANO:  Don't speculate.

6   You know or you don't know.

7        MR. WEINGARD:  We will leave a

8   blank in the record, and when you read

9   your testimony, just put in the date.

TO BE FURNISHED: _____

10  Q.      What was the degree in?

11  A.      General studies.

12       MR. WEINGARD:  Is that like a

13  liberal arts degree?

14       THE WITNESS:  Yes, yes.

15       MS. NAPOLITANO:  Can I just, you

16  know, Ira, this is your deposition, I

17  understand, but I prefer for one

18  attorney to ask questions at a time.

19       MR. FOGELGAREN:  Okay.

20       MR. WEINGARD:  I assume that's

21  directed to me.

22       MS. NAPOLITANO:  Yes, sir.

23       MR. WEINGARD:  And I certainly

11

Occhino

1

2      will try to do that.

3                  MS. NAPOLITANO:   Thank you.

4      Q.      Have you worked for any other law

5      enforcement agencies?

6      A.      No.

7      Q.      Were you in the military?

8      A.      No.

9      Q.      Have you ever been disciplined

10     while you were employed by the Nassau County

11     Police Department?

12                 MS. NAPOLITANO:   Objection to

13         form.

14                 You can answer.

15     A.      I don't understand that question.

16     Q.      Has anybody ever made complaints

17     or have you ever received any complaints about

18     your performance as a police officer while you

19     were serving for the Nassau County Police

20     Department?

21     A.      That's possible.  I don't recall

22     any specifics.

23     Q.      Do you recall if you were ever

24     disciplined as a result of any possible

25     complaints?

12

Occhino

1    MS. NAPOLITANO:  Objection.

2    You can answer.

3    THE WITNESS:  I'm sorry?

4    MS. NAPOLITANO:  I objected.  You

5    can answer.

6    THE WITNESS:  Can you repeat

7    that?

8    Q.    Have you ever been disciplined as

9    a result of any complaints made against you as

10   a police officer/detective at the Nassau

11   County Police Department?

12   A.    I recall I received a Form 59

13   once.

14   Q.    What's a Form 59?

15   A.    It's an in-house form.

16   Q.    What was that for?

17   A.    When I was on patrol in the 7th

18   Precinct, I was involved in an auto accident.

19   MR. WEINGARD:  I'm sorry?

20   THE WITNESS:  When I was on

21   patrol in the 7th Precinct, I was

22   involved in an auto accident.

23   Q.    Did you ever receive any training

24   as a police officer in securing a crime scene?

13

Occhino

1          A.     I would have received that

2 training for detective.

3          Q.     Where would you have received

4 that training?

5          A.     That would be on the job, learn

6 as you go, and I may have received some sort

7 of training regarding that in the police

8 academy.

9          Q.     Did you receive any training -

10 and again, this is all with regard to your

11 employment with the Nassau County Police

12 Department - with regard to securing firearms

13 recovered at crime scenes?

14          A.     I would have also received

15 training in detective school. I do not recall

16 any specific training regarding specifically

17 firearms.

18          Q.     Now, you said "detective school."

19 Was there a specific detective school that you

20 attended?

21          A.     When you make the rank of

22 detective, they send you for a few weeks of

23 classroom-type training.

24          Q.     Where was that, if you can

14

Occhino

1    remember?

2                    MR. WEINGARD:  Can we go off the

3         record for a second?

4                    (Discussion off the record.)

5    A.        I believe it was at the police

6    academy.

7                    MR. WEINGARD:  That's your best

8         memory.

9                    THE WITNESS:  Yeah, it wasn't in

10        a non-police facility.  Yes, the police

11        academy.

12   Q.        Did any of that training consist

13   of securing crime scenes?

14   A.        I believe so, yes.

15   Q.        Did any of that training consist

16   of securing of firearms recovered at crime

17   scenes?

18   A.        Once again, I don't recall those

19   specifics regarding a firearm.

20   Q.        On October 9, 2004, were you

21   aware if there was a procedure at the Nassau

22   County Police Department with regard to

23   securing a crime scene?

24   A.        I could assume that's the date in

15

Occhino

1    question?

2            MR. FOGELGAREN:  Yes.

3        A.      Can you repeat that question

4    again, please?

5        Q.      On that day, were you aware if

6    the Nassau County Police Department had a

7    procedure for securing crime scenes?

8        A.      I could only assume there is a

9    procedure.

10           MS. NAPOLITANO:  I don't want you

11           to assume.  If you don't know, you don't

12           know.  Don't assume.

13       Q.      Do you have any recollection, if

14   there was a procedure for securing crime

15   scenes as of that time, what it was?

16       A.      I don't know of any specific

17   procedures.

18       Q.      Did you have a custom and

19   practice at that time as to how you would

20   secure a crime scene as a detective in the

21   Nassau County Police Department?

22           MS. NAPOLITANO:  Objection as to

23           form.  Do you mean he himself?

24           MR. FOGELGAREN:  Yes.

16

Occhino

1

2          MS. NAPOLITANO:   Separate from

3     the police department?

4          MR. FOGELGAREN:   He himself as a

5     member of the police department, yes.

6     A.     Yes.

7     Q.     What was that?

8     A.     If I may speak, it's -- that

9     question can't be answered in and of itself,

10    because every crime scene is different, and

11    you approach every scene and every situation

12    differently.

13    Q.     Do you have any recollection of

14    the events of October 9, 2004?

15    A.     Some.

16    Q.     What do you recall?

17    A.     I recall I was working that day.

18    Q.     Do you recall what shift you were

19    working?

20    A.     A day tour.

21    Q.     Do you know what the hours would

22    have been?

23    A.     Tours have slightly changed, but

24    basically the hours would be 7 a.m. to 5 p.m.

25    Q.     At that time, were you working in

17

Occhino

1   the 3rd Squad?

2

3       A.      Yes.

4       Q.      Do you recall where you reported

5   to work on that day?

6       A.      Did I report?

7       Q.      Where you reported to work.

8       A.      The 3rd Squad.

9       Q.      Where was it located at that

10  time?

11      A.      214 Hillside Avenue.

12      Q.      Did you have an assignment for

13  that day?

14      A.      I probably had many assignments

15  for that day.

16      Q.      Were you given assignments for

17  that day, a particular time of that day?

18      A.      Again, I don't recall.  I could

19  only assume.

20              MS. NAPOLITANO:  Don't assume.

21      Q.      Were you working with anybody

22  else that day?

23      A.      I worked probably with many

24  people that day.

25      Q.      Did you keep a memo book at that

18

Occhino

1      time?

2              A.     No.

3              Q.     Did you keep any daily records?

4              A.     I don't recall.

5              Q.     Have you reviewed any documents

6       in order to prepare for this deposition today?

7              A.     Yes.

8              Q.     What documents did you review?

9              A.     It was a copy of the letter that

10      I wrote for and at Internal Affairs.

11             Q.     Do you have a copy of that letter

12      with you today?

13             A.     No.

14                    MR. FOGELGAREN:  Counsel, have we

15                    been provided with that?

16                    MS. NAPOLITANO:  Can I go off the

17                    record for a second?

18                    MR. FOGELGAREN:  Yes.

19                    (Discussion off the record.)

20                    MR. WEINGARD:  Before we go any

21                    further, I'd like to just make a record

22                    entry indicating that the reason that

23                    I'm appearing today is because of Judge

24                    Tomlinson's ruling, along with Judge

19

Occhino

1
2          Spatz' affirmance of that ruling, that
3          apparently if we proceed by not showing
4          up, we do so at our own peril.
5              If that's the case, I had no
6          choice but to follow the judge's
7          directive and not put my client at
8          peril. So I am here. I am reluctantly
9          here. I don't want to be here. We
10         still believe my client has complete and
11         absolute immunity in connection with
12         this matter. But nevertheless, given
13         this unusual position taken by the
14         magistrate judge, I have no options
15         except to be here.
16         Q.      Did you review any other
17    documents aside from what you've mentioned?
18         A.      No.
19         Q.      Other than with the county
20    attorney, did you have any discussions with
21    anybody at the Nassau County Police Department
22    about your testimony you were going to give at
23    this deposition?
24         A.      There was another person in the
25    room.

20

Occhino

1

2          MS. NAPOLITANO:  It was an intern

3     in the county attorney's office.

4          Q.     I am talking about did you have

5     any conversations with anybody at the police

6     department?

7          A.     No.

8          MR. WEINGARD:  Can we have a time

9     frame on that, please?

10          Q.     In the two weeks or month before

11     just to prepare for this deposition.

12          A.     No.

13          Q.     On October 9, 2004, do you recall

14     responding to a scene at Jericho Turnpike and

15     Holland Avenue in Floral Park?

16          A.     Yes.

17          Q.     How did you become aware of

18     having to respond to that area?

19          A.     I don't recall.

20          Q.     Were you in a vehicle at the

21     time?

22          A.     No.

23          Q.     Do you know where you were when

24     you first learned about a situation going on

25     at that location?

21

Occhino

1

2      A.      Somewhere in the 3rd Precinct

3 station house.

4      Q.      How did you become aware of what

5 was going on there?

6      A.      I don't recall.

7      Q.      After learning of what was going

8 on there, what did you do?

9      A.      I responded there with Detective

10 Barnych.

11              MS. NAPOLITANO:  Spell it for the

12      court reporter.

13              THE WITNESS:  B-A-R-N-Y-C-H.

14      Q.      Was Detective Barnych your

15 partner at the time?

16      A.      No.  If you can reframe that

17 question, "partner."

18      Q.      Were you assigned to go to that

19 area with Detective Barnych?

20      A.      I went with him there.

21      Q.      How did you go there?

22      A.      By car.

23      Q.      What type of car did you go in?

24      A.      I don't know the make or model.

25      Q.      Was it a marked Nassau County

22

Occhino

1   Police Department vehicle?

2          A.      It would have been an unmarked

3   detective car.

4          Q.      Did that car have a number

5   assigned to it?

6          A.      The car would have a number

7   assigned to it.

8          Q.      Did the car have a police radio?

9          A.      I don't recall.

10         Q.      Did you have a police radio at

11  that time on you?

12         A.      I don't recall.

13         Q.      Do you know if Detective Barnych

14  had a police radio on him?

15         A.      I don't recall.

16         Q.      While you were in the car, were

17  you in communication with anybody from the

18  Nassau County Police Department?

19         A.      I don't recall.

20         Q.      Were you told what location to

21  respond to?

22         A.      I don't recall if I personally

23  was told what location to respond to.

24         Q.      Did you have any conversations

23

1          Occhino

2     with Detective Barnych at that time about

3     where you were going to?

4          A.     I don't recall.

5          Q.     At the time you were going to the

6     location at Jericho Turnpike and Holland

7     Avenue, do you remember what information you

8     were given what you were going to respond to?

9          A.     No.

10          MS. NAPOLITANO:  Objection as to

11     form.

12          MR. WEINGARD:  I join in the

13     objection.

14          MS. NAPOLITANO:  You have to wait

15     for me to object or not.

16          Q.     Did there come a time that you

17     arrived at the location of Jericho Turnpike

18     and Holland Avenue?

19          A.     Yes.

20          Q.     When you got there, what did you

21     observe?

22          A.     A sedan, which was parked, and

23     Officer Vara.

24          Q.     Were there any other police

25     vehicles at that location, other than yours?

24

Occhino

1    A.    I don't recall.

2    Q.    Did you see any other members of

3    the Nassau County Police Department other than

4    Officer Vara when you first got there?

5    A.    When I first got there, I don't

6    recall.

7    Q.    Did you see anybody else outside

8    of the sedan other than Officer Vara?

9    MS. NAPOLITANO:  Objection to

10   form.

11   You can answer.

12   MR. WEINGARD:  Join in it.

13   A.    It was a public corner, a public

14   street.

15   Q.    Did you see anybody else besides

16   Detective --

17   A.    I don't recall.

18   Q.    -- Vara?

19   MS. NAPOLITANO:  Let him finish

20   his question.

21   Q.    Did you see anybody else in the

22   street other than Officer Vara?

23   A.    I don't recall.

24   Q.    Did you look to see if anybody

25

Occhino

1    was in the sedan at that time?

2         A.    I did not see anybody in that

3    sedan at that time.

4         Q.    Did you leave your car at that

5    time?

6              MS. NAPOLITANO:  Objection to

7              form.

8              You can answer.

9         A.    At sometime during the time I was

10   there I would have, and I did, leave my car.

11        Q.    Where did you go?

12        A.    To the vicinity of Jericho

13   Turnpike and Holland -- I believe it's Avenue.

14        Q.    Did you arrive at the vicinity of

15   Jericho Turnpike and Holland Avenue?

16        A.    Yes.

17        Q.    Outside the car?

18        A.    Yes.

19        Q.    Do you recall when you arrived at

20   that area what you observed when you were

21   outside of the car?

22             MR. WEINGARD:  Excuse me for one

23             moment.  Have we established

24             approximately what time this is taking

25

                Occhino

1    was in the sedan at that time?

2         A.    I did not see anybody in that

3    sedan at that time.

4         Q.    Did you leave your car at that

5    time?

6              MS. NAPOLITANO:  Objection to

7              form.

8              You can answer.

9         A.    At sometime during the time I was

10   there I would have, and I did, leave my car.

11        Q.    Where did you go?

12        A.    To the vicinity of Jericho

13   Turnpike and Holland -- I believe it's Avenue.

14        Q.    Did you arrive at the vicinity of

15   Jericho Turnpike and Holland Avenue?

16        A.    Yes.

17        Q.    Outside the car?

18        A.    Yes.

19        Q.    Do you recall when you arrived at

20   that area what you observed when you were

21   outside of the car?

22             MR. WEINGARD:  Excuse me for one

23             moment.  Have we established

24             approximately what time this is taking

26

                                Occhino

1

2       place?

3                       MR. FOGELGAREN:  Okay.  Let me

4       ask you this.

5           Q.      What time did your car arrive at

6       Jericho Turnpike and Holland Avenue?

7           A.      I don't recall the time.

8           Q.      Do you know how long you remained

9       inside your car once the car arrived?

10          A.      No.

11          Q.      When you left your vehicle, where

12      did you go from the vehicle physically?

13          A.      To Jericho Turnpike and Holland.

14          Q.      How far was that from where your

15      vehicle was parked?

16          A.      I don't know.

17          Q.      When you got to Jericho Turnpike

18      and Holland Avenue, did you observe anything

19      at that time?

20          A.      I observed a sedan parked facing

21      west and Officer Vara.

22          Q.      At that time, when you observed

23      the sedan facing west, was anybody inside the

24      sedan?

25          A.      No.

27

Occhino

1

2      Q.      Who was with you at that time,

3  when you arrived at Jericho Turnpike and

4  Holland Avenue?

5      A.      Detective Barnych.

6      Q.      Were there any other Nassau

7  County police personnel at that location at

8  that time?

9      A.      I don't recall.

10     Q.      Did you have a conversation with

11 Officer Vara at that time?

12     A.      I don't recall.

13     Q.      Do you know if Detective Barnych

14 had a conversation with Officer Vara?

15     A.      Yes, he did.

16     Q.      Did you hear any part of that

17 conversation?

18     A.      Yes, I did.

19     Q.      Do you have a recollection of

20 that conversation?

21     A.      I recall a part of that

22 conversation.

23     Q.      What do you recall?

24     A.      I recall Officer Vara stating he

25 heard a sound of something metal like hitting

28

Occhino

1    and/or striking the ground.

2        Q.    Did you hear anything else about

3    that conversation?

4        A.    I possibly heard other things,

5    but I don't recall the specifics of that

6    conversation.

7        Q.    Did anybody mention a gun at that

8    location at that time?

9        A.    I don't recall.

10       Q.    Did Officer Vara state if any

11   other police department personnel were at that

12   location --

13       A.    I don't recall.

14       Q.    -- prior to you and Detective

15   Barnych getting there?

16       A.    I don't recall.

17       Q.    Did Officer Vara mention anything

18   about a clip being recovered at that site?

19           MR. WEINGARD:  Excuse me.  Are we

20       talking about the site where the gun was

21       recovered or another site?

22           MR. FOGELGAREN:  I'll rephrase

23       that.

24       Q.    You heard Officer Vara mention he

29

Occhino

1  heard the sound of something metal like

2  striking the ground; is that correct?

3        A.    That's what I recall.

4        Q.    Did he tell you where that was?

5        A.    It was not at Jericho Turnpike.

6  I believe it was at and/or near a driveway of

7  a private home within that vicinity.

8        Q.    Did he tell you which private

9  home it was?

10        A.    I don't recall the specifics of

11  what he said.

12        Q.    Do you know if he pointed out a

13  particular private home at that time, as to

14  where he heard the sound of something metal

15  like striking the ground?

16        A.    Pointed out to who?

17        Q.    To you.

18        A.    I don't recall.

19        Q.    Do you know if he pointed a

20  private home to Detective Barnych at that

21  time?

22        A.    I don't recall.

23        Q.    How long did you remain at the

24  vicinity of Jericho Turnpike and Holland

30

Occhino

1
2  Avenue?

3          A.      I don't know.

4          Q.      After this conversation between

5  Officer Vara and Detective Barnych took place,

6  what happened after that?

7          A.      After the initial conversation

8  between Officer Vara and Detective Barnych at

9  Jericho Turnpike, Detective Barnych and I

10 ended up by foot at a driveway of a private

11 home, which I believe was on the side street,

12 which I believe was Holland Avenue.  It was a

13 short walking distance from Hempstead -- not

14 Hempstead Turnpike, excuse me, Jericho

15 Turnpike.

16         Q.      Why did you go to that location

17 at that time?

18         A.      Because obviously that was the

19 scene.

20         Q.      Did Officer Vara point that

21 location out to you?

22         A.      I don't know who pointed it out.

23         Q.      Do you recall what street address

24 that that driveway was located on Holland

25 Avenue?

31

Occhino

1    A.    No.

2    Q.    What did you do when you got to

3    that driveway?

4    A.    I just stood there.

5    Q.    When you went to that driveway,

6    who went with you?

7    A.    Detective Barnych.

8    Q.    Where on the driveway did you

9    stand?

10   A.    I don't recall specifically

11   where.

12   Q.    Were there any cars in the

13   driveway?

14   A.    I don't recall.

15   Q.    Where did Detective Barnych go at

16   that time?

17   A.    In and about the driveway.

18   Q.    Were you observing what Detective

19   Barnych was doing when he went in and about

20   that driveway?

21   A.    I don't recall.

22   Q.    Was there anybody else at that

23   driveway at that time besides yourself and

24   Detective Barnych?

1                          Occhino

2          A.       Yes.

3          Q.       Who was there?

4          A.       There were uniform police

5   officers.

6          Q.       How many?

7          A.       I don't recall.

8          Q.       Do you recall from what

9   department they were from?

10         A.       There were Floral Park police

11  officers there, and I recall there being

12  Nassau County police officers.

13         Q.       Did you have a conversation with

14  any of those uniform police officers?

15         A.       I don't recall.

16         Q.       Do you know if any of those

17  uniform police officers said anything to you?

18         A.       I do remember also Detective Mike

19  Fannon being there.  I may or may not have had

20  a conversation with him.  I don't recall

21  specifics.

22               MR. WEINGARD:  Can we clarify as

23        to whether Fannon is with one department

24        or the other?

25               MR. FOGELGAREN:  I was just about

33
Occhino

1      to ask.

2           Q.      Detective Fannon, do you know

3      where he was assigned to at that time?

4           A.      Yes, Nassau County Police

5      Department, the Crime Scene Unit.

6           Q.      At that point in time, did you

7      have an understanding of what occurred

8      previously at that location at Jericho

9      Turnpike and Holland Avenue?

10          A.      At the time of?

11          Q.      You were in the driveway.

12               MS. NAPOLITANO:  Objection to

13          form.

14               If you understand, you can

15          answer.

16               MR. WEINGARD:  I join.

17               THE WITNESS:  Answer it?

18               MS. NAPOLITANO:  If you

19          understand the question, you can answer.

20          A.      I had a basic understanding.

21          Q.      What was your understanding at

22     that time?

23          A.      That a car stop was made by 3rd

24     Precinct uniform, and a subject from the car

34

1                          Occhino

2  ran away.

3         Q.      Do you know who provided that

4  information to you?

5         A.      To me specifically?  No.

6         Q.      Do you know if that information

7  was provided to Detective Barnych?

8         A.      Sure.

9         Q.      Do you know who provided that

10 information to him?

11        A.      I can say Police Officer Vara

12 would have provided information regarding that

13 incident.

14        Q.      Was Officer Vara one of the

15 officers who made the car stop?

16              MR. WEINGARD:  Objection as to

17        form.  There's no indication that there

18        was more than one.

19        A.      Yes.

20        Q.      Did he tell you that?

21        A.      I don't recall.

22        Q.      Did Officer Vara indicate who

23 else was involved, which other uniform

24 officers were involved, in the initial car

25 stop?

35

Occhino

1    A.      I don't recall.

2           MR. FOGELGAREN:  It's 11:00.  Can

3    we try to call Judge Tomlinson?

4           MS. NAPOLITANO:  Yes.

5           (Discussion off the record.)

6           (Recess taken.)

7           MR. FOGELGAREN:  Could you read

8    back the last question.

9           (Record read.)

10          MR. WEINGARD:  I object to the

11   question.  That should be an objection

12   as to form.

13   Q.      Did you have any conversations

14   with Detective Fannon when you were in that

15   driveway?

16   A.      I don't recall.

17   Q.      Do you know if Detective Barnych

18   had any conversations with Detective Fannon?

19          MR. WEINGARD:  How does he spell

20   that name?

21          MR. FOGELGAREN:  Which one?

22          MR. WEINGARD:  Fannon.

23          MR. FOGELGAREN:  F-A-N-N-O-N.

24   A.      They spoke.

36

1                         Occhino
2          Q.      Did you hear the conversation or
3    parts of the conversation?
4          A.      I don't recall.
5          Q.      Do you have a recollection of
6    some substance of that conversation?
7          A.      No.
8          Q.      Did you speak with any of the
9    uniform officers present at that driveway?
10         A.      I don't recall.
11         Q.      Was there anybody else, beside
12   uniform police officers or other Nassau County
13   Police Department officers, on that driveway
14   at that time?
15              MR. WEINGARD:  You're talking
16         about both detectives and uniforms?
17         Q.      Anybody else besides police
18   personnel from Nassau County or Floral Park,
19   anybody else?
20         A.      Civilians?
21              MR. FOGELGAREN:  Yes.
22         A.      I don't believe so, when I was
23   there.
24         Q.      How long were you at that
25   driveway for?

37

Occhino

1        

2        A.     I don't recall.

3        Q.     What did you do while you were at

4  that driveway?

5        A.     Not much.

6        Q.     Did you learn anything else about

7  what had occurred at that site?

8        A.     Again, I learned a subject ran

9  away on foot through the driveway towards the

10  rear of the house and through and/or over some

11  type of fence.

12        Q.     Did you see a fence near that

13  driveway?

14        A.     I believe there was a fence in

15  the front of the driveway.

16        Q.     Was that the fence that you

17  learned that the subject had gone over?

18        A.     No.  I believe the fence he went

19  over was in the rear of the driveway and/or

20  the home.

21        Q.     Did you learn if anything was

22  recovered in that area by any police officer?

23        MS. NAPOLITANO:  Objection to

24     form.

25        A.     A handgun.

38

Occhino

1

2  Q.      Who informed you that a handgun

3  was recovered at that area?

4  A.      I saw a handgun.

5  Q.      Where did you see the handgun?

6  A.      In the driveway of the home we

7  are referring to.

8  Q.      Were there any cars or other

9  vehicles in that driveway at that time?

10  A.      I don't recall.

11  Q.      Was Officer Buonora at that

12  location at that time?

13  A.      I don't recall.

14  Q.      Did you learn if Officer Buonora

15  had been at that location previous to you

16  arriving that day?

17          MR. WEINGARD:   Objection as to

18      form.

19  A.      I don't recall.

20  Q.      Did you see Officer Buonora at

21  any time from when you had arrived in the

22  vehicle at Jericho Turnpike and Holland Avenue

23  up until the point in time when you arrived at

24  the driveway?

25  A.      I don't recall seeing Officer

39

1                        Occhino

2    Buonora.

3         Q.      Did you hear Officer Vara mention

4    Officer Buonora?

5         A.      I don't recall.

6         Q.      Where exactly did you see this

7    handgun?

8         A.      When you're facing the home, the

9    driveway is to the left of the home.  The gun

10   was on the ground in the driveway.  I don't

11   recall the specifics or the logistics of

12   exactly where it was, but it wasn't in the

13   very rear of the driveway, and it wasn't in

14   the front of the house.  It was somewhere in

15   the middle, give or take.

16        Q.      Had any police officer secured

17   that handgun?

18        A.      Again, I saw it on the ground.  I

19   don't recall.

20        Q.      Did you have a conversation with

21   anybody at that driveway with regard to that

22   handgun?

23        A.      I don't recall any conversations

24   or specifics.

25        Q.      Do you recall what type of

40

Occhino

1    handgun it was?

2          A.     No.

3          Q.     You don't know what caliber

4    handgun it was?

5          A.     No.

6                 MR. WEINGARD:  Are we talking

7          about did he know at that time, or does

8          he know now?

9          Q.     At that time, did you know what

10   caliber the handgun was?

11         A.     I don't recall.

12         Q.     At that time, did you know what

13   make the handgun was?

14         A.     No.

15         Q.     What was the closest you got to

16   that handgun at that site?

17         A.     I can't give you precise

18   measurements, a few feet.

19         Q.     Did you observe anything about

20   that handgun at that site?

21         A.     I don't recall.

22         Q.     Did you ever look at that handgun

23   to see if you could see a serial number on it?

24         A.     I did not, no.

25

41

Occhino

1

2       Q.      Do you know what color it was?

3       A.      No.

4       Q.      The fence that you described

5   being in the back of the home, how far was the

6   gun from that fence?

7       A.      I don't know.

8       Q.      Do you know if it was more than

9   10 feet away from that fence?

10          MR. WEINGARD:  Objection as to

11      form.

12      A.      I don't know.  It's possible.

13      Q.      Did you see anything else at that

14  driveway?

15          MS. NAPOLITANO:  Objection as to

16      form.

17          You can answer.

18      A.      I don't recall.

19      Q.      On that premises, did you go

20  anywhere else on that premises other than the

21  driveway?

22      A.      I would have went to the front of

23  the house, the sidewalk.

24      Q.      Did you have any particular

25  assignment at that time being at that house?

42

Occhino

1    A.    No.  Basically my assignment

2  would be assisting, would be if Detective

3  Barnych asked me to do something for him, I

4  would do it.

5        Q.    Was there a police officer in

6  charge of that location?

7        A.    Possibly.

8        MR. WEINGARD:  Excuse me.  At

9        what time are we speaking of?

10       Q.    When you were in the driveway, do

11  you know if there was a police officer who was

12  in charge of that area?

13       A.    I don't know who would be in

14  charge of that driveway.

15       Q.    Did Detective Barnych give you

16  any instructions as to what to do while you

17  were at that location?

18       A.    I don't recall him giving me any

19  instructions at all.

20       Q.    Other than seeing that handgun,

21  anything else that you noted?

22       MS. NAPOLITANO:  Objection as to

23       form.

24       You can answer.

43

Occhino

1

2      MR. WEINGARD:  Join in it.

3      A.      I may have.  I don't recall.

4      Q.      Did you see an ammunition clip at

5  that location?

6          MS. NAPOLITANO:  Objection as to

7      form.  At the driveway?

8          MR. FOGELGAREN:  At the driveway.

9          MR. WEINGARD:  Join in the

10     objection.

11     A.      I don't recall.

12     Q.      Did you see an ammunition clip

13  anywhere in proximity to that house where the

14  driveway was?

15     A.      I recall seeing an ammunition

16  clip.  To my best recollection, it was on

17  Jericho Turnpike.

18     Q.      Did you see that ammunition clip

19  before you arrived at the driveway?

20     A.      Yes.

21     Q.      Where was that ammunition clip

22  when you first saw it?

23     A.      To my best recollection, it was

24  on Jericho Turnpike, a little bit west of

25  Holland Avenue on or near the curb.

44

                              Occhino

1

2                    MR. WEINGARD:  Can I have that

3          answer read back, please.

4                    (Record read.)

5          Q.      Was it in proximity to a vehicle?

6          A.      Yes.

7          Q.      What vehicle?

8          A.      A sedan, I believe it was four

9    door.  It would have been the subject's

10   vehicle.

11         Q.      Did somebody point that

12   ammunition clip out to you, or is this

13   something that you observed on your own?

14         A.      I don't recall.  It could be one

15   or both of those things you just said.

16         Q.      Did you do anything with respect

17   to that ammunition clip after you first

18   observed it?

19         A.      No.

20         Q.      Do you know if any other police

21   officer did?

22         A.      I don't know.

23         Q.      Did you see any other police

24   officers doing anything with regard to the

25   handgun that you observed when you were in the

45

Occhino

1   driveway?

2       A.      No.   I just saw the handgun in

3   and of itself on the ground.

4       Q.      Did you make any notes while you

5   were at that location?

6       A.      I don't recall.

7       Q.      Did you hear any radio

8   transmissions while you were at that location?

9           MS. NAPOLITANO:  I am going to

10          object to the form.  There was Floral

11          Park and Nassau County Police there both

12          with different radios, so do you want to

13          be specific with him?

14          MR. FOGELGAREN:  First I want to

15          know whether he heard any radio

16          transmissions, then I will ask him.

17      A.      Police officers carry radios.   I

18  don't recall hearing any radio transmissions.

19      Q.      Prior to arriving at the site of

20  Jericho Turnpike and Holland Avenue, did you

21  hear any radio transmissions with regard to

22  what was going on at that location?

23      A.      I don't recall.

24      Q.      Did anything else happen in the

46

Occhino

1  vicinity of that driveway other than what

2  you've mentioned up until now?

3  A.    Did anything happen when?

4  Q.    After you saw the handgun.

5  A.    It's possible.  I don't know.

6  Q.    After you saw the handgun, do you

7  recall if you had any conversations with any

8  police officers at that site?

9  A.    It's possible, but I don't recall

10  any specific conversations.

11  Q.    Did you eventually leave that

12  area?

13  A.    Yes.

14  Q.    Do you recall when you left that

15  area?

16  A.    No.

17  Q.    Did you make any notes as to when

18  you left that area?

19  A.    I don't recall.

20  Q.    Do you know if you --

21  A.    Me specifically?

22  MR. FOGELGAREN:  Yes.

23  A.    I don't recall.

24  Q.    How did you leave that area?

47

Occhino

1    A.    In a car.

2    Q.    In what car did you leave the

3  area?

4    A.    In the same car that we drove

5  there in.

6    Q.    When that car arrived there, did

7  you notify anybody at the Nassau County Police

8  Department that you had arrived at the

9  location?

10   A.    Me specifically?

11   MR. FOGELGAREN:  Yes.

12   A.    I don't recall.

13   Q.    Was Detective Barnych the only

14 other person in the vehicle with you at that

15 time?

16   MS. NAPOLITANO:  At what time?

17   MR. FOGELGAREN:  At the time you

18       first arrived at the location in the

19       car.

20   A.    Yes.  Me and Detective Barnych,

21 it was just us two, that drove there in that

22 car.

23   Q.    Do you know if Detective Barnych

24 notified anybody of arriving at that location?

48

Occhino

1    A.      I don't know.

2    Q.      Up until the point you left that

3    location, do you recall anything else

4    occurring at that scene?

5    A.      Nothing specific that I can

6    recall, no.

7    Q.      Was Officer Vara still at that

8    scene when you left that scene?

9    A.      I don't recall.

10   Q.      Did you ever see Officer Buonora

11   at that scene?

12   A.      I don't recall seeing him there.

13   Q.      While you were at that driveway

14   at that location before you left, did you

15   learn of any involvement of Officer Buonora in

16   the events at that location?

17   MR. WEINGARD:   Objection as to

18   form.

19   A.      I don't recall.

20   Q.      Do you recall where you went to

21   after you left that location?

22   A.      Yes.

23   Q.      Where did you go?

24   A.      We went in the same car to a

49

1                          Occhino

2     house in Nassau County.  I believe it was

3     Uniondale or Roosevelt or somewhere near that

4     vicinity.

5              Q.     When you say "we," who else was

6     with you?

7                     MR. WEINGARD:  I was going to say

8              did we establish that.

9              A.     Detective Barnych and I.

10             Q.     Was there anybody else with you

11    from any police department besides Detective

12    Barnych?

13             A.     In the car?

14                    MR. FOGELGAREN:  Yes.

15             A.     No.

16                    MR. WEINGARD:  I am going to stop

17             for one moment.  Where was it that they

18             went; they went to a house?

19                    MR. FOGELGAREN:  In Nassau

20             County, Uniondale or Roosevelt.

21                    MR. WEINGARD:  Thank you.

22             Q.     Do you know how you were provided

23    the information with this particular house in

24    Nassau County in Uniondale or Roosevelt?

25             A.     Detective Barnych had the

50

Occhino

1    information.

2        Q.    Did Detective Barnych explain to

3    you why you were going over there?

4        A.    I knew and know that it was --

5    this house we were responding to was somehow

6    in connection to this event that was being

7    investigated.

8        Q.    Did you learn if you were going

9    to speak to somebody at that house?

10              MS. NAPOLITANO:  Objection to

11        form.

12              You can answer.

13        A.    I don't remember the specifics,

14   but going to that house somehow would or

15   hopefully lead to, directly or indirectly, the

16   subject who fled the scene on foot.

17        Q.    What information did you know at

18   that time while you were in the car about the

19   subject in question?

20        A.    I don't recall his -- at that

21   time, I don't recall what I knew about him,

22   his pedigree.  I don't recall.

23        Q.    Do you know if a driver's license

24   of the subject had been recovered at the scene

51

Occhino

1   at Jericho Turnpike and Holland Avenue?

2

3   A.      I don't recall.

4   Q.      Did you arrive at this house in

5   Uniondale or Roosevelt?

6   A.      Yes.

7   Q.      Did any other cars, police cars,

8   respond to that location at that time?

9   MR. WEINGARD:  Before we take an

10  answer, can we just get some sort of a

11  time frame, what approximate time it was

12  during the day?

13  MR. FOGELGAREN:  Okay.  I think I

14  asked him earlier.

15  Q.      Do you recall what time of day

16  you were at that driveway on Holland Avenue?

17  A.      No.

18  Q.      Do you know how much time it took

19  from the time you left that house up to the

20  point in time you got to the house at

21  Uniondale or Roosevelt?

22  A.      No.

23  Q.      Do you know whether it was

24  daytime or nighttime?

25  A.      It was daytime, early -- it could

52

Occhino

1   have been late morning into early afternoon

2   perhaps.  It was still during that day tour.

3        Q.     When you arrived at this house in

4   Uniondale or Roosevelt, what did you do?

5        A.     We got out of the car.  I believe

6   we knocked on the door or rang a doorbell.

7   Detective Barnych did speak to at least one

8   person at that home.

9        Q.     You also got out of the car?

10       A.     Yes.

11       Q.     Were you with Detective Barnych

12   when he spoke to that person or persons?

13       A.     I was with him.  I don't know how

14   close or far away, but I was obviously in that

15   immediate vicinity.

16       Q.     Did you hear any conversations

17   that occurred between Detective Barnych and

18   anybody who was at that house?

19       A.     I was in earshot, and I don't

20   recall what conversation -- specifics of the

21   conversation that took place.

22       Q.     Did Detective Barnych tell you

23   any information he had learned?

24       A.     He probably did, and I don't

53

1               Occhino

2      remember what information he learned and/or

3      what he told me.

4          Q.      How long did you remain at that

5      house for?

6          A.      I don't know.

7          Q.      Besides these conversations that

8      Detective Barnych had, do you recall anything

9      else that occurred at that house?

10         A.      No.

11         Q.      Were you and Detective Barnych

12      the only police officers who were present at

13      that house at that time?

14         A.      I don't recall.

15         Q.      Did you speak to anybody else

16      from the Nassau County Police Department,

17      whether by telephone, radio, while you were at

18      that house at Uniondale or Roosevelt?

19         A.      It's possible.  I don't recall.

20         Q.      Do you know if Detective Barnych

21      contacted or spoke to anybody with the Nassau

22      County Police Department while he was at that

23      location at the house in Uniondale or

24      Roosevelt?

25         A.      Again, it's possible, but I don't

54

Occhino

1   recall.

2         Q.      Did you make any notes while you

3   were at that house at Uniondale or Roosevelt?

4         A.      I don't recall.

5         Q.      Do you know if Detective Barnych

6   made any notes?

7         A.      I don't recall.

8         Q.      Where did you go after you left

9   that house in Uniondale or Roosevelt?

10        A.      I don't recall.

11        Q.      Do you recall doing anything else

12  with respect to this investigation on that

13  day?

14        A.      It's possible that we did, him

15  and/or I, but I don't recall.

16        Q.      Did there come a time that day on

17  October 9, 2004 that you returned to your

18  station house?

19        A.      Yes.

20        Q.      Do you recall about what time

21  that was?

22        A.      No.

23        Q.      Do you know when your tour ended

24  that day?

55

Occhino

1      A.      Give or take, it would be --

2  again, day tours have changed slightly over

3  the years, give or take 5 p.m.

4      Q.      Would you have arrived at your

5  station house before 5 p.m. that day?

6      A.      Yes, probably yes.

7      Q.      Do you know if you worked any

8  overtime that day?

9      A.      No.  I don't believe I did.

10     Q.      When you arrived at your station

11 house prior to the end of the tour, do you

12 recall what you did on that day?

13     A.      No.  It probably was a lot of

14 work, but I don't recall what.

15     Q.      Did you have a usual custom and

16 practice about that time of what you would do

17 when you returned to the station house at the

18 end of a day like that?

19             MS. NAPOLITANO:  Objection to

20     form.

21             You can answer.

22     A.      Well, I mean normally --

23 obviously every day is different, but it's a

24 very, very, very busy squad, perhaps the

56

Occhino

1    busiest in Nassau County, so I could say with

2    certainty that every day there are many things

3    to do, many cases, many phone calls, many

4    complainants.

5        Q.    Would you have filled out any

6    paperwork as to what you did on that tour that

7    day?

8        A.    No, other than if, as you asked

9    before, if I possibly took any handwritten

10   notes, that would be it, if I did.

11       Q.    Did you keep a sheet of where you

12   were at times on that day?

13               MS. NAPOLITANO:  Objection to

14           form.

15               You can answer.

16       A.    A sheet?  I don't know what that

17   means, but like when you leave the station

18   house or you get there, there's a blotter.

19   You know, you sign out, if that's what you're

20   referring to.

21       Q.    What information is contained on

22   the blotter?

23       A.    The time that you're going out,

24   that you're leaving, you know.  For example,

57

Occhino

1     for example, 0900 Detective Occhino out to

2     Hempstead.

3          Q.     Would you have put on that

4     blotter when you left to go to that location

5     at Jericho Turnpike and Holland Avenue in

6     Floral Park?

7          A.     Yes.  But to clarify, it could be

8     me and/or Detective Barnych.

9          Q.     If Detective Barnych had

10    indicated that he was going, would he have

11    indicated that you were also going with him?

12              MS. NAPOLITANO:  Objection.

13              MR. WEINGARD:  Objection.

14         A.     That's very possible.

15         Q.     Did you learn if a person was

16    arrested with regard to what had occurred at

17    the Jericho Turnpike/Holland Avenue location?

18              MS. NAPOLITANO:  Objection to

19         form.

20              You can answer.

21              MR. WEINGARD:  I join in it.

22         A.     Obviously.

23         Q.     When did you learn the person had

24    been arrested?

58

Occhino

1    A.    I don't recall.

2    Q.    Did you do any paperwork with

3    regard to the arrest?

4    A.    No.  If I may clarify, again,

5    "paperwork," a broad term.  Again referring to

6    notes, if that counts, if I took notes, then

7    the answer would be yes, but specifically the

8    arrest paperwork, no.

9    Q.    Do you know who the arresting

10   officer was on that case?

11   A.    No.

12   Q.    Do you know if Detective Barnych

13   played some role with regard to the arrest?

14   A.    Yes.

15   MS. NAPOLITANO:  Objection.

16   Q.    What is your understanding of

17   what Detective Barnych did?

18   A.    Well, it's his case, so he would

19   be -- how do I say?  An integral part of the

20   arrest process.

21   Q.    Did he ask you for assistance

22   with regard to anything with regard to the

23   arrest?

24   A.    I don't recall.  I was not there

59

```
 1                        Occhino
 2    for the arrest processing.
 3            Q.      Did you ever speak to Officer
 4    Vara about the case after the arrest was made?
 5            A.      To my best recollection, no.
 6            Q.      Did you ever speak to Officer
 7    Buonora about this case after the arrest was
 8    made?
 9            A.      No.
10            Q.      Was Police Officer Vara ever
11    interviewed about what had occurred at Holland
12    Avenue/Jericho Turnpike in Floral Park?
13                    MR. WEINGARD:  Objection.
14                    MS. NAPOLITANO:  Objection.
15            A.      By who?
16                    MR. FOGELGAREN:  I'll rephrase
17            it.
18            Q.      Were you present at any time when
19    Officer Vara was interviewed with regard to
20    the events that occurred at Jericho Turnpike
21    and Holland Avenue at Floral Park on October
22    9th of 2004?
23                    MS. NAPOLITANO:  Objection.
24            A.      I don't understand that question.
25                    (Discussion off the record.)
```

60

1          Occhino

2               (Occhino Exhibit 1, Document

3     Bates-stamped Nassau County 000001

4     through 000016, marked for

5     identification.)

6               (Occhino Exhibit 2, Document

7     Bates-stamped Nassau County 000355

8     through 000358, marked for

9     identification.)

10         Q.     I am going to show you what has

11    been marked as Exhibit Occhino 1 (handing).

12              MR. WEINGARD:  May I have a

13        moment to look this over before we

14        start?

15              MR. FOGELGAREN:  Sure.

16              (Counsel perusing document.)

17              MR. WEINGARD:  Thanks.

18         Q.     So you've taken a look at what's

19    been marked as Plaintiff's Exhibit Occhino 1.

20    Just look at the front page for a second.  Can

21    you identify the form of the document?

22              MR. WEINGARD:  I'm sorry.  Was

23        that Occhino 1 or Occhino 2?

24              MR. FOGELGAREN:  Occhino 1.

25              MS. NAPOLITANO:  What did you ask

61

Occhino

1    him?

2            MR. FOGELGAREN:  If he could

3    identify the form.

4            A.    It's an arrest report, sometimes

5    called an 81.

6            Q.    And this arrest report, who is it

7    on; who is the subject of this particular

8    arrest report?

9            A.    Darryl T. Coggins.

10           Q.    Do you know who would fill out

11   the information for this arrest report?

12           MS. NAPOLITANO:  Objection to

13   form.

14           MR. FOGELGAREN:  Strike that.

15           Q.    Do you know who filled out the

16   information for this particular arrest report?

17           A.    May I look at it?

18           MR. FOGELGAREN:  Absolutely,

19   please.

20           A.    Detective Barnych.

21           Q.    Going to the second page of the

22   report, it's marked page 2.  It's also

23   Bates-stamped Nassau County 000002.  Do you

24   see that?

                                                          62

                                  Occhino

1

2        A.      Yes.

3        Q.      In the middle of the page there's

4   the word "testimonials."

5        A.      (Witness nodding.)

6                MS. NAPOLITANO:  Say yes.

7        A.      Yes.

8        Q.      Were you familiar with part of

9   the form labeled "testimonials"?

10       A.      Yeah, sure.

11       Q.      What information is to be

12  recorded in that section of the form?

13       A.      Who is involved with the arrest

14  and/or the case.

15       Q.      Do you know who filled that

16  portion out?

17       A.      No.  I didn't.

18       Q.      Have you ever seen this prior to

19  today?

20       A.      Possibly.  I don't recall.

21       Q.      Now, there's an arresting

22  detective listed; is that correct?

23       A.      Yes.

24       Q.      Who is that?

25       A.      Alexander Barnych.

63

Occhino

1

2    Q.      The defendant is also listed

3    there.  Is there any reason for that?

4    A.      That's normal.  It's supposed to

5    be that way.

6    Q.      Who are supposed to be listed in

7    the testimonial section?

8    A.      People, persons, involved in the

9    case.

10    Q.      In this arrest report, who

11    decided who would be included in this

12    testimonial section?

13                MS. NAPOLITANO:  Objection.

14                You can answer.

15    A.      I don't know, not me.

16    Q.      Are you listed in the testimonial

17    section?

18    A.      Yes.

19    Q.      It indicates "nature of

20    testimony."  It says, "Responded to scene,

21    assisted in interviews with PO Vara and

22    remaining witnesses/passengers of subject

23    auto."  Do you see that?

24    A.      Yes.

25    Q.      Do you recall assisting in an

64

```
1                    Occhino
2    interview of Police Officer Vara at that
3    scene?
4         A.    I was there when he was speaking,
5    so it's how you define that.  But
6    specifically, I don't recall.
7         Q.    Do you recall if you asked him
8    any questions, if you asked Officer Vara any
9    questions?
10        A.    I don't recall.
11        Q.    Did you say anything to Officer
12   Vara at that time?
13        A.    It's possible.  I don't recall.
14        Q.    Do you recall assisting in
15   interviews of the remaining witnesses at that
16   scene?
17        A.    No.
18             MR. WEINGARD:  Objection as to
19        form.
20        A.    No.
21        Q.    Do you recall assisting in
22   interviews of the passengers of the subject
23   auto at that scene?
24        A.    I don't even think they were
25   there when I got there.
```

65

Occhino

1

2    Q.      I am going to show you what has

3    been marked as Occhino 2 and ask if you can

4    identify this document, which is four pages,

5    and it's marked with Nassau County Bates stamp

6    000355, 000356, 000357 and 000358?

7    A.      I'm sorry?

8    Q.      Can you identify that document?

9    A.      Yes.

10   Q.      What is it?

11   A.      It's the letter that I wrote to

12   the Internal Affairs Unit regarding this case.

13   Q.      This is a four-page document; is

14   that correct?

15   A.      Yes.

16   Q.      And the handwriting in this

17   document, is that your handwriting?

18   A.      Yes, sir.

19   Q.      Is that your handwriting on the

20   entire document?

21   A.      Well, on the last page there's a

22   couple of words or -- you know, that's not me

23   (indicating).  But yeah, for the most part,

24   yes.

25   Q.      Did you sign the document?

66

Occhino

1    A.    Yes.

2    Q.    You signed it on what page?

3    A.    I signed it on page 4, and I

4    initialed it on -- I initialed it on page 1,

5    page 2, page 3.

6    Q.    Do you recall what date you

7    filled out this document?

8    A.    If I refer to the document.

9         MR. FOGELGAREN:   You may, please.

10   A.    December 14, 2005.

11   Q.    Do you recall where this document

12   was filled out?

13   A.    At the Internal Affairs Unit,

14   which is at police headquarters.

15   Q.    Were you notified that you had to

16   appear at the Internal Affairs Unit with

17   regard to this matter at some point in time

18   before December 14, 2005?

19   A.    Of course.

20   Q.    Do you recall how long before?

21   A.    No.

22   Q.    Do you know who notified you?

23   A.    I don't recall.

24   Q.    After you were notified and prior

67

Occhino

1   to appearing at the Internal Affairs Unit, did

2   you speak to anybody from the Nassau County

3   Police Department with regard to appearing at

4   the Internal Affairs Unit?

5

6            MS. NAPOLITANO:  Objection.

7            You can answer.

8   A.       Before responding there?

9            MR. FOGELGAREN:  Yes.

10  A.       Did I speak to anyone?

11           MR. FOGELGAREN:  Yes.

12  A.       I'm sure I did.

13  Q.       Do you know who you spoke to?

14  A.       Well, I would have spoken to a

15  union rep, because whenever you go to Internal

16  Affairs, you have to notify the union and

17  their detectives, so in that regard, yes.

18  Q.       Did you speak to Detective

19  Barnych about appearing before Internal

20  Affairs?

21  A.       It's possible.  I don't recall

22  the specifics, though, regarding that.

23  Q.       Do you recall anything in general

24  about any conversations you had with Detective

25  Barnych?

68

Occhino

1

2      A.      No.

3      Q.      Did you speak to any other

4  members of the police department about

5  appearing in front of the Internal Affairs

6  Unit prior to December 14, 2005?

7      A.      I don't recall.

8      Q.      Did you speak to Officer Vara

9  about it?

10     A.      No.

11     Q.      Did you speak to Officer Buonora

12  about it?

13     A.      No.

14     Q.      Up to December 14, 2005, had you

15  ever had any conversations with Officer Vara

16  about the incident at Jericho Turnpike and

17  Holland Avenue in Floral Park on October 9,

18  2004?

19            MR. WEINGARD:  Objection, if he's

20       going to talk about contact.  No

21       objection if he's just being asked

22       whether he had a conversation.

23     Q.      Did you ever have a conversation

24  with Officer Vara?

25     A.      Any kind of conversation?

69

Occhino

1      Q.      About this incident.

2      A.      I don't recall ever having a
3  conversation with him about this incident.

4      Q.      Same question with regard to
5  Officer Buonora.

6      A.      Same answer.  I don't recall.

7              MS. NAPOLITANO:  Let him finish.

8      Q.      Who did you speak to at the
9  Internal Affairs Unit?

10     A.      I don't recall.

11     Q.      Who was with you when you
12  appeared before the Internal Affairs Unit?

13     A.      A union rep would be with me.
14  That's just how it is.  I don't recall who it
15  was.  And I don't recall if a lawyer came also
16  or not, but a union rep was with me.

17     Q.      Do you recall who from the
18  Internal Affairs Unit saw you at that time?

19     A.      I could only say it was a
20  detective sergeant.

21     Q.      Was it just one member of the
22  Internal Affairs Unit that saw you?

23     A.      It could have been two, so I
24  don't recall.

70

Occhino

1    Q.    Were you questioned about what

2    occurred on October 9, 2004 at that time, on

3    December 14, 2005?

4

5    A.    Of course, yes.

6    Q.    The statement that you wrote, was

7    that prepared before, during or after the

8    questioning by the Internal Affairs Unit?

9    A.    To my best recollection, it was

10   prepared after the questioning by the Internal

11   Affairs Unit.

12   Q.    Did you see the Internal Affairs

13   Unit on one occasion or more than one

14   occasion?

15   A.    I'm sorry.  I'm thinking.

16   MS. NAPOLITANO:  You're allowed

17   to think.

18   A.    To my best recollection, it was

19   once.

20   Q.    I am referring to page 1 of

21   exhibit Occhino 2.  You state that Detective

22   Barnych was responsible for catching cases on

23   that tour.  What does the term "catching

24   cases" mean?

25   A.    Okay.  I'll explain, and just

71

                    Occhino

1

2    please make note that that varies also.

3        Q.    Well, let me ask you this.  With

4    regard to this particular matter, could you

5    explain what "catching cases" meant?

6        A.    Yes.  Cases, events that are sent

7    to the squad to be a squad case, a detective,

8    possibly one, will be assigned for a

9    particular day, to assign those cases to him

10   for that day or for that tour.  So if

11   Detective Barnych was catching cases on a

12   certain day, any case sent up to the squad to

13   be investigated would be assigned to Detective

14   Barnych.

15       Q.    There's a paragraph on page 1

16   which starts with the number 3.  It's a little

17   more than halfway down.  Do you see it?

18       A.    Yes.

19            MR. WEINGARD:  Which exhibit?

20            MR. FOGELGAREN:  Again, Occhino

21   2.

22       Q.    It says, "At approximately 8:30

23   a.m. I accompanied Detective Barnych from the

24   3rd Squad to the incident location on Jericho

25   Turnpike in Floral Park."  Do you see that?

72

Occhino

1    A.    Yes.

2    Q.    Was that an accurate statement as

3  to when you went to the location?

4           MS. NAPOLITANO:  Objection.

5           You can answer.

6    A.    Yes.

7    Q.    The next line says that you

8  learned that the incident which the suspect

9  fled had occurred about four hours earlier; is

10  that correct?

11    A.    Yes.

12           MR. WEINGARD:  I am going to

13           object to the form of the questions.  If

14           you're asking him whether or not he has

15           a recollection based on a review of the

16           document, that's one thing.  If you ask

17           him whether it's a correct statement,

18           that's totally different.

19    Q.    The information that you placed

20  on this statement, the facts, where did you

21  obtain those facts; was it from your personal

22  recollection, did you review anything, did you

23  speak to anybody?

24           MR. WEINGARD:  Objection to the

73

Occhino

1         form of the question.

2         A.     I don't recall.

3         Q.     When you filled out this form,

4 the facts that you put on with regard to your

5 recollections, did you believe them to be

6 accurate at that time?

7         A.     Yes.

8         Q.     Do you believe them to be

9 accurate now?

10        A.     Yes.

11        Q.     How did you learn that the

12 incident --

13              MR. WEINGARD:  I am going to

14        continue my objection with regard to

15        form.  If you're asking him whether it

16        refreshes his recollection, that's one

17        thing.  If you ask him whether or not

18        it's accurate, it's a totally different

19        thing.  One is permissible, in my view,

20        and the other is not.

21              MR. FOGELGAREN:  Well, speaking

22        objections also are not permissible

23        during a deposition.  You can note your

24        objections.

74

Occhino

1       MR. WEINGARD:  I am noting it.

2       MR. FOGELGAREN:  I am just saying

3    the reasoning is what -- like I said,

4    speaking objections are not permissible.

5    Q.     From what did you learn the

6    incident from where the suspect fled occurred

7    four hours earlier?

8       MS. NAPOLITANO:  Objection to

9       form.

10      MR. WEINGARD:  Join in it.

11   Q.     You indicated on this form that

12   the incident from where the suspect fled

13   occurred four hours earlier.  Did you mean it

14   occurred four hours earlier when you got to

15   the scene?

16      MR. WEINGARD:  Objection as to

17      form.

18      MS. NAPOLITANO:  Objection to

19      form.

20      You can answer.

21   A.     Yes.

22   Q.     How did you obtain that

23   information?

24   A.     I don't know.

75

Occhino

1

2   Q.      At the time you filled out this

3   statement, did you know where you got that

4   information from?

5   A.      I don't recall.

6   Q.      Going to page 2, paragraph 4, you

7   indicated that Officer Vara informed Detective

8   Barnych of information about the stop; is that

9   correct?

10  A.      Yes.

11  Q.      Was that based on a conversation

12  that you heard between Detective Barnych and

13  Officer Vara at that time?

14          MS. NAPOLITANO:  Objection as to

15      form.

16          MR. WEINGARD:  Join.

17  A.      Possibly.  I don't recall.

18  Q.      In that paragraph, the initials

19  SFST are used.  Do you see that?

20  A.      Yes.

21  Q.      What does that stand for?

22  A.      I believe it stands for

23  standardized field sobriety test.

24  Q.      Did you hear Officer Vara say

25  anything at the site at Jericho Turnpike and

76

Occhino

1    Holland Avenue on October 9, 2004 with regard

2    to a DWI investigation going on?

3

4         A.      Right now at this moment, I

5    recall I was within earshot when he spoke out

6    loud to Detective Barnych.  As I look at my

7    statement here to recall, SFST was given by PO

8    Vara to the subject that fled.

9         Q.      The statement also, I think on

10   the fifth line from the bottom, indicates that

11   Detective Michael Fannon was of the Crime

12   Scene Unit.  Was that correct?

13        A.      Yes.

14        Q.      You also indicated a ring was

15   recovered?

16        A.      Yes.

17        Q.      How did you learn that?

18        A.      I don't recall.

19               MR. WEINGARD:  I am going to

20        object as to form.

21        A.      I don't recall.

22        Q.      Going to paragraph 6 on page 3,

23   you stated that you had no involvement in the

24   arrest of Darryl Coggins.

25        A.      Correct.

77

Occhino

1

2      Q.      In that same paragraph you also

3  stated that you had no involvement in the

4  arrest processing of Darryl Coggins; is that

5  correct?

6      A.      Correct.

7      Q.      Did you ever speak to Darryl

8  Coggins?

9      A.      Never.

10     Q.      Now, in paragraph 7 you stated

11  that you were not subpoenaed by the district

12  attorney for testimony in any grand jury

13  proceedings against Darryl Coggins; is that

14  correct?

15     A.      Yes.

16     Q.      Did you speak to any members of

17  the district attorney's office with regard to

18  the facts and circumstances of what occurred

19  at Jericho Turnpike and Holland Avenue in

20  Floral Park on October 9, 2004?  And this is

21  prior to the grand jury presentation, the

22  initial grand jury presentation, after the

23  arrest of Darryl Coggins.

24     A.      I don't recall the time frame.  I

25  spoke to someone from the district attorney's

78

1                    Occhino

2    office, but I don't remember when.

3         Q.     Do you recall who you spoke to at

4    the district attorney's office?

5         A.     To my best recollection --

6              MS. NAPOLITANO:  You know what

7         he's asking you, right, what grand jury

8         he's asking you about?

9              MR. FOGELGAREN:  It wasn't a

10        particular grand jury.  I'll withdraw

11        the question.

12        Q.     You indicated you spoke to an

13   assistant DA at some point in time; is that

14   correct?

15        A.     Yes.

16        Q.     Do you recall when that was?

17        A.     No.

18        Q.     Do you recall if there was a

19   subsequent grand jury convened to investigate

20   what occurred on October 9, 2004?

21        A.     Yes.

22              MS. NAPOLITANO:  I am going to

23        object.

24              MR. WEINGARD:  I join in it.

25        Q.     Did you speak to an assistant

79

Occhino

1   district attorney at that time?

2          MS. NAPOLITANO:   Objection.

3          MR. WEINGARD:   I join.

4    A.     I spoke to an assistant district

5   attorney.  I don't remember when.  It was

6   regarding this incident.

7          Q.     Going to page 4 of your

8   statement, take a look at that.  Actually,

9   starting at paragraph 8 on page 3.  Take a

10  look at that whole paragraph through page 9.

11         A.     Yeah.

12         Q.     Did you ever meet with Assistant

13  DA James Clark?

14         A.     Yes.

15         Q.     Do you recall when you met

16  Assistant DA James Clark --

17         A.     No.

18         Q.     -- with regard to this matter?

19         A.     No.

20         Q.     What was the reason you met with

21  Assistant DA James Clark?

22         A.     I don't know.  I had to.

23         Q.     Do you recall the conversation

24  you had with Assistant DA James Clark with

80

Occhino

1  regard to this matter?

2      A.    I recall sitting down with him

3  and him asking me questions regarding this

4  matter, and I recall him showing me some

5  photos of the driveway where the gun was.

6      Q.    Did he indicate to you what he

7  was investigating at that time?

8      A.    It's possible.  I don't recall

9  what he said specifically what he was

10  investigating, but it was obvious that it

11  involved this case.

12      Q.    Do you know what he was

13  investigating about this case at that time?

14      MS. NAPOLITANO:  Objection to

15      form.

16      You can answer.

17      A.    There were police officers

18  potentially that are in trouble, and he was

19  investigating that.

20      Q.    Do you know which police officers

21  were in trouble?

22      A.    It was PO Vara and/or PO Buonora,

23  one or both.

24      Q.    Did you have an understanding of


81

```
                        Occhino
1
2     what type of trouble Police Officer Vara might
3     be in at that time?
4          A.     I don't recall specifically what
5     type of trouble he was in, no.
6          Q.     Do you have any general
7     recollection at that time of what type of
8     trouble he might have been in?
9          A.     I believe, to my recollection,
10    there was a problem regarding the recovery of
11    the gun.
12         Q.     Did you understand what the
13    problem regarding the recovery of the gun was?
14                MR. WEINGARD:  That's pure
15         speculation, object.
16         A.     I don't recall.
17         Q.     Do you know if Police Officer
18    Buonora was being investigated at the time you
19    spoke to Assistant DA James Clark?
20         A.     I believe that it was PO Vara
21    and/or PO Buonora.
22         Q.     Do you know what about PO Buonora
23    was being investigated at that time?
24         A.     Not specifically, but again, I
25    knew there was some sort of problem with the
```

82

1                         Occhino

2    gun.

3          Q.     At the time you spoke to

4    Assistant DA James Clark, did you have any

5    conversation about Officer Buonora with

6    Assistant DA James Clark?

7          A.     It's possible.  I don't remember.

8    He asked me questions.  I'm sure PO Buonora

9    and PO Vara's name came up, but I don't

10   remember specifically what he asked me.

11         Q.     Occhino 2, Exhibit Occhino 2,

12   your statement, was this statement written

13   after you spoke to Assistant DA James Clark?

14         A.     I don't remember.  I don't

15   recall.

16         Q.     At the time you wrote this

17   statement, did you have any knowledge of

18   whether Detective Buonora had been involved in

19   the events on October 9, 2004?

20                MR. WEINGARD:  Objection.

21                THE WITNESS:  PO Buonora?

22                MR. FOGELGAREN:  Yes.

23                THE WITNESS:  You said

24         "detective."

25                MR. FOGELGAREN:  I'm sorry, PO

83

Occhino

1
2          Buonora.

3                 THE WITNESS:  Repeat the

4          question, please.

5                 MR. WEINGARD:  Objection; calls

6          for speculation.

7          Q.      On October 9, 2004, did you have

8    any information or any knowledge as to whether

9    Police Officer Buonora was involved in the

10   events on October 9, 2004 in Floral Park?

11         A.      It's possible.  I don't recall.

12         Q.      Well, on your statement, December

13   14, 2005, did you indicate anything about

14   Police Officer Buonora's involvement?

15         A.      I would have to --

16                MR. FOGELGAREN:  Take a look.

17                MR. WEINGARD:  I am going to

18         object.  The witness has testified that

19         he doesn't know whether he prepared that

20         before or after speaking with the ADA.

21         So unless you can tell us when he spoke

22         to the ADA, it doesn't have relevance.

23                MR. FOGELGAREN:  We will decide

24         whether or not it has relevance at some

25         point in time.

84

                              Occhino

1                             Occhino

2              MR. WEINGARD:  And also I object

3         as to form.

4         A.      On October 9th?

5         Q.      Well, the report is dated

6    December -- yes.

7         A.      But on October 9th I don't recall

8    seeing Officer Buonora, seeing him there.

9         Q.      I am just asking about what is

10   included in your statement, that's all.  I was

11   asking if there was anything included about

12   Detective Buonora in your statement?

13        A.      Buonora?

14             MR. WEINGARD:  Continue the

15        objection, please.

16        A.      I don't see his name, unless I'm

17   making an error.  I don't see his name

18   anywhere.

19        Q.      After October 9, 2004, did you

20   have any role in investigating the incident on

21   October 9, 2004 at Jericho Turnpike in Floral

22   Park and Holland Avenue?

23             MS. NAPOLITANO:  Objection to

24        form.

25             You can answer.

85

1            Occhino

2            MR. WEINGARD:  I join in it.

3       A.    No.

4       Q.    Did you learn what happened to

5   the prosecution of Darryl Coggins?

6       A.    No.  Do you mean what he was

7   charged with?

8       Q.    Do you know what he was charged

9   with?

10      A.    No.  I would have to refer

11  (indicating).

12      Q.    Do you know what ever happened as

13  a result of those charges; do you know if he

14  was ever convicted, acquitted?

15      A.    I could only speculate.

16            MS. NAPOLITANO:  Don't speculate.

17      Q.    I am not asking you to speculate.

18      A.    No, no.

19            MR. FOGELGAREN:  I have no

20            further questions at this time.

21            MS. NAPOLITANO:  Are you keeping

22            it open?

23  RQ          MR. FOGELGAREN:  Yes.  Obviously,

24            I also want to get the entire file of

25            the Internal Affairs Unit with regard to

86

                    Occhino

1

2   the investigation of this case, and if

3   there's anything at that time that we

4   see, we will let you know.

5        MS. NAPOLITANO:  Mr. Weingard, do

6   you have questions?

7        MR. WEINGARD:  Give me one

8   minute, but I think I'm okay.

9        No, thank you.  No questions at

10  this time.

11       (Time noted:  12:44 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

87

Occhino

1

A C K N O W L E D G M E N T

2

3

4     STATE OF NEW YORK      )
                             :ss
5     COUNTY OF              )

6

7           I, NICHOLAS OCCHINO, hereby certify

8     that I have read the transcript of my

9     testimony taken under oath in my deposition of

10    February 25, 2010; that the transcript is a

11    true, complete and correct record of my

12    testimony, and that the answers on the record

13    as given by me are true and correct.

14

15

16                    _____

17                    NICHOLAS OCCHINO

18

19

20    Signed and subscribed to before
      me, this            day
21    of                    , 2010.
      _____
22    Notary Public, State of New York

23

24

25

88

1

2          ------------------I N D E X------------------

3     WITNESS                 EXAMINATION BY          PAGE

4     NICHOLAS OCCHINO    MR. FOGELGAREN               4

5

6

7          --------------DOCUMENT REQUEST--------------

8     PAGE  85    Entire file of Internal Affairs

9                 Unit

10

11         ----------INFORMATION TO BE FURNISHED--------

12    PAGE  10    Date received Associate's degree

13                from Nassau Community College

14

15         ------------------EXHIBITS------------------

16    OCCHINO                              FOR I.D.

17      1         Document Bates-stamped Nassau

18                County 000001 through 000016     60

19      2         Document Bates-stamped Nassau

20                County 000355 through 000358     60

21

22                (Counsel retained exhibits.)

23

24

25

**0**

**000001** [2] - 60:3, 88:18
**000002** [1] - 61:24
**000016** [2] - 60:4, 88:18
**000355** [3] - 60:7, 65:6, 88:20
**000356** [1] - 65:6
**000357** [1] - 65:6
**000358** [3] - 60:8, 65:6, 88:20
**07-CV-3624** [1] - 1:11
**0900** [1] - 57:2

**1**

**1** [9] - 60:2, 60:11, 60:19, 60:23, 60:24, 66:5, 70:20, 71:15, 88:17
**1-10** [1] - 1:9
**10** [2] - 41:9, 88:12
**10107** [1] - 2:22
**10:20** [1] - 1:15
**11501** [2] - 2:16, 4:13
**11550** [1] - 2:6
**11702** [1] - 1:23
**11:00** [1] - 35:3
**124** [1] - 1:23
**12:44** [1] - 86:11
**14** [6] - 66:11, 66:19, 68:6, 68:14, 70:4, 83:13
**1490** [1] - 4:12
**19** [2] - 5:16, 9:14
**1962** [1] - 9:18
**1990** [2] - 5:16, 9:15
**1991** [1] - 8:23
**1997** [1] - 8:24

**2**

**2** [11] - 60:6, 60:23, 61:23, 65:3, 66:6, 70:21, 71:21, 75:6, 82:11, 88:19
**2004** [16] - 7:4, 14:21, 16:14, 20:13, 54:18, 59:22, 68:18, 70:3, 76:2, 77:20, 78:20, 82:19, 83:7, 83:10, 84:19, 84:21
**2005** [6] - 66:11, 66:19, 68:6, 68:14, 70:4, 83:13
**2010** [4] - 1:14, 87:10, 87:20, 89:22
**202** [1] - 1:23

**214** [1] - 17:11
**25** [2] - 1:14, 87:10
**250** [1] - 2:21

**3**

**3** [4] - 66:6, 71:16, 76:22, 79:10
**3rd** [11] - 6:14, 6:16, 6:22, 7:3, 7:6, 7:14, 17:2, 17:8, 21:2, 33:24, 71:24

**4**

**4** [4] - 66:4, 75:6, 79:8, 88:4
**401** [1] - 2:21

**5**

**5** [4] - 9:18, 16:24, 55:4, 55:6
**50** [2] - 1:13, 2:5
**501** [1] - 2:5
**516-938-4000** [1] - 1:24
**57th** [1] - 2:21
**59** [2] - 12:13, 12:15

**6**

**6** [1] - 76:22
**60** [2] - 88:18, 88:20

**7**

**7** [2] - 16:24, 77:10
**7th** [9] - 7:8, 7:13, 7:18, 7:23, 8:21, 9:6, 12:18, 12:22, 89:21

**8**

**8** [1] - 79:10
**81** [1] - 61:6
**85** [1] - 88:8
**8:30** [1] - 71:22

**9**

**9** [16] - 7:4, 14:21, 16:14, 20:13, 54:18, 68:17, 70:3, 76:2, 77:20, 78:20, 79:11, 82:19, 83:7, 83:10, 84:19, 84:21
**9th** [3] - 59:22, 84:4, 84:7

**A**

**a.m** [3] - 1:15, 16:24, 71:23
**absolute** [1] - 19:11
**absolutely** [1] - 61:19
**academy** [6] - 9:8, 9:9, 9:15, 13:9, 14:7, 14:12
**Academy** [1] - 9:13
**accident** [2] - 12:19, 12:23
**accommodate** [1] - 5:8
**accompanied** [1] - 71:23
**accurate** [4] - 72:3, 73:7, 73:10, 73:19
**acquitted** [1] - 85:14
**action** [2] - 4:18, 89:17
**ADA** [2] - 83:20, 83:22
**address** [2] - 4:11, 30:23
**administer** [1] - 3:14
**Affairs** [18] - 18:11, 65:12, 66:14, 66:17, 67:2, 67:5, 67:16, 67:20, 68:5, 69:10, 69:13, 69:19, 69:23, 70:8, 70:11, 70:12, 85:25, 88:8
**affirmance** [1] - 19:2
**afternoon** [1] - 52:2
**agencies** [1] - 11:5
**AGREED** [3] - 3:3, 3:8, 3:12
**Alexander** [1] - 62:25
**allowed** [1] - 70:16
**ammunition** [7] - 43:4, 43:12, 43:15, 43:18, 43:21, 44:12, 44:17
**AND** [3] - 3:2, 3:7, 3:11
**answer** [24] - 11:14, 12:3, 12:6, 24:12, 25:9, 33:16, 33:18, 33:20, 41:17, 42:25, 44:3, 50:13, 51:10, 55:22, 56:16, 57:21, 58:8, 63:14, 67:7, 69:7, 72:6, 74:21, 80:17, 84:25
**answered** [1] - 16:9
**answers** [3] - 4:24, 5:3, 87:12
**appear** [1] - 66:17
**appeared** [1] - 69:13

**appearing** [5] - 18:24, 67:2, 67:4, 67:19, 68:5
**approach** [1] - 16:11
**approximate** [1] - 51:11
**area** [11] - 20:18, 21:19, 25:21, 37:22, 38:3, 42:13, 46:13, 46:16, 46:19, 46:25, 47:4
**arrest** [20] - 7:2, 7:15, 58:4, 58:9, 58:14, 58:21, 58:24, 59:2, 59:4, 59:7, 61:5, 61:7, 61:9, 61:12, 61:17, 62:13, 63:10, 76:24, 77:4, 77:23
**arrested** [2] - 57:17, 57:25
**arresting** [2] - 58:10, 62:21
**arrive** [3] - 25:15, 26:5, 51:4
**arrived** [13] - 23:17, 25:20, 26:9, 27:3, 38:21, 38:23, 43:19, 47:7, 47:9, 47:19, 52:4, 55:5, 55:11
**arriving** [3] - 38:16, 45:20, 47:25
**arts** [1] - 10:15
**aside** [1] - 19:17
**assign** [1] - 71:9
**assigned** [11] - 5:23, 6:12, 7:7, 7:17, 8:19, 21:18, 22:6, 22:8, 33:4, 71:8, 71:13
**assignment** [4] - 9:4, 17:12, 41:25, 42:2
**assignments** [2] - 17:14, 17:16
**assistance** [1] - 58:22
**assistant** [2] - 78:13, 78:25, 79:5
**Assistant** [8] - 79:13, 79:17, 79:22, 79:25, 81:19, 82:4, 82:6, 82:13
**assisted** [1] - 63:21
**assisting** [4] - 42:3, 63:25, 64:14, 64:21
**associate** [1] - 9:21
**Associate's** [1] - 88:12
**assume** [7] - 10:22, 14:25, 15:9, 15:12, 15:13, 17:19, 17:20
**attend** [2] - 9:10, 9:12

**attended** [1] - 13:21
**Attorney** [8] - 2:4, 2:11, 2:14, 2:19, 6:3, 6:5, 6:8, 6:12
**attorney** [5] - 10:20, 19:20, 77:12, 79:2, 79:6
**attorney's** [4] - 20:3, 77:17, 77:25, 78:4
**attorneys** [1] - 3:3
**authorized** [1] - 3:14
**auto** [4] - 12:19, 12:23, 63:23, 64:23
**Avenue** [26] - 4:12, 17:11, 20:15, 23:7, 23:18, 25:14, 25:16, 26:6, 26:18, 27:4, 30:2, 30:12, 30:25, 33:10, 38:22, 43:25, 45:21, 51:2, 51:16, 57:6, 57:18, 59:21, 68:17, 76:2, 77:19, 84:22
**Avenue/Jericho** [1] - 59:12
**aware** [4] - 14:22, 15:6, 20:17, 21:4

**B**

**B-A-R-N-Y-C-H** [1] - 21:13
**Babylon** [1] - 1:23
**Barnych** [50] - 21:10, 21:14, 21:19, 22:14, 23:2, 27:5, 27:13, 28:16, 29:21, 30:5, 30:8, 30:9, 31:8, 31:16, 31:20, 31:25, 34:7, 35:18, 42:4, 42:16, 47:14, 47:21, 47:24, 49:9, 49:12, 49:25, 50:3, 52:8, 52:12, 52:18, 52:23, 53:8, 53:11, 53:20, 54:6, 57:9, 57:10, 58:13, 58:18, 61:21, 62:25, 67:19, 67:25, 70:22, 71:11, 71:14, 71:23, 75:8, 75:12, 76:6
**barricades** [1] - 8:11
**based** [2] - 72:16, 75:11
**basic** [1] - 33:21
**Bates** [1] - 60:3, 60:7, 61:24, 65:5, 88:17, 88:19
**Bates-stamped** [5] - 60:3, 60:7, 61:24, 88:17, 88:19

**BE** [2] - 10:11, 88:11
**become** [2] - 20:17, 21:4
**beside** [1] - 36:11
**best** [8] - 4:23, 14:8, 43:16, 43:23, 59:5, 70:9, 70:18, 78:5
**between** [5] - 3:3, 30:4, 30:8, 52:18, 75:12
**birth** [1] - 9:17
**bit** [2] - 7:25, 43:24
**blank** [1] - 10:25, 10:9
**blood** [1] - 89:17
**blotter** [3] - 56:19, 56:23, 57:5
**book** [1] - 17:25
**bottom** [1] - 76:10
**break** [1] - 5:7
**BREWINGTON** [1] - 2:3
**broad** [1] - 58:6
**Buonora** [24] - 2:20, 38:11, 38:14, 38:20, 39:2, 39:4, 48:11, 48:16, 59:7, 68:11, 69:6, 80:23, 81:18, 81:21, 81:22, 82:5, 82:8, 82:18, 82:21, 83:2, 83:9, 84:8, 84:12, 84:13
**BUONORA** [1] - 1:8
**Buonora's** [1] - 83:14
**Bureau** [5] - 2:10, 7:19, 8:3, 8:9, 8:15
**busiest** [1] - 56:2
**busy** [1] - 55:25
**BY** [4] - 2:7, 2:23, 4:6, 88:3

**C**

**caliber** [2] - 40:4, 40:11
**cannot** [1] - 4:25
**capacity** [3] - 1:7, 1:8, 1:9
**car** [29] - 21:22, 21:23, 22:4, 22:5, 22:7, 22:9, 22:17, 25:5, 25:11, 25:18, 25:22, 26:5, 26:9, 33:24, 33:25, 34:15, 34:24, 47:2, 47:3, 47:5, 47:7, 47:20, 47:23, 48:25, 49:13, 50:19, 52:6, 52:10
**carry** [1] - 45:18
**cars** [4] - 31:13, 38:8, 51:7

**case** [13] - 19:5, 58:11, 58:19, 59:4, 59:7, 62:14, 63:9, 65:12, 71:7, 71:12, 80:12, 80:14, 86:2
**cases** [7] - 56:4, 70:22, 70:24, 71:5, 71:6, 71:9, 71:11
**catching** [4] - 70:22, 70:23, 71:5, 71:11
**certain** [2] - 5:23, 71:12
**certainly** [1] - 10:25
**certainty** [1] - 56:3
**certification** [1] - 3:5
**certify** [3] - 87:7, 89:9, 89:15
**changed** [2] - 16:23, 55:3
**charge** [3] - 42:7, 42:13, 42:15
**charged** [2] - 85:7, 85:8
**charges** [1] - 85:13
**Chief** [1] - 2:10
**choice** [1] - 19:6
**circumstances** [2] - 4:19, 77:18
**civilians** [1] - 36:20
**clarify** [3] - 32:22, 57:8, 58:5
**Clark** [8] - 79:14, 79:17, 79:22, 79:25, 81:19, 82:4, 82:6, 82:13
**classroom** [1] - 13:24
**classroom-type** [1] - 13:24
**client** [2] - 19:7, 19:10
**Clinton** [2] - 1:13, 2:5
**clip** [8] - 28:19, 43:4, 43:12, 43:16, 43:18, 43:21, 44:12, 44:17
**close** [1] - 52:15
**closest** [1] - 40:16
**COGGINS** [1] - 1:3
**Coggins** [8] - 4:17, 61:10, 76:24, 77:4, 77:8, 77:13, 77:23, 85:5
**College** [2] - 9:23, 88:13
**color** [1] - 41:2
**communication** [1] - 22:18
**Community** [2] - 9:23, 88:13
**complainants** [1] -

56:5
**complaints** [4] - 11:16, 11:17, 11:25, 12:10
**complete** [2] - 19:10, 87:11
**conduct** [1] - 6:9
**connection** [2] - 19:11, 50:7
**consist** [2] - 14:13, 14:16
**contact** [1] - 68:20
**contacted** [1] - 53:21
**contained** [1] - 56:22
**continue** [2] - 73:15, 84:14
**convened** [1] - 78:19
**conversation** [24] - 27:10, 27:14, 27:17, 27:20, 27:22, 28:4, 28:7, 30:4, 30:7, 32:13, 32:20, 36:2, 36:3, 36:6, 39:20, 52:21, 52:22, 68:22, 68:23, 68:25, 69:4, 75:11, 79:24, 82:5
**conversations** [11] - 20:5, 22:25, 35:14, 35:19, 39:23, 46:8, 46:11, 52:17, 53:7, 67:24, 68:15
**convicted** [1] - 85:14
**copy** [2] - 18:10, 18:12
**corner** [1] - 24:14
**correct** [14] - 29:3, 62:22, 65:14, 72:11, 72:18, 75:9, 76:12, 76:25, 77:5, 77:6, 77:14, 78:14, 87:11, 87:13
**Counsel** [1] - 88:22
**counsel** [2] - 18:15, 60:16
**counts** [1] - 58:7
**County** [40] - 2:11, 2:12, 2:14, 5:12, 5:14, 5:18, 9:5, 9:11, 9:13, 11:10, 11:19, 12:12, 13:12, 14:23, 15:7, 15:22, 19:21, 21:25, 22:19, 24:4, 27:7, 32:12, 33:5, 36:12, 36:18, 45:12, 47:8, 49:2, 49:20, 49:24, 53:16, 53:22, 56:2, 60:3, 60:7, 61:24, 65:5, 67:3, 88:18, 88:20
**county** [2] - 19:19, 20:3

**COUNTY** [5] - 1:6, 1:18, 87:5, 89:5
**couple** [1] - 65:22
**course** [2] - 66:20, 70:5
**Court** [1] - 3:16
**court** [1] - 21:12
**COURT** [1] - 1:2
**Craig** [1] - 2:19
**CRAIG** [1] - 1:8
**crime** [9] - 12:25, 13:14, 14:14, 14:17, 14:24, 15:8, 15:15, 15:21, 16:10
**Crime** [2] - 33:6, 76:11
**crimes** [1] - 8:13
**curb** [1] - 43:25
**custom** [2] - 15:19, 55:16

**D**

**DA** [9] - 78:13, 79:14, 79:17, 79:22, 79:25, 81:19, 82:4, 82:6, 82:13
**daily** [1] - 18:4
**DARRYL** [1] - 1:3
**Darryl** [8] - 4:17, 61:10, 76:24, 77:4, 77:7, 77:13, 77:23, 85:5
**Date** [1] - 88:12
**date** [4] - 9:17, 10:10, 14:25, 66:7
**dated** [1] - 84:5
**daytime** [2] - 51:24, 51:25
**December** [7] - 66:11, 66:19, 68:6, 68:14, 70:4, 83:12, 84:6
**decide** [1] - 83:23
**decided** [1] - 63:11
**Defendant** [2] - 1:17, 2:19
**defendant** [1] - 63:2
**Defendants** [2] - 1:10, 2:11
**define** [1] - 64:5
**degree** [4] - 9:21, 10:12, 10:15, 88:12
**Department** [22] - 2:12, 5:12, 5:15, 5:18, 9:5, 11:11, 11:20, 12:12, 13:13, 14:23, 15:7, 15:22, 19:21, 22:2, 22:19, 24:4, 33:6, 36:13, 47:9, 53:16, 53:22, 67:4

**department** [8] - 16:3, 16:5, 20:6, 28:12, 32:9, 32:23, 49:11, 68:4
**DEPARTMENT** [2] - 1:7, 1:18
**deposition** [10] - 3:6, 3:12, 10:18, 18:7, 19:23, 20:11, 73:24, 87:9, 89:11, 89:13
**Deposition** [1] - 1:17
**Deputy** [1] - 2:10
**described** [1] - 41:4
**Detective** [57] - 21:9, 21:14, 21:19, 22:14, 23:2, 24:17, 27:5, 27:13, 28:15, 29:21, 30:5, 30:8, 30:9, 31:8, 31:16, 31:19, 31:25, 32:18, 34:7, 35:15, 35:18, 35:19, 42:3, 42:16, 47:14, 47:21, 47:24, 49:9, 49:11, 49:25, 50:3, 52:8, 52:12, 52:18, 52:23, 53:8, 53:11, 53:20, 54:6, 57:2, 57:9, 57:10, 58:13, 58:18, 61:21, 67:18, 67:24, 70:21, 71:11, 71:13, 71:23, 75:7, 75:12, 76:6, 76:11, 82:18, 84:12
**detective** [16] - 5:19, 5:21, 6:19, 8:2, 13:3, 13:16, 13:19, 13:20, 13:23, 15:21, 22:4, 33:3, 62:22, 69:21, 71:7, 82:24
**detectives** [2] - 36:16, 67:17
**different** [5] - 16:10, 45:13, 55:24, 72:19, 73:19
**differently** [1] - 16:12
**directed** [1] - 10:23
**directive** [1] - 19:7
**directly** [1] - 50:16
**disciplined** [3] - 11:9, 11:24, 12:9
**Discussion** [4] - 14:5, 18:20, 35:6, 59:25
**discussions** [1] - 19:20
**distance** [1] - 30:13
**district** [6] - 77:11, 77:17, 77:25, 78:4, 79:2, 79:5
**DISTRICT** [2] - 1:2,

1:2
**District** [4] - 6:3, 6:5, 6:8, 6:11
**Docket** [1] - 1:11
**DOCUMENT** [1] - 88:7
**Document** [4] - 60:2, 60:6, 88:17, 88:19
**document** [12] - 60:16, 60:21, 65:4, 65:8, 65:13, 65:17, 65:20, 65:25, 66:8, 66:9, 66:12, 72:17
**documents** [3] - 18:6, 18:9, 19:17
**DOES** [1] - 1:9
**DONNA** [1] - 2:9
**door** [2] - 44:9, 52:7
**doorbell** [1] - 52:7
**down** [4] - 4:25, 5:3, 71:17, 80:3
**driver's** [1] - 50:24
**driveway** [40] - 29:7, 30:10, 30:24, 31:4, 31:6, 31:9, 31:14, 31:18, 31:21, 31:24, 33:12, 35:16, 36:9, 36:13, 36:25, 37:4, 37:9, 37:13, 37:15, 37:19, 38:6, 38:9, 38:24, 39:9, 39:10, 39:13, 39:21, 41:14, 41:21, 42:11, 42:15, 43:7, 43:8, 43:14, 43:19, 45:2, 46:2, 48:14, 51:16, 80:6
**drove** [2] - 47:5, 47:22
**drugs** [1] - 8:13
**duly** [2] - 4:3, 89:12
**during** [5] - 25:10, 51:12, 52:3, 70:7, 73:24
**duties** [7] - 6:7, 6:22, 6:24, 7:12, 8:8, 8:25, 9:2
**DWI** [1] - 76:3

**E**

**early** [2] - 51:25, 52:2
**earshot** [2] - 52:20, 76:5
**East** [1] - 1:23
**EASTERN** [1] - 1:2
**education** [1] - 9:20
**effect** [1] - 3:15
**emergency** [1] - 8:11
**employed** [3] - 5:9, 5:11, 11:10
**employment** [2] -

5:14, 13:12
**end** [2] - 55:12, 55:19
**ended** [2] - 30:10, 54:24
**enforcement** [1] - 11:5
**entire** [3] - 6:19, 65:20, 85:24
**Entire** [1] - 88:8
**entry** [1] - 18:23
**error** [1] - 84:17
**ESQ** [2] - 2:7, 2:9, 2:18, 2:23
**establish** [1] - 49:8
**established** [1] - 25:24
**event** [1] - 50:7
**events** [6] - 16:14, 48:17, 59:20, 71:6, 82:19, 83:10
**eventually** [1] - 46:12
**exactly** [2] - 39:6, 39:12
**EXAMINATION** [2] - 4:6, 88:3
**examined** [1] - 4:4
**example** [2] - 56:25, 57:2
**except** [2] - 3:8, 19:15
**excuse** [4] - 25:23, 28:20, 30:14, 42:9
**exhibit** [2] - 70:21, 71:19
**Exhibit** [5] - 60:2, 60:6, 60:11, 60:19, 82:11
**EXHIBITS** [1] - 88:15
**exhibits** [1] - 88:22
**explain** [3] - 50:3, 70:25, 71:5

**F**

**F-A-N-N-O-N** [1] - 35:24
**facility** [1] - 14:11
**facing** [3] - 26:20, 26:23, 39:8
**facts** [5] - 4:19, 72:21, 72:22, 73:5, 77:18
**familiar** [1] - 62:8
**Fannon** [7] - 32:19, 32:23, 33:3, 35:15, 35:19, 35:23, 76:11
**far** [3] - 26:14, 41:5, 52:15
**February** [3] - 1:14,

9:18, 87:10
**feet** [2] - 40:19, 41:9
**fence** [8] - 37:11, 37:12, 37:14, 37:16, 37:18, 41:4, 41:6, 41:9
**few** [2] - 13:23, 40:19
**field** [1] - 75:23
**fifth** [1] - 76:10
**file** [2] - 85:24, 88:8
**filing** [1] - 3:5
**fill** [2] - 10:4, 61:11
**filled** [7] - 56:6, 61:16, 62:15, 66:8, 66:13, 73:4, 75:2
**finish** [2] - 5:2, 24:20, 69:8
**firearm** [1] - 14:20
**firearms** [3] - 13:13, 13:18, 14:17
**first** [8] - 5:13, 20:24, 24:5, 24:6, 43:22, 44:17, 45:15, 47:19
**fled** [5] - 50:17, 72:10, 74:7, 74:13, 76:8
**Floral** [12] - 20:15, 32:10, 36:18, 45:11, 57:7, 59:12, 59:21, 68:17, 71:25, 77:20, 83:10, 84:21
**FOGELGAREN** [44] - 2:7, 4:7, 10:21, 15:3, 15:25, 16:4, 18:15, 18:19, 26:3, 28:23, 32:25, 35:3, 35:8, 35:22, 35:24, 36:21, 43:8, 45:15, 46:23, 47:12, 47:18, 49:14, 49:19, 51:13, 59:16, 60:15, 60:24, 61:3, 61:15, 61:19, 66:10, 67:9, 67:11, 71:20, 73:22, 74:3, 78:9, 82:22, 82:25, 83:16, 83:23, 85:19, 85:23, 88:4
**Fogelgaren** [1] - 4:16
**follow** [1] - 19:6
**follows** [1] - 4:5
**foot** [3] - 30:10, 37:9, 50:17
**FOR** [1] - 88:16
**force** [1] - 3:15
**Form** [2] - 12:13, 12:15
**form** [41] - 3:9, 11:13, 12:16, 15:24, 23:11, 24:11, 25:8, 33:14, 34:17, 35:13,

37:24, 38:18, 41:11, 41:16, 42:24, 43:7, 45:11, 48:19, 50:12, 55:21, 56:15, 57:20, 60:21, 61:4, 61:14, 62:9, 62:12, 64:19, 72:14, 73:2, 73:4, 73:16, 74:10, 74:12, 74:18, 74:20, 75:15, 76:20, 80:16, 84:3, 84:24
**forth** [1] - 89:12
**four** [7] - 44:8, 65:4, 65:13, 72:10, 74:8, 74:14, 74:15
**four-page** [1] - 65:13
**frame** [3] - 20:9, 51:11, 77:24
**Franklin** [1] - 4:12
**FREDERICK** [1] - 2:3
**front** [5] - 37:15, 39:14, 41:22, 60:20, 68:5
**Fuchs** [1] - 1:19
**FUCHS** [2] - 89:7, 89:25
**full** [1] - 4:8
**FURNISHED** [2] - 10:11, 88:11
**FURTHER** [2] - 3:7, 3:11

**G**

**general** [5] - 6:24, 9:2, 10:13, 67:23, 81:6
**given** [6] - 17:16, 19:12, 23:8, 76:7, 87:13, 89:14
**grand** [6] - 77:12, 77:21, 77:22, 78:7, 78:10, 78:19
**ground** [6] - 28:2, 29:3, 29:16, 39:10, 39:18, 45:4
**gun** [8] - 28:8, 28:21, 39:9, 41:6, 80:6, 81:11, 81:13, 82:2

**H**

**halfway** [1] - 71:17
**hand** [1] - 89:21
**handgun** [19] - 37:25, 38:2, 38:4, 38:5, 39:7, 39:17, 39:22, 40:2, 40:5, 40:11, 40:14, 40:17, 40:21, 40:23, 42:21, 44:25, 45:3, 46:5,

46:7
**handing** [1] - 60:11
**handwriting** [3] - 65:16, 65:17, 65:19
**handwritten** [1] - 56:10
**head** [1] - 4:25
**headquarters** [1] - 66:15
**hear** [8] - 27:16, 28:3, 36:2, 39:3, 45:8, 45:22, 52:17, 75:24
**heard** [7] - 27:25, 28:5, 28:25, 29:2, 29:15, 45:16, 75:12
**hearing** [1] - 45:19
**Hempstead** [5] - 1:13, 2:6, 30:13, 30:14, 57:3
**hereby** [2] - 87:7, 89:9
**HEREBY** [1] - 3:2
**herein** [1] - 3:4
**hereinbefore** [1] - 89:11
**hereunto** [1] - 89:21
**highest** [1] - 9:19
**Hillside** [1] - 17:11
**himself** [2] - 15:24, 16:4
**hired** [1] - 9:14
**hitting** [1] - 27:25
**hold** [1] - 5:18
**Holland** [25] - 20:15, 23:6, 23:18, 25:14, 25:16, 26:6, 26:13, 26:18, 27:4, 29:25, 30:12, 30:24, 33:10, 38:22, 43:25, 45:21, 51:2, 51:16, 57:6, 59:11, 59:21, 68:17, 76:2, 77:19, 84:22
**home** [11] - 29:8, 29:10, 29:14, 29:21, 30:11, 37:20, 38:6, 39:8, 39:9, 41:5, 52:9
**hopefully** [1] - 50:16
**hours** [6] - 16:21, 16:24, 72:10, 74:8, 74:14, 74:15
**house** [30] - 12:16, 21:3, 37:10, 39:14, 41:23, 41:25, 43:13, 49:2, 49:18, 49:23, 50:6, 50:10, 50:15, 51:4, 51:19, 51:20, 52:4, 52:19, 53:5, 53:9, 53:13, 53:18, 53:23, 54:4, 54:10, 54:19, 55:6, 55:12, 55:18, 56:19

## I

**I.D** [1] - 88:16
**identification** [2] - 60:5, 60:9
**identify** [4] - 60:21, 61:4, 65:4, 65:8
**immediate** [1] - 52:16
**immediately** [1] - 6:13
**immunity** [1] - 19:11
**IN** [1] - 89:20
**in-house** [1] - 12:16
**INC** [1] - 1:22
**incident** [11] - 34:13, 68:16, 69:2, 69:4, 71:24, 72:9, 73:13, 74:7, 74:13, 79:7, 84:20
**included** [3] - 63:11, 84:10, 84:11
**indicate** [3] - 34:22, 80:7, 83:13
**indicated** [6] - 57:11, 57:12, 74:12, 75:7, 76:14, 78:12
**indicates** [2] - 63:19, 76:10
**indicating** [1] - 18:23
**indicating)** [2] - 65:23, 85:11
**indication** [1] - 34:17
**indirectly** [1] - 50:16
**individual** [3] - 1:7, 1:8, 1:9
**information** [19] - 23:7, 34:4, 34:6, 34:10, 34:12, 49:23, 50:2, 50:18, 52:24, 53:2, 56:22, 61:12, 61:17, 62:11, 72:20, 74:24, 75:4, 75:8, 83:8
**INFORMATION** [1] - 88:11
**informed** [2] - 38:2, 75:7
**initial** [3] - 30:7, 34:24, 77:22
**initialed** [1] - 66:5
**initials** [1] - 75:18
**inside** [2] - 26:9, 26:23
**instructions** [2] - 42:17, 42:20
**integral** [1] - 58:20
**interested** [1] - 89:18
**intern** [1] - 20:2
**Internal** [18] - 18:11, 65:12, 66:14, 66:17,

67:2, 67:5, 67:15, 67:19, 68:5, 69:10, 69:13, 69:19, 69:23, 70:8, 70:10, 70:12, 85:25, 88:8
**interrupt** [1] - 7:21
**interview** [3] - 6:25, 7:15, 64:2
**interviewed** [2] - 59:11, 59:19
**interviews** [3] - 63:21, 64:15, 64:22
**investigate** [1] - 78:19
**investigated** [4] - 50:8, 71:13, 81:18, 81:23
**investigating** [5] - 80:8, 80:11, 80:14, 80:20, 84:20
**investigation** [3] - 54:13, 76:3, 86:2
**involved** [9] - 12:19, 12:23, 34:23, 34:24, 62:13, 63:8, 80:12, 82:18, 83:9
**involvement** [4] - 48:16, 76:23, 77:3, 83:14
**IRA** [1] - 2:7
**Ira** [2] - 4:16, 10:18
**IS** [3] - 3:2, 3:7, 3:11
**IT** [3] - 3:2, 3:7, 3:11
**itself** [2] - 16:9, 45:4

## J

**JAMES** [1] - 1:7
**James** [9] - 2:13, 79:14, 79:17, 79:22, 79:25, 81:19, 82:4, 82:6, 82:13
**JEFFREY** [2] - 2:18, 2:23
**Jennifer** [1] - 1:19
**JENNIFER** [2] - 89:7, 89:25
**Jericho** [27] - 20:14, 23:6, 23:17, 25:13, 25:16, 26:6, 26:13, 26:17, 27:3, 29:6, 29:25, 30:9, 30:14, 33:9, 38:22, 43:17, 43:24, 45:21, 51:2, 57:6, 57:18, 59:20, 68:16, 71:24, 75:25, 77:19, 84:21
**job** [1] - 13:6
**JOHN** [1] - 1:9
**join** [11] - 23:12, 24:13, 33:17, 43:2,

43:9, 57:22, 74:11, 75:16, 78:24, 79:4, 85:2
**Judge** [3] - 18:24, 18:25, 35:4
**judge** [1] - 19:14
**judge's** [1] - 19:6
**jury** [6] - 77:12, 77:21, 77:22, 78:7, 78:10, 78:19

## K

**keep** [4] - 4:24, 17:25, 18:4, 56:12
**keeping** [1] - 85:21
**kind** [1] - 68:25
**knocked** [1] - 52:7
**knowledge** [2] - 82:17, 83:8

## L

**labeled** [1] - 62:9
**last** [2] - 35:9, 65:21
**late** [1] - 52:2
**LAURENCE** [2] - 2:18, 2:23
**LAW** [2] - 2:3, 2:18
**law** [1] - 11:4
**lawsuit** [1] - 4:20
**lawyer** [1] - 69:16
**lead** [1] - 50:16
**learn** [12] - 13:6, 37:6, 37:21, 38:14, 48:16, 50:9, 57:16, 57:24, 73:12, 74:6, 76:17, 85:4
**learned** [6] - 20:24, 37:8, 37:17, 52:24, 53:2, 72:9
**learning** [1] - 21:7
**least** [1] - 52:8
**leave** [8] - 10:3, 10:8, 25:5, 25:11, 46:12, 46:25, 47:3, 56:18
**leaving** [1] - 56:25
**left** [11] - 26:11, 39:9, 46:15, 46:19, 48:3, 48:9, 48:15, 48:22, 51:19, 54:9, 57:5
**less** [1] - 7:25
**letter** [3] - 18:10, 18:12, 65:11
**level** [2] - 8:12, 9:19
**liberal** [1] - 10:15
**license** [1] - 50:24
**line** [2] - 72:8, 76:10
**listed** [4] - 62:22, 63:2, 63:6, 63:16
**located** [2] - 17:9,

30:24
**location** [33] - 20:25, 22:21, 22:24, 23:6, 23:17, 23:25, 27:7, 28:9, 28:13, 30:16, 30:21, 33:9, 38:12, 38:15, 42:7, 42:18, 43:5, 45:6, 45:9, 45:23, 47:10, 47:19, 47:25, 48:4, 48:15, 48:17, 48:22, 51:8, 53:23, 57:5, 57:18, 71:24, 72:4
**logistics** [1] - 39:11
**look** [10] - 24:25, 40:23, 60:13, 60:18, 60:20, 61:18, 76:6, 79:9, 79:11, 83:16
**loud** [1] - 76:6

## M

**magistrate** [1] - 19:14
**Main** [1] - 1:23
**March** [1] - 89:22
**marked** [8] - 21:25, 60:4, 60:8, 60:11, 60:19, 61:23, 65:3, 65:5
**marriage** [1] - 89:17
**matter** [7] - 19:12, 66:18, 71:4, 79:19, 80:2, 80:5, 89:19
**mean** [5] - 15:24, 55:23, 70:24, 74:14, 85:6
**means** [1] - 56:18
**meant** [1] - 71:5
**measurements** [1] - 40:19
**meet** [1] - 79:13
**member** [2] - 16:5, 69:22
**members** [3] - 24:3, 68:4, 77:16
**memo** [1] - 17:25
**memory** [1] - 14:9
**mention** [4] - 28:8, 28:18, 28:25, 39:3
**mentioned** [2] - 19:17, 46:3
**met** [2] - 79:16, 79:21
**metal** [3] - 27:25, 29:2, 29:15
**Michael** [1] - 76:11
**middle** [2] - 39:15, 62:3
**might** [2] - 81:2, 81:8
**Mike** [1] - 32:18

**military** [1] - 11:7
**Mineola** [2] - 2:16, 4:12
**minute** [1] - 86:8
**model** [1] - 21:24
**moment** [4] - 25:24, 49:17, 60:13, 76:4
**month** [1] - 20:10
**months** [1] - 6:6
**morning** [3] - 4:14, 4:15, 52:2
**most** [1] - 65:23
**MR** [104] - 4:7, 7:20, 10:3, 10:8, 10:14, 10:21, 10:22, 10:25, 12:20, 14:3, 14:8, 15:3, 15:25, 16:4, 18:15, 18:19, 18:21, 20:8, 23:12, 24:13, 25:23, 26:3, 28:20, 28:23, 32:22, 32:25, 33:17, 34:16, 35:3, 35:8, 35:11, 35:20, 35:22, 35:23, 35:24, 36:15, 36:21, 38:17, 40:7, 41:10, 42:9, 43:2, 43:8, 43:9, 44:2, 45:15, 46:23, 47:12, 47:18, 48:18, 49:7, 49:14, 49:16, 49:19, 49:21, 51:9, 51:13, 57:14, 57:22, 59:13, 59:16, 60:12, 60:15, 60:17, 60:22, 60:24, 61:3, 61:15, 61:19, 64:18, 66:10, 67:9, 67:11, 68:19, 71:19, 71:20, 72:13, 72:25, 73:14, 73:22, 74:2, 74:3, 74:11, 74:17, 75:16, 76:19, 78:9, 78:24, 79:4, 81:14, 82:20, 82:22, 82:25, 83:5, 83:16, 83:17, 83:23, 84:2, 84:14, 85:2, 85:19, 85:23, 86:7, 88:4
**MS** [55] - 10:6, 10:17, 10:24, 11:3, 11:12, 12:2, 12:5, 15:11, 15:23, 16:2, 17:20, 18:17, 20:2, 21:11, 23:10, 23:14, 24:10, 24:20, 25:7, 33:13, 33:19, 35:5, 37:23, 41:15, 42:23, 43:6, 45:10, 47:17, 50:11, 55:20, 56:14, 57:13, 57:19, 58:16, 59:14, 59:23, 60:25, 61:13, 62:6, 63:13, 67:6, 69:8, 70:16, 72:5,

74:9, 74:19, 75:14, 78:6, 78:22, 79:3, 80:15, 84:23, 85:16, 85:21, 86:5

**N**

name [6] - 4:8, 4:16, 35:21, 82:9, 84:16, 84:17
NAPOLITANO [56] - 2:9, 10:6, 10:17, 10:24, 11:3, 11:12, 12:2, 12:5, 15:11, 15:23, 16:2, 17:20, 18:17, 20:2, 21:11, 23:10, 23:14, 24:10, 24:20, 25:7, 33:13, 33:19, 35:5, 37:23, 41:15, 42:23, 43:6, 45:10, 47:17, 50:11, 55:20, 56:14, 57:13, 57:19, 58:16, 59:14, 59:23, 60:25, 61:13, 62:6, 63:13, 67:6, 69:8, 70:16, 72:5, 74:9, 74:19, 75:14, 78:6, 78:22, 79:3, 80:15, 84:23, 85:16, 85:21, 86:5
narcotics [1] - 8:13
NASSAU [4] - 1:6, 1:17, 89:5
Nassau [42] - 2:11, 2:12, 2:14, 5:12, 5:14, 5:18, 9:5, 9:11, 9:12, 9:23, 11:10, 11:19, 12:11, 13:12, 14:22, 15:7, 15:22, 19:21, 21:25, 22:19, 24:4, 27:6, 32:12, 33:5, 36:12, 36:18, 45:12, 47:8, 49:2, 49:19, 49:24, 53:16, 53:21, 56:2, 60:3, 60:7, 61:24, 65:5, 67:3, 88:13, 88:17, 88:19
nature [1] - 63:19
near [4] - 29:7, 37:12, 43:25, 49:3
need [1] - 5:7
never [1] - 77:9
nevertheless [1] - 19:12
NEW [3] - 1:2, 87:4, 89:3
New [10] - 1:13, 1:20, 1:23, 2:6, 2:16, 2:22, 4:13, 87:22, 89:8
next [1] - 72:8
NICHOLAS [5] - 1:18, 87:7, 87:17,

88:4, 89:10
Nicholas [1] - 4:10
nighttime [1] - 51:24
nine [1] - 5:22
non [1] - 14:11
non-police [1] - 14:11
normal [1] - 63:4
normally [1] - 55:23
Notary [4] - 1:20, 4:4, 87:22, 89:7
note [2] - 71:2, 73:24
noted [2] - 42:22, 86:11
notes [7] - 45:5, 46:18, 54:3, 54:7, 56:11, 58:7
nothing [1] - 48:6
Notice [1] - 1:19
notified [4] - 47:25, 66:16, 66:23, 66:25
notify [1] - 47:8, 67:16
noting [1] - 74:2
number [4] - 22:5, 22:7, 40:24, 71:16

**O**

oath [2] - 3:14, 87:9
object [9] - 23:15, 35:11, 45:11, 72:14, 76:20, 78:23, 81:15, 83:18, 84:2
objected [1] - 12:5
objection [47] - 11:12, 12:2, 15:23, 23:10, 23:13, 24:10, 25:7, 33:13, 34:16, 35:12, 37:23, 38:17, 41:10, 41:15, 42:23, 43:6, 43:10, 48:18, 50:11, 55:20, 56:14, 57:13, 57:14, 57:19, 58:16, 59:13, 59:14, 59:23, 61:13, 63:13, 64:18, 67:6, 68:19, 68:21, 72:5, 72:25, 73:15, 74:9, 74:17, 74:19, 75:14, 79:3, 80:15, 82:20, 83:5, 84:15, 84:23
objections [4] - 3:8, 73:23, 73:25, 74:5
observe [3] - 23:21, 26:18, 40:20
observed [6] - 25:21, 26:20, 26:22, 44:13, 44:18, 44:25
observing [1] - 31:19
obtain [2] - 72:22,

74:23
obvious [1] - 80:11
obviously [5] - 30:18, 52:15, 55:24, 57:23, 85:23
occasion [2] - 70:13, 70:14
Occhino [15] - 4:10, 4:14, 57:2, 60:2, 60:6, 60:11, 60:19, 60:23, 60:24, 65:3, 70:21, 71:20, 82:11
OCCHINO [6] - 1:18, 87:7, 87:17, 88:4, 88:16, 89:10
occurred [14] - 33:8, 37:7, 52:18, 53:9, 57:17, 59:11, 59:20, 70:3, 72:10, 74:7, 74:14, 74:15, 77:18, 78:20
occurring [1] - 48:5
October [20] - 5:16, 7:4, 9:14, 14:21, 16:14, 20:13, 54:18, 59:21, 68:17, 70:3, 76:2, 77:20, 78:20, 82:19, 83:7, 83:10, 84:4, 84:7, 84:19, 84:21
OF [8] - 1:2, 1:6, 2:3, 2:18, 87:4, 87:5, 89:3, 89:5
offenders [2] - 7:2, 7:15
office [4] - 20:3, 77:17, 78:2, 78:4
Officer [49] - 2:13, 2:19, 23:23, 24:5, 24:9, 24:23, 26:21, 27:11, 27:14, 27:24, 28:11, 28:18, 28:25, 30:5, 30:8, 30:20, 34:11, 34:14, 34:22, 38:11, 38:14, 38:20, 38:25, 39:3, 39:4, 48:8, 48:11, 48:16, 59:3, 59:6, 59:10, 59:19, 64:2, 64:8, 64:11, 68:8, 68:11, 68:15, 68:24, 69:6, 75:7, 75:13, 75:24, 81:2, 81:17, 82:5, 83:9, 83:14, 84:8
OFFICER [2] - 1:7, 1:8
officer [10] - 3:13, 8:7, 11:18, 12:25, 37:22, 39:16, 42:6, 42:12, 44:21, 58:11
officer/detective [1] - 12:11

officers [16] - 32:5, 32:11, 32:12, 32:14, 32:17, 34:15, 34:24, 36:9, 36:12, 36:13, 44:24, 45:18, 46:9, 53:12, 80:18, 80:21
OFFICES [2] - 2:3, 2:18
official [3] - 1:7, 1:8, 1:9
once [4] - 12:14, 14:19, 26:9, 70:19
One [1] - 2:15
one [20] - 6:2, 9:6, 10:19, 25:23, 32:23, 34:14, 34:18, 35:22, 44:14, 49:17, 52:8, 69:22, 70:13, 71:8, 72:17, 73:17, 73:20, 80:24, 86:7
oOo [3] - 3:19
open [1] - 85:22
operations [1] - 6:10
Operations [4] - 7:19, 8:3, 8:9, 8:16
options [1] - 19:14
order [1] - 18:7
outcome [1] - 89:18
outside [3] - 24:8, 25:18, 25:22
overtime [1] - 55:9
own [2] - 19:4, 44:13

**P**

p.m [4] - 16:24, 55:4, 55:6, 86:11
PAGE [2] - 88:3, 88:8, 88:12
page [18] - 60:20, 61:22, 61:23, 62:3, 65:13, 65:21, 66:3, 66:4, 66:5, 66:6, 70:20, 71:15, 75:6, 76:22, 79:8, 79:10, 79:11
pages [1] - 65:4
paperwork [4] - 56:7, 58:3, 58:6, 58:9
paragraph [8] - 71:15, 75:6, 75:18, 76:22, 77:2, 77:10, 79:10, 79:11
Park [12] - 20:15, 32:10, 36:18, 45:12, 57:7, 59:12, 59:21, 68:17, 71:25, 77:20, 83:10, 84:22
parked [3] - 23:22, 26:15, 26:20
part [5] - 27:16,

27:21, 58:20, 62:8, 65:23
particular [9] - 17:17, 29:14, 41:24, 49:23, 61:8, 61:17, 71:4, 71:9, 78:10
parties [2] - 3:4, 89:16
partner [2] - 21:15, 21:17
parts [1] - 36:3
passengers [1] - 64:22
patrol [3] - 9:2, 12:18, 12:22
pedigree [1] - 50:23
people [3] - 7:16, 17:24, 63:8
performance [1] - 11:18
perhaps [3] - 7:25, 52:3, 55:25
peril [2] - 19:4, 19:8
permissible [3] - 73:20, 73:23, 74:5
person [6] - 19:24, 47:15, 52:9, 52:13, 57:16, 57:24
personal [1] - 72:22
personally [1] - 22:23
personnel [3] - 27:7, 28:12, 36:18
persons [3] - 6:25, 52:13, 63:8
perusing [1] - 60:16
phone [1] - 56:4
photos [1] - 80:6
physically [1] - 26:12
place [3] - 26:2, 30:5, 52:22
placed [1] - 72:20
plainclothes [1] - 9:3
Plaintiff [2] - 1:4, 2:4
plaintiff [1] - 4:17
Plaintiff's [1] - 60:19
played [1] - 58:14
PO [1] - 63:21, 76:7, 80:23, 81:20, 81:21, 81:22, 82:8, 82:9, 82:21, 82:25
point [9] - 30:20, 33:7, 38:23, 44:11, 48:3, 51:20, 66:18, 78:13, 83:25
pointed [4] - 29:13, 29:17, 29:20, 30:22
Police [33] - 2:12, 2:19, 5:12, 5:14, 5:18, 9:5, 9:13, 11:11, 11:19, 12:12, 13:12,

14:23, 15:7, 15:22, 19:21, 22:2, 22:19, 24:4, 33:5, 34:11, 36:13, 45:12, 47:8, 53:16, 53:22, 59:10, 64:2, 67:4, 81:2, 81:17, 83:9, 83:14
**police** [42] - 8:7, 9:7, 9:9, 9:15, 11:18, 12:11, 12:25, 13:8, 14:6, 14:11, 16:3, 16:5, 20:5, 22:9, 22:11, 22:15, 23:24, 27:7, 28:12, 32:4, 32:10, 32:12, 32:14, 32:17, 36:12, 36:17, 37:22, 39:16, 42:6, 42:12, 44:20, 44:23, 45:18, 46:9, 49:11, 51:7, 53:12, 66:15, 68:4, 80:18, 80:21
**POLICE** [4] - 1:6, 1:7, 1:8, 1:18
**portion** [1] - 62:16
**position** [3] - 5:17, 8:5, 19:13
**possible** [14] - 11:21, 11:24, 41:12, 46:6, 46:10, 53:19, 53:25, 54:15, 57:15, 64:13, 67:21, 80:9, 82:7, 83:11
**possibly** [6] - 28:5, 42:8, 56:10, 62:20, 71:8, 75:17
**potentially** [1] - 80:19
**practice** [2] - 15:20, 55:17
**Precinct** [6] - 8:21, 9:6, 12:19, 12:22, 21:2, 33:25
**precise** [1] - 40:18
**prefer** [1] - 10:19
**premises** [2] - 41:19, 41:20
**prepare** [2] - 18:7, 20:11
**prepared** [3] - 70:7, 70:10, 83:19
**present** [4] - 5:24, 36:9, 53:12, 59:18
**presentation** [2] - 77:21, 77:22
**previous** [1] - 38:15
**previously** [1] - 33:9
**private** [5] - 29:8, 29:9, 29:14, 29:21, 30:10
**problem** [3] - 81:10, 81:13, 81:25

**procedure** [4] - 14:22, 15:8, 15:10, 15:15
**procedures** [1] - 15:18
**proceed** [1] - 19:3
**proceedings** [1] - 77:13
**process** [1] - 58:21
**processing** [2] - 59:2, 77:4
**prosecution** [1] - 85:5
**provided** [6] - 18:16, 34:3, 34:7, 34:9, 34:12, 49:22
**proximity** [1] - 43:13, 44:5
**Public** [4] - 1:20, 4:4, 87:22, 89:8
**public** [2] - 24:14
**pure** [1] - 81:14
**pursuant** [1] - 1:19
**put** [4] - 10:10, 19:7, 57:4, 73:5

**Q**

**questioned** [1] - 70:2
**questioning** [2] - 70:8, 70:10
**questions** [11] - 4:19, 5:2, 10:20, 64:8, 64:9, 72:14, 80:4, 82:8, 85:20, 86:6, 86:9

**R**

**radio** [8] - 22:9, 22:11, 22:15, 45:8, 45:16, 45:19, 45:22, 53:17
**radios** [2] - 45:13, 45:18
**ran** [2] - 34:2, 37:8
**rang** [1] - 52:7
**rank** [1] - 13:22
**read** [6] - 10:9, 35:8, 35:10, 44:3, 44:4, 87:8
**REALTIME** [1] - 1:22
**rear** [3] - 37:10, 37:19, 39:13
**reason** [3] - 18:23, 63:3, 79:21
**reasoning** [1] - 74:4
**receive** [2] - 12:24, 13:10
**received** [7] - 11:17, 12:13, 13:2, 13:4,

13:7, 13:15, 88:12
**Recess** [1] - 35:7
**recollection** [5] - 15:14, 16:13, 27:19, 36:5, 43:16, 43:23, 59:5, 70:9, 70:18, 72:16, 72:23, 73:17, 78:5, 81:7, 81:9
**recollections** [1] - 73:6
**record** [12] - 4:9, 10:9, 14:4, 14:5, 18:18, 18:20, 18:22, 35:6, 59:25, 87:11, 87:12, 89:13
**Record** [2] - 35:10, 44:4
**recorded** [1] - 62:12
**records** [1] - 18:4
**recovered** [8] - 13:14, 14:17, 28:19, 28:22, 37:22, 38:3, 50:25, 76:15
**recovery** [2] - 81:10, 81:13
**refer** [2] - 66:9, 85:10
**referring** [4] - 38:7, 56:21, 58:6, 70:20
**reframe** [1] - 21:16
**refreshes** [1] - 73:17
**regard** [24] - 13:11, 13:13, 14:23, 39:21, 44:24, 45:22, 57:17, 58:4, 58:14, 58:23, 59:19, 66:18, 67:4, 67:17, 69:5, 71:4, 73:5, 73:15, 76:2, 77:17, 79:19, 80:2, 85:25
**regarding** [10] - 13:8, 13:17, 14:20, 34:12, 65:12, 67:22, 79:7, 80:4, 81:10, 81:13
**related** [1] - 89:16
**relevance** [2] - 83:22, 83:24
**reluctantly** [1] - 19:8
**remain** [1] - 29:24, 53:4
**remained** [1] - 26:8
**remaining** [2] - 63:22, 64:15
**remember** [11] - 10:2, 14:2, 23:7, 32:18, 50:14, 53:2, 78:2, 79:6, 82:7, 82:10, 82:14
**rep** [2] - 67:15, 69:14, 69:17
**repeat** [3] - 12:7, 15:4, 83:3

**rephrase** [3] - 4:23, 28:23, 59:16
**report** [9] - 17:6, 61:5, 61:7, 61:9, 61:12, 61:17, 61:23, 63:10, 84:5
**reported** [2] - 17:4, 17:7
**reporter** [2] - 4:24, 21:12
**REPORTING** [1] - 1:22
**represent** [1] - 4:17
**REQUEST** [1] - 88:7
**reserved** [1] - 3:10
**respect** [2] - 44:16, 54:13
**respective** [1] - 3:4
**respond** [7] - 6:24, 7:15, 20:18, 22:22, 22:24, 23:8, 51:8
**Responded** [1] - 63:20
**responded** [2] - 8:11, 21:9
**responding** [2] - 20:14, 50:6, 67:8
**responsible** [1] - 70:22
**result** [3] - 11:24, 12:10, 85:13
**retained** [1] - 88:22
**returned** [2] - 54:18, 55:18
**review** [4] - 18:9, 19:16, 72:16, 72:23
**reviewed** [1] - 18:6
**ring** [1] - 76:14
**role** [2] - 58:14, 84:20
**room** [1] - 19:25
**Roosevelt** [10] - 49:3, 49:20, 49:24, 51:5, 51:21, 52:5, 53:18, 53:24, 54:4, 54:10
**RQ** [1] - 85:23
**ruling** [2] - 18:25, 19:2

**S**

**saw** [8] - 38:4, 39:18, 43:22, 45:3, 46:5, 46:7, 69:19, 69:23
**scene** [18] - 12:25, 14:24, 15:21, 16:10, 16:11, 20:14, 30:19, 48:5, 48:9, 48:12, 50:17, 50:25, 63:20, 64:3, 64:16, 64:23,

74:16
**Scene** [2] - 33:6, 76:12
**scenes** [7] - 6:25, 7:15, 13:14, 14:14, 14:18, 15:8, 15:16
**school** [3] - 13:16, 13:19, 13:20
**sealing** [1] - 3:5
**second** [2] - 14:4, 18:18, 60:20, 61:22
**section** [2] - 62:12, 63:7, 63:12, 63:17
**secure** [1] - 15:21
**secured** [1] - 39:16
**securing** [7] - 12:25, 13:13, 14:14, 14:17, 14:24, 15:8, 15:15
**sedan** [3] - 23:22, 24:9, 25:2, 25:4, 26:20, 26:23, 26:24, 44:8
**see** [27] - 24:3, 24:8, 24:16, 24:22, 24:25, 25:3, 37:12, 38:5, 38:20, 39:6, 40:24, 41:13, 43:4, 43:12, 43:18, 44:23, 48:11, 61:25, 63:23, 70:12, 71:17, 71:25, 75:19, 84:16, 84:17, 86:4
**seeing** [6] - 38:25, 42:21, 43:15, 48:13, 84:8
**send** [1] - 13:23
**sent** [2] - 71:6, 71:12
**separate** [1] - 16:2
**sergeant** [1] - 69:21
**serial** [1] - 40:24
**serving** [1] - 1:19
**set** [2] - 89:12, 89:21
**SFST** [2] - 75:19, 76:7
**shall** [1] - 3:9
**sheet** [2] - 56:12, 56:17
**shift** [1] - 16:18
**short** [1] - 30:13
**shortly** [1] - 9:15
**show** [2] - 60:10, 65:2
**showing** [2] - 19:3, 80:5
**shy** [1] - 7:10
**side** [1] - 30:11
**sidewalk** [1] - 41:23
**sign** [2] - 56:20, 65:25
**Signed** [1] - 87:19
**signed** [4] - 3:13, 3:15, 66:3, 66:4

**site** [9] - 28:19, 28:21, 28:22, 37:7, 40:17, 40:21, 45:20, 46:9, 75:25
**sitting** [1] - 80:3
**situation** [2] - 16:11, 20:24
**situations** [1] - 8:12
**six** [2] - 6:6, 6:17
**slightly** [2] - 16:23, 55:3
**sobriety** [1] - 75:23
**someone** [1] - 77:25
**sometime** [3] - 8:23, 25:10
**sometimes** [1] - 61:5
**somewhere** [3] - 21:2, 39:14, 49:3
**sorry** [7] - 8:14, 12:4, 12:20, 60:22, 65:7, 70:15, 82:25
**sort** [3] - 13:7, 51:10, 81:25
**sound** [3] - 27:25, 29:2, 29:15
**Spatz'** [1] - 19:2
**speaking** [6] - 5:4, 42:10, 64:4, 73:22, 74:5, 83:20
**Special** [4] - 7:19, 8:3, 8:9, 8:15
**specific** [6] - 13:17, 13:20, 15:17, 45:14, 46:11, 48:6
**specifically** [11] - 13:17, 31:11, 34:5, 46:22, 47:11, 58:8, 64:6, 80:10, 81:4, 81:24, 82:10
**specifics** [10] - 11:22, 14:20, 28:6, 29:11, 32:21, 39:11, 39:24, 50:14, 52:21, 67:22
**speculate** [5] - 10:5, 10:6, 85:15, 85:16, 85:17
**speculation** [2] - 81:15, 83:6
**spell** [2] - 21:11, 35:20
**spoken** [1] - 67:14
**squad** [5] - 5:24, 55:25, 71:7, 71:12
**Squad** [16] - 6:3, 6:5, 6:8, 6:12, 6:14, 6:16, 6:23, 7:3, 7:6, 7:8, 7:13, 7:14, 7:18, 17:2, 17:8, 71:24
**ss** [2] - 87:4, 89:4
**stamp** [1] - 65:5

**stamped** [5] - 60:3, 60:7, 61:24, 88:17, 88:19
**stand** [2] - 31:10, 75:21
**standardized** [1] - 75:23
**stands** [1] - 75:22
**start** [3] - 5:3, 5:13, 60:14
**started** [1] - 9:15
**starting** [1] - 79:10
**starts** [1] - 71:16
**state** [3] - 4:8, 28:11, 70:21
**STATE** [2] - 87:4, 89:3
**State** [3] - 1:20, 87:22, 89:8
**statement** [14] - 70:6, 72:3, 72:18, 72:21, 75:3, 76:7, 76:9, 79:9, 82:12, 82:17, 83:12, 84:10, 84:12
**STATES** [1] - 1:2
**stating** [1] - 27:24
**station** [6] - 21:3, 54:19, 55:6, 55:11, 55:18, 56:18
**still** [3] - 19:10, 48:8, 52:3
**STIPULATED** [3] - 3:2, 3:7, 3:11
**stood** [1] - 31:5
**stop** [5] - 33:24, 34:15, 34:25, 49:16, 75:8
**street** [5] - 8:12, 24:15, 24:23, 30:11, 30:23
**Street** [5] - 1:13, 1:23, 2:5, 2:15, 2:21
**street-level** [1] - 8:12
**strike** [1] - 61:15
**striking** [3] - 28:2, 29:3, 29:16
**studies** [1] - 10:13
**subject** [10] - 33:25, 37:8, 37:17, 50:17, 50:20, 50:25, 61:8, 63:22, 64:22, 76:8
**subject's** [1] - 44:9
**subpoenaed** [1] - 77:11
**subscribed** [1] - 87:19
**subsequent** [1] - 78:19
**substance** [1] - 36:6
**Suite** [3] - 1:23, 2:5,

2:21
**supposed** [2] - 63:4, 63:6
**suspect** [3] - 72:9, 74:7, 74:13
**SWAT** [1] - 8:10
**sworn** [4] - 3:13, 3:16, 4:3, 89:12

**T**

**team** [1] - 8:10
**telephone** [1] - 53:17
**term** [2] - 58:6, 70:23
**test** [1] - 75:23
**testified** [2] - 4:5, 83:18
**testimonial** [3] - 63:7, 63:12, 63:16
**testimonials** [2] - 62:4, 62:9
**testimony** [7] - 10:10, 19:22, 63:20, 77:12, 87:9, 87:12, 89:14
**THE** [11] - 7:24, 10:16, 12:4, 12:7, 12:21, 14:10, 21:13, 33:18, 82:21, 82:23, 83:3
**thereafter** [1] - 9:16
**thinking** [1] - 70:15
**three** [3] - 7:10, 7:24, 8:17
**TO** [2] - 10:11, 88:11
**today** [5] - 18:7, 18:13, 18:24, 62:19
**Tomlinson** [1] - 35:4
**Tomlinson's** [1] - 18:25
**took** [5] - 30:5, 51:18, 52:22, 56:10, 58:7
**totally** [2] - 72:19, 73:19
**tour** [7] - 16:20, 52:3, 54:24, 55:12, 56:7, 70:23, 71:10
**tours** [2] - 16:23, 55:3
**towards** [1] - 37:9
**training** [10] - 12:24, 13:3, 13:5, 13:8, 13:10, 13:16, 13:17, 13:24, 14:13, 14:16
**transcript** [2] - 87:8, 87:10
**transmissions** [4] - 45:9, 45:17, 45:19, 45:22
**trial** [1] - 3:10

**trouble** [5] - 80:19, 80:22, 81:2, 81:5, 81:8
**true** [3] - 87:11, 87:13, 89:13
**try** [3] - 4:23, 11:2, 35:4
**trying** [1] - 9:25
**Turnpike** [28] - 20:14, 23:6, 23:17, 25:14, 25:16, 26:6, 26:13, 26:17, 27:3, 29:6, 29:25, 30:9, 30:14, 30:15, 33:10, 38:22, 43:17, 43:24, 45:21, 51:2, 57:6, 59:12, 59:20, 68:16, 71:25, 75:25, 77:19, 84:21
**Turnpike/Holland** [1] - 57:18
**two** [3] - 20:10, 47:22, 69:24
**type** [7] - 13:24, 21:23, 37:11, 39:25, 81:2, 81:5, 81:7

**U**

**under** [1] - 87:9
**undercover** [1] - 6:10
**uniform** [7] - 32:4, 32:14, 32:17, 33:25, 34:23, 36:9, 36:12
**uniforms** [1] - 36:16
**union** [4] - 67:15, 67:16, 69:14, 69:17
**Uniondale** [10] - 49:3, 49:20, 49:24, 51:5, 51:21, 52:5, 53:18, 53:23, 54:4, 54:10
**Unit** [17] - 33:6, 65:12, 66:14, 66:17, 67:2, 67:5, 68:6, 69:10, 69:13, 69:19, 69:23, 70:8, 70:11, 70:13, 76:12, 85:25, 88:9
**UNITED** [1] - 1:2
**unless** [2] - 83:21, 84:16
**unmarked** [1] - 22:3
**unusual** [1] - 19:13
**up** [9] - 19:4, 30:10, 38:23, 46:3, 48:3, 51:19, 68:14, 71:12, 82:9
**usual** [1] - 55:16

**V** 95

**Vara** [38] - 2:13, 23:23, 24:5, 24:9, 24:19, 24:23, 26:21, 27:11, 27:14, 27:24, 28:11, 28:18, 28:25, 30:5, 30:8, 30:20, 34:11, 34:14, 34:22, 39:3, 48:8, 59:4, 59:10, 59:19, 63:21, 64:2, 64:8, 64:12, 68:8, 68:15, 68:24, 75:7, 75:13, 75:24, 76:8, 80:23, 81:2, 81:20
**VARA** [1] - 1:7
**Vara's** [1] - 82:9
**varies** [1] - 71:2
**vehicle** [10] - 20:20, 22:2, 26:11, 26:12, 26:15, 38:22, 44:5, 44:7, 44:10, 47:15
**vehicles** [2] - 23:25, 38:9
**verbal** [1] - 4:24
**vicinity** [7] - 25:13, 25:15, 29:8, 29:25, 46:2, 49:4, 52:16
**victims** [1] - 7:2
**view** [1] - 73:20

**W**

**wait** [2] - 5:2, 23:14
**waived** [1] - 3:6
**walking** [1] - 30:13
**weeks** [2] - 13:23, 20:10
**WEINGARD** [63] - 2:18, 2:23, 7:20, 10:3, 10:8, 10:14, 10:22, 10:25, 12:20, 14:3, 14:8, 18:21, 20:8, 23:12, 24:13, 25:23, 28:20, 32:22, 33:17, 34:16, 35:11, 35:20, 35:23, 36:15, 38:17, 40:7, 41:10, 42:9, 43:2, 43:9, 44:2, 48:18, 49:7, 49:16, 49:21, 51:9, 57:14, 57:22, 59:13, 60:12, 60:17, 60:22, 64:18, 68:19, 71:19, 72:13, 72:25, 73:14, 74:2, 74:11, 74:17, 75:16, 76:19, 78:24, 79:4, 81:14, 82:20, 83:5, 83:17, 84:2, 84:14, 85:2, 86:7

**Weingard** [1] - 86:5
**west** [3] - 26:21, 26:23, 43:24
**West** [2] - 2:15, 2:21
**WHEREOF** [1] - 89:20
**whole** [1] - 79:11
**wiretaps** [1] - 6:9
**withdraw** [1] - 78:10
**witness** [5] - 4:3, 62:5, 83:18, 89:11, 89:14
**WITNESS** [13] - 7:24, 10:16, 12:4, 12:7, 12:21, 14:10, 21:13, 33:18, 82:21, 82:23, 83:3, 88:3, 89:20
**witnesses** [2] - 7:2, 64:15
**witnesses/ passengers** [1] - 63:22
**word** [1] - 62:4
**words** [1] - 65:22
**written** [1] - 82:12
**wrote** [4] - 18:11, 65:11, 70:6, 82:16

**Y**

**years** [7] - 5:22, 6:18, 7:11, 7:22, 7:25, 8:18, 55:4
**YORK** [3] - 1:2, 87:4, 89:3
**York** [10] - 1:13, 1:20, 1:23, 2:6, 2:16, 2:22, 4:13, 87:22, 89:9
**yourself** [1] - 31:24

97

1

2                          C E R T I F I C A T E

3      STATE OF NEW YORK        )

4                              ) ss.:

5      COUNTY OF NASSAU          )

6

7              I, JENNIFER FUCHS, a Notary

8      Public within and for the State of New

9      York, do hereby certify:

10             That NICHOLAS OCCHINO, the

11     witness whose deposition is hereinbefore

12     set forth, was duly sworn by me and that

13     such deposition is a true record of the

14     testimony given by such witness.

15             I further certify that I am not

16     related to any of the parties to this

17     action by blood or marriage; and that I

18     am in no way interested in the outcome

19     of this matter.

20             IN WITNESS WHEREOF, I have

21     hereunto set my hand this 7th day of

22     March, 2010.

23                         *Jennifer Fuchs*

24     --------------------------

25                  JENNIFER FUCHS